## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

TREY FRANZOY, an individual; PATRIOT CONTEST & GAMES, LLC, a Wyoming limited liability company; and CHARLIE CHEDDA'S, LLC, a Wyoming limited liability company,

      Plaintiffs,

v.

CHRISTOPHER SCHRODER, in his official capacity as Director of the Colorado Division of Gaming, Colorado Department of Revenue, and in his individual capacity; MICHAEL PHIBBS, in his individual capacity; DANIEL J. HARTMAN, in his individual capacity; KIRSTEN GREGG, in her individual capacity; CITY OF GRAND JUNCTION, COLORADO; CITY OF PUEBLO, COLORADO; and CITY OF COLORADO SPRINGS, COLORADO,

      Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEY FEES (42 U.S.C. §§ 1983, 1988)

---

## INTRODUCTION

1.    Plaintiffs bring this civil-rights action under 42 U.S.C. § 1983 for declaratory and injunctive relief, damages, and attorney fees.

2.    Colorado's Division of Gaming launched a pre-adjudicatory shutdown program that targeted Plaintiffs' skill-based contests without publishing or using objective standards for distinguishing lawful contests from prohibited gambling devices. Although the Division later conceded it lacked in-house expertise and administrable criteria, it coordinated with three municipalities to impose cease-and-desist letters, licensing blocks, and seizures on Plaintiffs'

1

operations. One seizure resulted in a twenty-three-month retention of operating capital despite a court order to return the property. Simultaneously, Plaintiffs possessed a settlement agreement with a district attorney and a forensic analysis by an independent gaming laboratory, both concluding that Plaintiffs' configuration was skill-based, not a form of illegal gambling, and lawful. Yet the Division and municipalities pressed forward without neutral standards or prompt post-deprivation procedures, breaching fundamental constitutional protections.

3.       The Fourth Amendment forbids unreasonable seizures of property; duration without adequate justification for continued retention renders a seizure unconstitutional. *See United States v. Place*, 462 U.S. 696, 709–10 (1983) (holding ninety-minute luggage detention unreasonable). The First Amendment protects against prior restraints and informal censorship; any licensing scheme vesting discretion without neutral criteria operates as a prior restraint. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757–59, 769–72 (1988) (licensing schemes with unbridled discretion chill protected speech and are presumptively invalid). The Fourteenth Amendment Due Process Clause demands notice and an opportunity to be heard before the government deprives a person of property, and when summary action occurs, a prompt and neutral post-deprivation hearing must follow. *See Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976) (balancing private interest, risk of error, and government need). These protections apply with added force when enforcement chills lawful speech and operates without published standards.

## JURISDICTION AND VENUE

4.       This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343(a)(3)–(4) (civil rights action under 42 U.S.C. § 1983).

5.    The Court may grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

6.    Personal jurisdiction is proper because each state-officer defendant resides in Colorado and directed the challenged practices within this District, and each municipal defendant is a Colorado city, with all enforcement actions occurring in Colorado.

7.    Venue lies in this District under 28 U.S.C. § 1391(b)(1)–(2) because all defendants reside in Colorado and a substantial part of the events giving rise to the claims occurred here.

## PARTIES

8.    Plaintiff Trey Franzoy is a natural person who owns and operates Charlie Chedda's, LLC and Patriot Contest & Games, LLC, through which he operates arcade-style businesses in Colorado featuring skill-based contests.

9.    Plaintiff Patriot Contest & Games, LLC is a Wyoming limited liability company registered to do business in Colorado that places and services skill-based devices for fundraising-partner hosts on a revenue-share model.

10.    Plaintiff Charlie Chedda's, LLC is a Wyoming limited liability company registered to do business in Colorado.

11.    Defendant Christopher Schroder is the Director of the Colorado Division of Gaming within the Colorado Department of Revenue. He is sued in his official capacity for prospective declaratory and injunctive relief and in his individual capacity for damages.

3

12.     Defendant Michael Phibbs is the Senior Director of the Specialized Business Group within the Department of Revenue and is sued in his individual capacity for damages arising from administrative and investigative conduct.

13.     Defendant Daniel J. Hartman is the former Director of the Division of Gaming and is sued in his individual capacity for damages.

14.     Defendant Kirsten Gregg is the Chief of Investigations at the Division of Gaming and is sued in her individual capacity for damages.

15.     Defendant City of Grand Junction, Colorado is a Colorado municipal corporation sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief based on municipal policies and final-policymaker decisions.

16.     Defendant City of Pueblo, Colorado is a Colorado municipal corporation sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief.

17.     Defendant City of Colorado Springs, Colorado is a Colorado municipal corporation sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief based on municipal property-handling practices.

**STANDING, RIPENESS, AND CREDIBLE THREAT**

18.     Plaintiffs satisfy Article III standing. They have suffered concrete, particularized injuries traceable to Defendants and redressable by the relief sought. The factual basis for these injuries is set forth in detail in the Statement of Facts.

19.     The controversy is ripe for adjudication. The Division launched a shutdown-letter program and Plaintiffs challenged it; state and municipal officials have taken continuing enforcement actions while the legality of Plaintiffs' configuration remains unresolved. One

4

municipal defendant has issued cease-and-desist letters, licensing denials, prosecutorial ordinances, and raids while a declaratory action in that jurisdiction remains pending and set for trial next year, establishing concrete present hardship and fitness for judicial decision.

20.     A credible threat of renewed enforcement independently supports pre-enforcement standing. The Division retains policy-level control over the enforcement regime and can revoke the pause orders it issued in December 2023. State actors continue coordinating with local governments and third-party intermediaries regarding Plaintiffs' operations, and permitting authorities have conditioned approvals on non-adjudicatory procedures that provide no meaningful forum for resolving the legality question. These circumstances establish a non-speculative threat of continued enforcement and operational chill.

## STATEMENT OF FACTS

### A.  The Farley Analysis and 2021 Settlement Baseline

21.     On November 22, 2020, the independent gaming laboratory Nick Farley & Associates conducted a forensic examination of the Triangle Games Skill-Based Amusement System version 1.5.2 operated by Plaintiffs at their Grand Junction location. The laboratory reported findings that became central to this dispute: the system draws from finite, self-replenishing pools of predetermined outcomes; the player must perform a time-limited cognitive selection task to obtain value; and the system contains no hidden random-number generator or other mechanism by which chance alone can produce a win. The report further specified that a player failing the ten-second selection task receives no prize and that the presence of a consolation option does not alter the fact that winning depends on successful human performance, not chance.

5

22.    In February 2021, Charlie Chedda's, LLC and the elected District Attorney for Colorado's 21st Judicial District executed a Settlement Agreement and Release in Mesa County Case No. 2019CV25. The agreement incorporates the November 22, 2020, Farley report as its Exhibit A, establishing an objective, dated baseline for Plaintiffs' Grand Junction operation by reference to devices "as they existed on November 22, 2020." The District Attorney promised not to file or prosecute simulated-gambling charges under Colo. Rev. Stat. § 18-10.5-103 against the Farley-defined configuration at the Grand Junction address, while reserving authority to pursue other offenses and clarifying that modifications or different devices fall outside the agreement's scope. Plaintiffs have continued to operate the devices in reliance on this baseline, maintaining the hardware, software versioning, and gameplay parameters set forth in the Farley report and fixed by the 2021 settlement.

### B. Division of Gaming's Enforcement Program

23.    On May 4, 2023, the Division of Gaming launched a form cease-and-desist directive issued by then-Director Daniel J. Hartman. The letter ordered recipients to cease "all unlicensed gaming and/or sports betting at once" and warned of enforcement action by the Limited Gaming Control Commission, criminal prosecution, and civil action. The Division simultaneously steered operators toward obtaining a gaming license by directing them to contact the Division's Chief of Investigations "for further information about obtaining a gaming license or sports betting license."

24.    Plaintiffs' counsel responded on May 22, 2023, by submitting the Farley analysis and the 2021 settlement to the Division. Eight days later, on May 30, 2023, Chief of Investigations Kirsten Gregg forwarded counsel's submission to the Attorney General with the

notation "fyi. We can discuss further tomorrow." This transmission evidenced state-level coordination, signaling that the Division viewed the matter as requiring inter-agency attention.

25.     By November 20, 2023, Division leadership had the fully executed settlement in hand. On December 8, 2023, Director Christopher Schroder directed Division staff: "please do not send Cease and desist letters to Charlie Chedda or Patriot Contests." This directive demonstrated policy-level control over the enforcement program and reflected an internal reassessment after leadership reviewed the settlement.

26.     Yet the enforcement posture soon revealed uncertainty underlying the initial shutdown campaign. On May 22, 2024, Senior Director Michael Phibbs circulated an email titled "Clarification of Definitions of Gambling Devices," attaching statutory materials and seeking guidance on the very terms the Division had invoked in its enforcement directives. One week later, on May 29, 2024, Chief Gregg stated in an internal email that Division staff "are not considered experts and [could not] testify that a device is a slot machine." These admissions underscored the risk of error in a program that had already threatened shutdowns, licensing actions, and criminal prosecution.

27.     Coordination with third parties continued. In October 2024, Department of Revenue personnel coordinated training for fraternal organization leadership on gambling enforcement issues. The breadth of these communications—spanning from the May 2023 shutdown letter to continued outreach in late 2024—demonstrates a Division-driven enforcement campaign launched without standards, maintained through escalation to the Attorney General, briefly paused after leadership's review of the settlement, and resumed through training and coordination even as the Division acknowledged its own lack of expertise.

7

**C.  Colorado Springs Seizure and Extended Retention**

28.    On May 11, 2023, Colorado Springs police seized $118,762.11 in United States currency from Plaintiffs' business premises. The People subsequently filed a civil-forfeiture action in El Paso County District Court on July 19, 2023, with service of process occurring on September 26, 2023. Throughout 2023 and into 2024, Plaintiffs contested the restraint, and the court eventually ruled on the matter. On February 6, 2025, the court ordered the Colorado Springs police to return the seized currency and silver bars to Mr. Franzoy by March 13, 2025.

29.    Despite this judicial directive, the evidence unit repeatedly delayed release. As documented in a Joint Status Report filed on April 18, 2025, the unit initially indicated a check would be available on April 11, 2025, then postponed to April 16, then to April 18, before finally confirming pickup for April 21. On April 21, 2025, approximately eleven months after the court's order and nearly twenty-three months after the initial seizure, Colorado Springs police released a bank check for the cash and returned the silver bars to Mr. Franzoy. On April 23, 2025, the People filed a Stipulated Motion to Dismiss the forfeiture action to reflect that return.

30.    As of November 7, 2025, Colorado Springs police retained equipment cabinets and computers valued at more than $150,000, further demonstrating prolonged possession and the ongoing capital deprivation.

**D.  State and Municipal Pressure Through Third Parties**

31.    On October 5, 2023, the Colorado Department of State issued an Observation Report following inspections at multiple fraternal posts. On November 20, 2023, a Department of State investigator forwarded the report to Department of Revenue personnel with a note that read: "Just passing on this observation report regarding illegal gaming devices in a few fraternal

8

organizations." The report indicated that licensees claimed to have received a letter from the Colorado Secretary of State approving the games as legal and requested any such documentation. Internal Division emails reflect follow-up the next day, and the Division's Agent in Charge responded, "I didn't think there was a letter saying they were legal. Maybe I missed something."

32.     Communications with veterans' organizations compounded the state-driven pressure. In January 2025, Veterans of Foreign Wars state leadership relayed representations from a Division investigator and pressed for removal of Patriot's devices. On January 16, 2025, Patriot responded by enclosing the Farley forensic report and the Attorney General-approved settlement and urged the VFW to "refrain from interfering further and let due process of law work," while noting that if the games were illegal, the Division's agent should issue a cease-and-desist letter to Patriot rather than threaten the host organizations.

33.     On November 20, 2023, the shopping-center owner's counsel wrote to Grand Junction officials and copied Senior Director Michael Phibbs about alleged unlicensed gambling at Charlie Chedda's. Phibbs replied that he had included Division Director Christopher Schroder and offered to "work with you on language specific to gambling" for leases. That same morning, Director Schroder forwarded the thread to Chief of Investigations Gregg with "FYI," attaching the fully executed 2021 settlement. These communications show coordination on landlord relations while leadership possessed the settlement document.

34.     Spillover effects followed. In February 2024, Wells Fargo closed Charlie Chedda's accounts after agency pressure and adverse publicity. In early 2025, VFW state command issued a directive to affiliated posts ordering removal of Patriot's devices after the Division represented to the VFW that the devices were illegal. These events injured Plaintiffs'

9

reputation, threatened host relationships, and narrowed access to financial services and venue
partners.

### E.  Pueblo's Coordinated Enforcement Campaign

35.    In 2021, Pueblo's Liquor Enforcement Division resolved its action against
American Legion Post 2 by stipulation, agreeing not to pursue further action so long as the laws
or the devices did not change. This stipulation tracked the Farley-anchored baseline and put
Pueblo officials on notice that Patriot's configuration at Post 2 was lawful.

36.    On August 30, 2023, Pueblo police issued cease-and-desist letters threatening
criminal charges against employees at Fraternal Order of Eagles 145 and Steel City Eagles 3367
because Patriot's devices were present. On September 20, 2023, a new cease-and-desist letter
targeted American Legion Post 2 despite Plaintiffs' prior submission of the Farley report and the
2021 Post 2 resolution as exculpatory materials. The letters identified Plaintiffs' games as illegal,
causing fraternal organizations to cease operations immediately, with resulting revenue loss to
both the host organizations and Patriot.

37.    While Plaintiffs paid required fees and applied for device licensing, Pueblo
withheld approvals. On November 3, 2023, a Sales Tax Division official denied Steel City's
liquor-license application with the notation "No approval until removal of skilled games," and
the City withheld already-paid device-license stickers from Patriot. These actions impeded
lawful operations despite fee payment and prior licensing approvals.

38.    On May 13, 2024, Pueblo's City Council approved gambling-related ordinances
modeled on state law, which the Mayor signed on May 17, 2024. At the May 13 council meeting,
the Chief of Police stated that fraternal-organization operations were illegal and that Pueblo

required the ordinance to prosecute and shut down those operations because the District Attorney was not pursuing criminal charges. The City Attorney similarly described the ordinance as enabling municipal prosecution.

39.    On May 24, 2024, Plaintiffs filed a declaratory action in Pueblo County challenging the state statutes and Pueblo provisions and seeking a determination that Patriot's games comply with law. A two-day trial is set to begin on January 27, 2026.

40.    Despite the pending declaratory case, Pueblo escalated enforcement. On April 5, 2025, Pueblo police executed a search at Steel City Eagles, and multiple individuals were charged under the municipal code regarding electronic gambling. These events occurred while the civil declaratory action remained live and approaching trial.

**F.  Grand Junction's Relocation Prohibition**

41.    By November 2023, Division leadership and Grand Junction officials were in communication about Plaintiffs' operations while the fully executed 2021 settlement was circulating within the state government. On November 20, 2023, the shopping-center owner's counsel wrote to Grand Junction police commanders regarding "alleged unlicensed gambling" at Charlie Chedda's and copied Senior Director Michael Phibbs. Phibbs replied that he had included Division Director Schroder and offered to help develop "language specific to gambling" for lease provisions. That same morning, Director Schroder forwarded the thread to Chief of Investigations Gregg with "FYI," attaching the settlement. These exchanges demonstrate that state leadership engaged with the City regarding Plaintiffs while possessing the settlement document and coordinating on third-party pressure.

11

42.     Around the same period, Division leadership circulated a "2023 Suspected
Gaming Locations" image as part of an internal enforcement thread, evidencing the compilation
and sharing of suspected-location materials with local partners. This practice confirms
coordination channels between state and local enforcement.

43.     On February 27, 2025, the Grand Junction City Attorney wrote to Mr. Franzoy:
"relocation in the City is not an option given City ordinances" and requested a copy of the
District Attorney settlement agreement. This authoritative statement simultaneously
acknowledged the settlement's existence while categorically foreclosing relocation within City
limits, representing a final municipal policy applied directly to Plaintiffs' situation.

44.     Contemporaneous records reflect that Grand Junction adopted an ordinance in
February 2023 barring relocation or opening of new simulated-gaming arcades, renewed it in
February 2024 while shutting down other operators, and renewed it again in 2025 in a manner
that effectively singled out Plaintiffs despite the settlement baseline. This ordinance-based
moratorium, paired with coordinated state-city communications, foreclosed a lawful path for
Plaintiffs to operate within City limits.

### G.  Mesa County's Permitting Loop and Non-Adjudicatory Requirements

45.     On July 30, 2025, Mesa County's Planning Manager told Mr. Franzoy that the
County would not accept or approve any application to permit a "Skilled Gaming type business,"
citing communications with the Department of Revenue and asserting that such operations are
legal only in Black Hawk, Central City, and Cripple Creek. The County directed Plaintiffs to
obtain a state "letter of review and determination" proving the proposed business is not illegal;
without this document, the County would not consider processing planning and building permits.

46.     The next day, July 31, 2025, Mesa County reiterated the requirement, stating that because Plaintiffs intended to apply for an arcade or skilled gaming or similar business, the County was requesting a letter of determination from the appropriate regulatory agency and would not approve any application.

47.     Mesa County then sought that determination from the Division of Gaming. On August 18, 2025, a County planner asked the Division's Chief of Investigations whether the Division could determine the legality of Plaintiffs' games. On August 22, 2025, the Chief replied that the Division "is unable to provide Mesa County with a determination on whether or not Charlie Cheddas' games are legal under the Colorado Limited Game Act." The Chief suggested that Mesa County or Plaintiffs "file a petition for declaratory order" with the Colorado Limited Gaming Control Commission under Rule 30-601 to -603. The Chief further stated that the Division could not guarantee the Commission would decide the petition.

48.     Mesa County then adopted the Commission petition process as a condition for permitting. On August 27, 2025, the Community Development Director advised that the County could not permit the use unless a "petition for declaratory order" were filed with the Commission and asserted that "only the [Commission] can determine whether this operation is in fact a prize redemption arcade and not under their jurisdiction," citing 1 Colo. Code Regs. 207-1, Rules 30-601 to -603.

49.     In a separate August 26, 2025, exchange, the Division's Chief of Investigations stated that email was not the proper forum for a legal determination and again directed Mesa County and Plaintiffs to the Commission petition process. When Plaintiffs pressed for ordinary permit processing, the County answered on September 2, 2025, that it had identified a risk the

use might be illegal, that it lacked expertise to distinguish permissible from prohibited devices, and that this "underlies the need" for a Commission opinion. The County also instructed Plaintiffs to request a pre-application meeting through its portal.

50.     The Commission path proved illusory. On December 23, 2024, another operator, No Limit Games, LLC, petitioned the Commission for a declaratory order on whether its kiosks were "simulated gambling devices" under section 18-10.5-102(6)(a). The Commission set the matter for discussion on January 16, 2025. On that date, the Commission voted unanimously to decline and dismiss the petition, with the Vice-Chair stating that the Commission lacked jurisdiction or authority to address the issue and that the Commission "was not the correct body to address" such determinations. The Commission directed counsel to memorialize the decision in a written order stating that the requested declaratory order would not terminate the controversy or resolve the uncertainty regarding the statute's application.

51.     Mesa County routed Plaintiffs from the County to the Division to the Commission, only to find that the Commission had already disclaimed authority to resolve the precise question the County required. The Division's inability to decide legality and the Commission's dismissal of the petition left no adjudicatory forum available while delaying ordinary land-use review for Plaintiffs' proposed relocation.

**H.  Ongoing harms**

52.     The foregoing events have produced concrete, ongoing injury. Colorado Springs retained Plaintiffs' $118,762.11 in operating capital for nearly twenty-three months despite a court order to return the funds, and continues to hold equipment valued at more than $150,000. Pueblo's cease-and-desist letters, categorical licensing denials, and April 2025 raid caused

immediate host defections and revenue loss, with the municipal case approaching trial. Grand Junction's ordinance-based relocation prohibition, combined with state-city coordination regarding enforcement, foreclosed a lawful avenue to relocate operations within City limits and damaged Plaintiffs' landlord relationships. Mesa County's permitting loop created an infinite regress, conditioning permits on a non-existent determination. Cross-agency communications through the Department of State, coordinated training, and VFW pressure injured Plaintiffs' reputation, threatened host contracts, and narrowed access to financial and venue partnerships. These harms continue to accumulate in legal fees, compliance costs, lost business opportunities, and chilled operations that undermine the value of Plaintiffs' lawful configuration.

## FEDERAL CLAIMS FOR RELIEF UNDER 42 U.S.C. § 1983

### COUNT I

### Fourth Amendment
### (Unreasonable Seizure and Prolonged Retention)

53.    Plaintiffs incorporate the preceding paragraphs.

54.    The Fourth Amendment protects property from unreasonable seizures. A seizure occurs when a governmental actor effects a meaningful interference with a person's possessory interests in property. The touchstone for evaluating a seizure's constitutionality is reasonableness, assessed by balancing the nature and quality of the intrusion against the importance of the governmental interests at stake and the diligence shown in pursuing them. This protection extends to seizures of property outside the home and is not confined to privacy-based objections. A seizure's duration must be reasonable and cannot be prolonged without adequate justification tied to legitimate law-enforcement needs pursued with diligence.

55.     Colorado Springs police seized $118,762.11 from Plaintiffs' business on May 11, 2023, and retained the funds for nearly twenty-three months. A court ordered return of the property by March 13, 2025. Despite this directive, the evidence unit repeatedly delayed release, postponing the projected date multiple times before finally releasing the property on April 21, 2025. As of November 7, 2025, police retained equipment valued at more than $150,000. The duration and manner of retention were unreasonable. After the court's February 6, 2025, return order, the government's interest in continued possession was at its nadir while the possessory interest in prompt restoration of capital and equipment was at its apex. Prolonged interference with property beyond a clear judicial deadline, absent legitimate law-enforcement need pursued with diligence, violates the Fourth Amendment.

56.     Defendants Hartman, Gregg, Schroder, and Phibbs were responsible for setting in motion the enforcement posture that foreseeably led to the unreasonable seizure and retention. Hartman issued the May 4, 2023, cease-and-desist letter; Gregg escalated it to the Attorney General; Schroder exercised policy-level control through the December 8, 2023, directive and internal circulation of the settlement; and Phibbs directed continued enforcement while the Division acknowledged definitional uncertainty and lack of expertise. These officials caused the enforcement sequence that prompted municipal seizures and prolonged the restraint through continued state-level coordination. Section 1983 imposes liability on officials who through their own actions cause a constitutional deprivation, including by setting in motion a series of events they know or reasonably should know will cause a violation by another actor. The facts establish the required affirmative link between these officials' conduct and the unreasonable seizure.

16

57.    The law governing these principles was clearly established before 2023. A seizure constitutionally occurs upon meaningful interference with possessory interests. Reasonableness turns on scope and duration, and undue delay renders a seizure unconstitutional. Under these settled standards, a twenty-three-month restraint capped by post-order delay is unreasonable.

58.    Plaintiffs suffered concrete damages including loss of use of $118,762.11 for nearly twenty-three months, business interruption, lost opportunities, and costs associated with seeking return, with equipment retention continuing on information and belief. Plaintiffs seek compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities, together with punitive damages where permitted, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT II

**Procedural Due Process**
**(Shutdowns and Licensing Blocks Without Pre-Deprivation Process; Delayed Post-Deprivation Process; Non-Adjudicatory Permit Loop)**

59.    Plaintiffs incorporate the preceding paragraphs.

60.    The Due Process Clause of the Fourteenth Amendment requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner before the government deprives a person of property. Pre-deprivation process is the rule; exceptions are extraordinary and require exigent circumstances coupled with prompt post-deprivation review. When summary action is taken, the government must follow it with a prompt and neutral post-deprivation hearing.

61.    The Division's May 4, 2023, cease-and-desist letter demanded immediate cessation under threat of criminal, civil, and Commission enforcement without any pre-

17

deprivation neutral process. Plaintiffs' counsel promptly supplied the Farley analysis and settlement; the Division escalated to the Attorney General and continued programmatic communications. These actions imposed a compelled business shutdown without contemporaneous notice and hearing tailored to the risk of error. Plaintiffs possessed a district attorney settlement and independent forensic analysis; the risk of erroneous deprivation was acute.

62.    Pueblo compounded the deprivation through cease-and-desist letters labeling Plaintiffs' games illegal, licensing denials with the categorical notation "No approval until removal of skilled games," and withholding of already-paid device-license stickers. Fraternal hosts ceased operations upon receiving these letters. The City then denied or withheld licensing and adopted ordinances aimed at prosecution and shutdown, all without providing timely, neutral procedures to contest the determinations. On April 5, 2025, while a declaratory action remained pending, Pueblo executed a raid resulting in criminal charges. This imposed deprivations without meaningful pre-deprivation process or prompt post-deprivation review.

63.    Colorado Springs' twenty-three-month retention of $118,762.11 and continued equipment hold, including delays even after a court-ordered return date, demonstrate the absence of prompt, neutral post-deprivation procedures adequate to test continued detention. When the government acts first and hears later, it must afford a prompt and neutral hearing keyed to the deprivation; the record here shows prolonged interference and post-order lag instead.

64.    Mesa County imposed an administrative loop that denied any meaningful process. The County refused to process permits absent a state determination of legality, the Division declined to make that determination, the County then conditioned permits on a petition to a

Commission that had already disclaimed jurisdiction, and the Commission voted unanimously that it was "not the correct body to address" the issue. This circular sequence left Plaintiffs without a pre-deprivation hearing, prompt post-deprivation review, or any adjudicator at all.

65.     Plaintiffs' interests in operating capital, equipment, paid-for license stickers, and ongoing business operations are substantial. The risk of error was acute: Division leadership sought "Clarification of Definitions of Gambling Devices" and the Chief of Investigations acknowledged that staff "are not considered experts and [could not] testify that a device is a slot machine." Pueblo's categorical "No approval until removal" and the Commission's non-path demonstrate the absence of neutral, administrable criteria and the high value of pre- or prompt post-deprivation procedures. The government's interests did not justify immediate shutdowns and prolonged retention without tailored safeguards.

66.     Defendants Hartman, Gregg, Schroder, and Phibbs caused these due-process deprivations. Hartman initiated the shutdown program. Gregg escalated to the Attorney General and later directed operators toward a non-adjudicatory forum while acknowledging staff lacked expertise. Schroder exercised policy control. Phibbs continued directing enforcement while acknowledging definitional uncertainty. Officials are liable under § 1983 when they set in motion a series of acts by others whom they know or reasonably should know will cause a constitutional deprivation.

67.     The governing principles were clearly established before 2023: pre-deprivation process is the rule; when summary action is permitted, the State must provide a prompt and neutral post-deprivation hearing; and due process requires meaningful opportunity to be heard, not circular referral to a forum that will not decide.

19

68.      Plaintiffs suffered damages including loss of use of funds, continued equipment retention, lost venue revenues, compliance and legal costs, and business interruption. They seek compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities, punitive damages where permitted, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

### COUNT III

**Due Process (Vagueness)**
**(As Applied to the Farley-Defined Configuration; Limited Facial Relief)**

69.      Plaintiffs incorporate the preceding paragraphs.

70.      The Due Process Clause forbids laws that fail to give fair notice of what is prohibited and that encourage arbitrary and discriminatory enforcement. Laws vesting unfettered discretion in officers without minimal guidelines are unconstitutional. When government restraints touch speech or ordinary commercial communication, clarity requirements are heightened because uncertainty chills lawful activity.

71.      As applied to the Farley-defined baseline, the State's scheme and the municipalities' enforcement measures lack administrable standards. In May 2024, Division leadership circulated "Clarification of Definitions of Gambling Devices," seeking guidance on the core terms it had been invoking. One week later, the Division's Chief acknowledged that staff "are not considered experts and [could not] testify that a device is a slot machine." These contemporaneous admissions establish an absence of objective criteria and a high risk of arbitrary application.

72.     Pueblo's licensing stance confirms the vagueness problem. After cease-and-desist letters labeled Plaintiffs' games illegal, the City denied or withheld approvals with the categorical notation "No approval until removal of skilled games" and withheld already-paid device-license stickers. The City articulated no neutral standards distinguishing lawful skill contests from prohibited devices, inviting discretion unmoored to published criteria.

73.     Mesa County's permitting process added a non-adjudicatory loop underscoring the vagueness problem. When the County asked the Division to render a legality determination, the Division declined and directed Plaintiffs to petition a Commission. The County then adopted the Commission petition as a permitting condition while admitting it lacked expertise to distinguish permissible devices from prohibited ones. On January 16, 2025, the Commission unanimously declined a similar petition, stating it "was not the correct body to address" the issue and that a declaratory order would not resolve uncertainty. An enforcement regime that channels operators to a forum disclaiming authority is the essence of standardless process and unconstitutional uncertainty.

74.     The Division's foundational cease-and-desist letter itself reflected the lack of administrable standards. The May 4, 2023, directive ordered recipients to cease "all unlicensed gaming and/or sports betting at once," threatening Commission, criminal, and civil enforcement and steering to licensure—before any neutral yardstick for distinguishing lawful skill contests from prohibited devices had been articulated or made available. In late 2023, while the fully executed settlement was circulating internally, Division leadership issued an internal "do not send" instruction for Plaintiffs, underscoring that outcomes turned on discretion, not published criteria.

21

75.    The statutory and municipal terms as implemented—"gambling device," "simulated gambling device," and related enforcement triggers—fail to give fair notice as applied to the Farley-defined baseline and invite arbitrary, ad hoc enforcement by Division, Pueblo, and Grand Junction officials.

76.    Defendants Hartman, Gregg, Schroder, and Phibbs are liable because they initiated, directed, and maintained the standardless enforcement posture producing these vagueness injuries. Hartman issued the shutdown directive. Gregg escalated to the Attorney General, later insisted on the Commission petition process while acknowledging staff lacked expertise. Schroder exercised policy control over the letter program. Phibbs continued directing enforcement while leadership sought definitional clarification. Their actions form the affirmative link to the deprivation.

77.    Plaintiffs seek a declaration that, as applied to the Farley-defined baseline and the documented record, the State's and municipalities' use of these provisions and practices is unconstitutionally vague, with limited facial relief to prevent continued chilling through standardless restraints; compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities; punitive damages where permitted; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

### COUNT IV

### First Amendment
### (Programmatic Prior Restraints and Informal Censorship of Truthful, Non-Misleading Commercial Speech)

78.    Plaintiffs incorporate the preceding paragraphs.

79.     The First Amendment forbids prior restraints and informal censorship regimes that suppress speech without procedural safeguards. Any system of prior restraint requires procedural safeguards, including prompt judicial review with the burden on the government to justify continued restraint. The First Amendment also protects truthful, non-misleading commercial speech from restrictions that fail the *Central Hudson* test: the restriction must directly and materially advance a substantial governmental interest and must be narrowly tailored to serve that interest. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563–66 (1980). Content-based and speaker-based burdens on commercial speech warrant heightened scrutiny. Licensing schemes vesting unbridled discretion in officials operate as prior restraints and chill protected speech. Prior restraints are presumptively invalid.

80.     The Division instituted a pre-adjudicatory shutdown regime on May 4, 2023, demanding immediate cessation, threatening Commission, criminal, and civil enforcement, and steering recipients to licensure, all without neutral standards or prompt government-initiated judicial review. Plaintiffs' counsel promptly supplied the Farley analysis and settlement. Eight days later, the Division escalated the matter to the Attorney General for coordinated enforcement. These actions restrained Plaintiffs' truthful, non-misleading speech soliciting lawful contests and business partners before any neutral adjudication and without the required safeguards.

81.     The prior restraint extended through licensing and third-party channels. In October 2023, the Department of State delivered an Observation Report about "illegal gaming devices" at fraternal posts to Department of Revenue officials, triggering internal follow-ups. In October 2024, Department policy staff circulated training communications concerning

23

"Gambling in the canteen," projecting coordinated messaging to fraternal organizations. In January 2025, VFW state leadership relayed state enforcement assertions and pressed for removal of Plaintiffs' devices. Officials also pressed landlords: on November 20, 2023, Senior Director Phibbs offered to help a shopping-center owner develop "language specific to gambling" for leases while Division leadership possessed the fully executed settlement. These communications operated like informal censorship by pressuring intermediaries—hosts and landlords—to cut off Plaintiffs' speech and business relationships.

82.    Pueblo's categorical "No approval until removal of skilled games" and withholding of already-paid device-license stickers amplified the restraint on Plaintiffs' marketing and contracting with hosts. The City's stance chilled speech by signaling that ordinary promotional and business communications about Plaintiffs' games would trigger denial of municipal approvals, without content-neutral, published standards or prompt review—an unbridled-discretion problem.

83.    The restraints fail *Central Hudson*. Plaintiffs' speech truthfully promotes lawful, non-misleading skill contests verified by the Farley analysis and anchored by the 2021 settlement baseline. The government's interest in preventing illegal gambling is substantial, but the Division's own record admits unresolved definitions and lack of staff expertise, and the municipalities relied on standardless directives and third-party pressure rather than tailored, objective criteria. A shutdown letter commanding immediate cessation, licensing denials conditioned on removal of Plaintiffs' devices, and informal threats to hosts and landlords do not directly and materially advance the asserted interest and are more extensive than necessary

24

because they lack neutral, administrable standards, fail to allow prompt neutral review, and sweep in truthful speech about lawful contests.

84.     Defendants Hartman, Gregg, Schroder, and Phibbs caused these First Amendment violations through their personal direction of the enforcement regime. Hartman initiated the shutdown directive. Gregg escalated to the Attorney General and later directed Mesa County and Plaintiffs toward a petition to a Commission that would not decide the issue. Schroder exercised policy control over the program while circulating the executed settlement internally. Phibbs reinforced the program through landlord-facing communications and coordinated training. Their actions set in motion and maintained a regime of prior restraints and informal censorship that predictably suppressed Plaintiffs' speech.

85.     Plaintiffs suffered damages including lost placements and revenue, reputational harm, and increased compliance and legal costs from chilled communications with hosts, customers, and landlords. They seek compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities, punitive damages where permitted, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT V

### Municipal Liability—Pueblo
### (Prior Restraints and Due Process Violations Through Coordinated Enforcement)

86.     Plaintiffs incorporate the preceding paragraphs.

87.     A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy or custom, a final-policymaker decision, or deliberate indifference to a known risk, and that policy is the direct cause of the injury. *Monell v. Dep't of Soc. Servs.*,

436 U.S. 658, 690–94 (1978). A single decision by a final policymaker regarding an official matter may constitute municipal policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–83 (1986). Where a municipality fails to train officials in constitutional obligations and the failure is deliberately indifferent to a highly predictable consequence, liability attaches. The policy must be the moving force behind the injury.

88.    Pueblo's course of conduct from August 2023 through April 2025 constitutes an official policy of enforcement directed at Plaintiffs' operations. The City's cease-and-desist letters, licensing denials, ordinance adoption, and subsequent raid form a continuous enforcement campaign with stated purpose to prosecute and shut down Plaintiffs' devices.

89.    On August 30 and September 20, 2023, Pueblo police issued cease-and-desist letters to fraternal hosts identifying Plaintiffs' games as illegal and threatening criminal charges. In November 2023, a City official denied Steel City's liquor-license application with the notation "No approval until removal of skilled games" and withheld already-paid device-license stickers from Patriot. These administrative actions established the City's enforcement posture and immediately chilled host operations.

90.    On May 13, 2024, Pueblo's City Council adopted gambling-related ordinances. At the public meeting, the Chief of Police stated that fraternal-organization operations were illegal and that the City needed ordinances to "prosecute and shut them down" because the District Attorney would not bring charges. The City Attorney echoed this rationale, describing municipal prosecution procedures. This council decision represented a final-policymaker act explicitly targeting the operations Plaintiffs conducted.

26

91.     On April 5, 2025, Pueblo police executed the ordinance-based policy through a search at Steel City Eagles and arrested individuals under the municipal code for electronic gambling. This raid occurred while a federal declaratory action challenging the ordinances remained pending and scheduled for trial on January 27–28, 2026.

92.     Pueblo's ordinance-based enforcement campaign, documented through cease-and-desist letters, categorical licensing denials, formal ordinance adoption with stated intent to prosecute Plaintiffs' operations, and the April 5 raid, constitutes a final-policymaker decision and official custom that operated as prior restraints on commercial speech, imposed licensing denials without neutral criteria or timely review, and effected searches without constitutional safeguards. This policy caused each constitutional violation alleged.

93.     Plaintiffs suffered concrete damages including lost host revenues and placements from the cease-and-desist letters, withheld licensing and fees in November 2023, and direct harm from the search and charges in April 2025. Plaintiffs seek declaratory and injunctive relief barring Pueblo from enforcing these ordinances and policies against the Farley-defined baseline absent neutral, published standards and prompt, neutral procedures; compensatory damages; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT VI

### Municipal Liability—Colorado Springs
### (Property-Handling Practices Causing Fourth and Fourteenth Amendment Violations)

94.     Plaintiffs incorporate the preceding paragraphs.

95.     A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy or custom, a final-policymaker decision, or deliberate indifference

to an obvious need, and that policy directly causes the injury. Municipal liability for failure to train attaches when the need for training was obvious and the failure was deliberately indifferent to a highly predictable consequence. *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989). The policy must be the moving force behind the constitutional violation.

96.     Colorado Springs maintained a policy or custom of prolonged property retention and post-seizure procedures inadequate to comply with constitutional and judicial deadlines. Police seized $118,762.11 on May 11, 2023. A court ordered return by March 13, 2025. The evidence unit repeatedly postponed release, postponing the projected date from April 11 to April 16 to April 18, before releasing the property only on April 21, 2025. This twenty-three-month restraint included a prolonged post-order delay documented by judicial necessity for delay-prevention measures. As of November 7, 2025, police retained equipment valued at more than $150,000.

97.     Colorado Springs acted with deliberate indifference to the obvious need to train and supervise evidence-unit personnel on prompt post-seizure procedures and compliance with court-ordered deadlines. Given the predictable recurrence of seizures in municipal law-enforcement operations, the need for adequate post-deprivation procedures was plain. The City's failure to train created a foreseeable consequence: prolonged retention, missed deadlines, and constitutional violations. The very need for court-issued delay-prevention orders evidences the inadequacy of the City's procedures as an operative matter of municipal practice.

98.     The City's property-handling policy and failure to train directly caused Plaintiffs' injuries: loss of use of capital for twenty-three months, business interruption, legal costs incurred to secure return, and continuing equipment retention. Plaintiffs seek declaratory and injunctive

relief requiring the City to implement constitutionally adequate post-seizure procedures, including timely notice, prompt neutral hearings with the burden on the City to justify retention, written protocols ensuring compliance with court-ordered release dates, and a single accountable point of contact for property claimants; compensatory damages; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT VII

### Municipal Liability—Grand Junction
### (Ordinance-Based Relocation Prohibition and Coordinated Targeting)

99.    Plaintiffs incorporate the preceding paragraphs.

100.    A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy or custom, a final-policymaker decision, or deliberate indifference, and that policy directly causes the injury. A single authoritative statement by a final policymaker regarding an official matter establishes municipal policy. Municipal liability requires the policy to be the moving force behind the constitutional injury.

101.    On February 23, 2024, Grand Junction adopted Ordinance No. 5199, barring relocation or opening of new gaming-related businesses within City limits. This ordinance was the City's official policy directed at curtailing operations like Plaintiffs'. On February 27, 2025, the Grand Junction City Attorney issued a final statement of municipal policy to Mr. Franzoy: "relocation in the City is not an option given City ordinances." This categorical foreclosure, issued by a final policymaker regarding an official matter, applied the ordinance-based policy specifically to Plaintiffs and demonstrated that the City intended to prevent Plaintiffs' relocation regardless of objective land-use suitability or compliance with the Farley-defined baseline.

102.   The record documents state-city coordination targeting Plaintiffs. Division leadership circulated lists of "suspected gaming locations" to municipal law-enforcement partners while possessing knowledge of the 2021 settlement. In November 2023, state and City officials exchanged communications regarding Plaintiffs' operations and enforcement strategies. This coordination, coupled with the ordinance-based relocation prohibition, demonstrates a policy aimed at suppressing Plaintiffs' operations through municipal land-use restrictions.

103.   Grand Junction's ordinance and the City Attorney's authoritative statement operated as prior restraints. The categorical "no relocation" policy chilled Plaintiffs' truthful commercial speech about lawful skill contests by foreclosing ordinary business relocation and expansion within the *City. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757–59, 769–72 (1988). The ordinance-based policy also denied due process by providing no neutral criteria, no administrable standards, and no prompt review mechanism for determining whether Plaintiffs' Farley-defined configuration complied with City law. *Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976). The City foreclosed relocation without neutral standards or meaningful process, leaving Plaintiffs with no lawful path within City limits. *Barry v. Barchi*, 443 U.S. 55, 64–66 (1979).

104.   Grand Junction's ordinance-based policy and the City Attorney's final-policymaker statement directly caused Plaintiffs' injuries: loss of relocation and expansion opportunities within City limits, interference with landlord relations and lease expectancy, chilled communications with prospective hosts and customers, and increased compliance costs while seeking constitutional relief.

105.    Plaintiffs seek declaratory and injunctive relief barring enforcement of the relocation prohibition against the Farley-defined configuration absent neutral, published siting standards and prompt, neutral procedures; prohibiting coordinated targeting with state actors without neutral criteria and evenhanded application; compensatory damages; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## SOVEREIGN IMMUNITY AND CAPACITIES

106.    The Eleventh Amendment bars damages actions against a State and its agencies in federal court, including suits for damages against state officials in their official capacities and suits seeking retroactive monetary relief from the state treasury.

107.    Prospective relief may be obtained against a state officer in his official capacity to halt an ongoing violation of federal law, provided the complaint alleges an ongoing violation and seeks prospective rather than retroactive relief. *Ex parte Young*, 209 U.S. 123, 155–60 (1908). Plaintiffs seek only prospective declaratory and injunctive relief against the Director of the Colorado Division of Gaming in his official capacity; no damages are sought against the State or any state official in an official capacity.

108.    Federal courts may not order state officials to comply with state law in an official-capacity posture. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). To the extent any claim could be construed to compel compliance with state statutes, rules, or ordinances as such, Plaintiffs disclaim and do not pursue that relief against state officials in their official capacities.

109.    State officers sued in their individual capacities are "persons" under 42 U.S.C. § 1983 liable for damages for their own unconstitutional conduct. *Hafer v. Melo*, 502 U.S. 21, 25–

31

31 (1991). The claims against Daniel J. Hartman, Kirsten Gregg, Christopher Schroder, and Michael Phibbs proceed in their individual capacities based on their personal participation and causal role in the violations alleged; any immunity defenses are affirmative matters for those defendants to prove.

110. Municipal defendants are "persons" under § 1983, not protected by the Eleventh Amendment, and are subject to declaratory, injunctive, and compensatory relief upon proof of municipal policy or final-policymaker acts as the moving force behind the injury. Punitive damages are unavailable against municipalities and are sought only against individual-capacity defendants. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259–71 (1981).

111. Attorney fees and costs are recoverable by prevailing parties under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

### A. Declarations

a) Plaintiffs request a declaration that, as applied to the Farley-defined configuration and on the facts alleged, Defendants' enforcement actions—including cease-and-desist letters, licensing blocks, relocation prohibitions, searches, seizures, and property retentions—violate the First, Fourth, and Fourteenth Amendments to the United States Constitution.

b) Plaintiffs further request a declaration that the State's and municipalities' statutory and ordinance provisions, as applied to Plaintiffs and as implemented through the enforcement practices described in Counts I through VII, are unconstitutionally vague and operate as prior restraints on commercial speech.

**B. Injunctive Relief Against the Director of the Colorado Division of Gaming (Official Capacity)**

a)      Plaintiffs request a prospective injunction under *Ex parte Young*, enjoining the Director from issuing cease-and-desist letters, shutdown directives, or equivalent communications directed at Plaintiffs' operations without published, objective criteria and a prompt, neutral review process placing the burden on the government to justify any restraint. The order should include withdrawal of the May 4, 2023, shutdown communication as to Plaintiffs and written notice to affected intermediaries that the Division will not demand stoppages or threaten enforcement absent these safeguards.

b)      Plaintiffs further request that the Director be enjoined from directing Plaintiffs or local governments to condition operations or permitting on a petition to the Colorado Limited Gaming Control Commission, or from otherwise conditioning speech or operations on Commission action, where the Commission has already disclaimed jurisdiction and declined to adjudicate such legality questions.

c)      Plaintiffs also request that the Director be enjoined from informal censorship by pressuring third parties such as fraternal organizations, veteran commands, landlords, or trade associations to remove or refuse Plaintiffs' devices through threat of enforcement or licensing consequences, unless the Division first promulgates neutral, published criteria and affords prompt, neutral review meeting constitutional standards. This includes an order barring use of training campaigns or one-off communications to induce removals that would chill Plaintiffs' truthful, non-misleading commercial speech.

d)      Finally, Plaintiffs request an order requiring the Director to publish objective enforcement criteria and a neutral review mechanism before initiating future pre-adjudicatory restraints against Plaintiffs' configuration and to apply those criteria consistently in any communications with state or municipal partners affecting Plaintiffs' operations.

### C. Injunctive Relief Against the City of Pueblo

a)      Plaintiffs request a permanent injunction barring Pueblo from enforcing its gambling-related ordinances and licensing measures against Plaintiffs absent neutral, published criteria and prompt review procedures placing the burden on the City to justify any restraint. The order should bar conditioning approvals on categorical notations such as "No approval until removal of skilled games" and from withholding already-paid device-license stickers without written, standard-based reasons and an avenue for timely review.

b)      Plaintiffs further request an order requiring the City to provide prompt, neutral post-seizure hearings for any future seizure or restraint of property, with the burden on the City and return by a date certain unless the City proves continued retention is lawful, together with clear written notice of procedures and points of contact to reclaim property.

c)      Plaintiffs also request that Pueblo be enjoined from informal censorship by pressuring fraternal organizations, veteran commands, landlords, or similar intermediaries to remove or refuse Plaintiffs' contests through threats of enforcement or licensing consequences, unless the City applies neutral, published criteria and affords prompt, neutral review meeting constitutional standards.

d)      Finally, Plaintiffs request that Pueblo be required to publish objective standards and timelines governing licensing and enforcement decisions; to issue written reasons keyed to

34

those standards for any denial or restraint; and to provide a prompt administrative appeal to a neutral decisionmaker, followed by prompt judicial review.

### D. Injunctive Relief Against the City of Colorado Springs

a)    Plaintiffs request a permanent injunction barring Colorado Springs from maintaining property-handling and post-seizure practices that cause delayed notice or prolonged retention of seized property, and requiring constitutionally adequate procedures ensuring timely return or a prompt, neutral determination of lawful retention. The record reflects a twenty-three-month restraint, repeated post-order delays, and the need for court-issued delay-prevention orders before final release.

b)    The injunction should require a prompt, neutral post-seizure hearing whenever the City seeks to retain property beyond a short, defined interval, with the burden on the City to justify retention by a date certain. The City must provide clear written notice of procedures and a single accountable point of contact for property claimants.

c)    The injunction should direct immediate return of the equipment currently retained or, if the City asserts a lawful basis for retention, a prompt hearing under these standards.

d)    Finally, the injunction should require the City to adopt and publish written standard operating procedures ensuring compliance with court-ordered release dates, establishing internal deadlines for processing returns, designating a single accountable point of contact for claimants, and requiring written reasons keyed to lawful criteria for any continued retention.

### E.  Injunctive Relief Against the City of Grand Junction

a)      Plaintiffs request a permanent injunction barring Grand Junction from enforcing any ordinance, moratorium, policy, or practice that categorically prohibits relocation or siting of Plaintiffs' configuration within City limits absent neutral, published, objective siting standards and a prompt, neutral process placing the burden on the City to justify any restraint. The order should bar application of Ordinance No. 5199 and any successor or renewal that forecloses relocation without such standards and process.

b)      Plaintiffs further request an order requiring the City to process any relocation or siting request for Plaintiffs under objective, administrable criteria with written reasons keyed to those criteria, firm decision deadlines, and prompt administrative appeal to a neutral decisionmaker followed by prompt judicial review. The order should preclude the City from conditioning relocation or permitting on non-adjudicatory steps and from relying on coordination channels or "suspected locations" lists as a substitute for published standards.

c)      Plaintiffs also request an order prohibiting the City from applying its ordinance-based restrictions in a manner that categorically denies relocation, as reflected in the City Attorney's March 28, 2025, written statement that "relocation in the City is not an option," unless and until the City adopts and applies neutral standards and affords prompt, neutral procedures.

d)      Finally, Plaintiffs request such further prospective relief as is necessary to ensure evenhanded application of any valid, neutral standards to Plaintiffs and similarly situated venues, and to prevent coordinated targeting that would chill lawful operations absent published criteria and timely process.

**F. Damages**

a)     Plaintiffs request compensatory damages against the Cities of Pueblo, Colorado Springs, and Grand Junction, and against Defendants Hartman, Gregg, Schroder, and Phibbs in their individual capacities, to compensate for: loss of use of $118,762.11 during the nearly twenty-three-month seizure and documented post-order delays; continuing equipment retention valued at more than $150,000; lost venue revenues and business opportunities resulting from municipal cease-and-desist letters, categorical licensing denials, enforcement ordinances, and raids; loss of relocation and expansion opportunities within Grand Junction; reputational and contractual harm from cross-agency coordination and third-party pressure; and incremental legal and compliance costs incurred to address these violations.

b)     Plaintiffs seek punitive damages against Hartman, Gregg, Schroder, and Phibbs where the evidence demonstrates conduct motivated by evil intent or involving reckless or callous indifference to federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages are not sought against municipal defendants.

**G. Fees, Costs, and Interest**

Plaintiffs request:

a)     reasonable attorney fees and expenses under 42 U.S.C. § 1988;

b)     taxable costs under 28 U.S.C. § 1920; and

c)     pre-judgment and post-judgment interest at the maximum rates permitted by law under 28 U.S.C. § 1961.

### H. Further relief and retention of jurisdiction

Plaintiffs request such other and further legal and equitable relief as the Court deems just and proper to effectuate the declarations and injunctions and to remedy the harms established. The Court should retain jurisdiction to enforce and modify its orders and to resolve disputes concerning compliance with the relief granted.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable, including all claims for legal relief and damages under 42 U.S.C. § 1983. Claims for declaratory and injunctive relief are to be decided by the Court. Fed. R. Civ. P. 38, 39.

Respectfully submitted on 7 November 2025,

By:  *s/ Edward C. Hopkins Jr.*
Edward C. Hopkins Jr., Bar. No. 43298
Raymond K. Bryant, Bar No. 42586
Civil Rights Litigation Group, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
Phone: (720) 515-6165
ed@rightslitigation.com
raymond@rightslitigation.com
Attorneys for Plaintiffs