IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 25-cv-03588-GPG-KAS

TREY FRANZOY, an individual;
PATRIOT CONTEST & GAMES, LLC, a Wyoming limited liability company; and
CHARLIE CHEDDA'S, LLC, a Wyoming limited liability company,

      Plaintiffs,

v.

CHRISTOPHER SCHRODER, in his official capacity as Director of the Colorado Division of
Gaming, Colorado Department of Revenue, and in his individual capacity;
MICHAEL PHIBBS, in his individual capacity;
DANIEL J. HARTMAN, in his individual capacity;
KIRSTEN GREGG, in her individual capacity;
CITY OF GRAND JUNCTION, COLORADO;
CITY OF PUEBLO, COLORADO; and
CITY OF COLORADO SPRINGS, COLORADO,

      Defendants.

---

**ORDER**

---

Before the Court are four motions to dismiss: City of Grand Junction's Motion to Dismiss

Plaintiff's Amended Complaint Pursuant to F.R.C.P. 12(B)(6) (D. 27); Motion to Dismiss

Plaintiff's First Amended Complaint on Behalf of Defendants Schroder, Phibbs, Hartman, and

Gregg (D. 33); City of Colorado Springs's Motion to Dismiss (D. 34); and Defendant City of

Pueblo, Colorado's Motion to Dismiss (D. 36).  The Court GRANTS all of the motions for the

following reasons.

1

## I.  FACTS

This civil action arises from disputes regarding whether gambling operation was occurring within the State of Colorado.[1]   In February 2021, Plaintiff Charlie Chedda's, LLC (Charlie Chedda's) entered into a settlement agreement (2021 Settlement) with the District Attorney for Colorado's 21st Judicial District (D. 25 at ¶ 22).  The 2021 Settlement established that the District Attorney would not file or prosecute simulated-gambling charges under C.R.S. § 18-10.5-103 against Charlie Chedda's for using the Triangle Games Skill-Based Amusement System (Triangle System) at its Grand Junction location (*id.*).  This 2021 Settlement forms the basis for many of the allegations in the complaint.[2]   The rest of the complaint is comprised of vague recitations of a

---

[1] The Court draws the operative facts as set forth in the First Amended Complaint for Declaratory and Injunctive Relief, Damages, and Attorney Fees (42 U.S.C. §§ 1983, 1988) (D. 25).  Plaintiffs' complaint is overall a poorly structured kitchen sink of allegations.  At the same time, it is also significantly lacking in context and details that would enable the Court to properly understand the claims asserted.  The Court has attempted to discern the factual allegations presented and which claims apply to which Defendants to the best of its ability, but to the extent it has misconstrued or misunderstood anything, the fault lies with Plaintiff for failing to plead a "short and *plain* statement" according to Federal Rule of Civil Procedure 8(a) (emphasis added).

It is also noted that the complaint dedicates significant space to recounting Mesa County's permitting scheme, and Plaintiffs appear to base some of their claims on this scheme (*see* D. 25 at ¶¶ 45–52, 74, 84).  Mesa County is not named as a defendant in this action, and the Court does not see how the allegations regarding its permitting scheme are otherwise relevant and so does not address them in this Order.

[2] Plaintiffs seem to misunderstand that while the settlement may serve as an acknowledgement that Charlie Chedda's operation of simulated-gambling may not garner a conviction under Colorado criminal law (the Court also cannot say this for certain because Plaintiffs have not included a copy of the settlement anywhere), that is a very different and unrelated issue from whether Plaintiffs' simulated-gambling conduct can be regulated by local zoning laws. Furthermore, Plaintiffs do not clarify if the settlement applies to Patriot as well as Charlie Chedda's, or if it is binding on any other parties besides the District Attorney for the 21st Judicial District.

series of events with no clear connection between the events. As such, the Court briefly describes each event individually.

### A. Division of Gaming Letter

On or around May 4, 2023, the Colorado Division of Gaming (CDG) issued a letter ordering recipients to cease "all unlicensed gaming and/or sports betting at once" and warning of enforcement action by the Limited Gaming Control Commission, criminal prosecution, and civil action (*id.* at ¶ 23).[3] Plaintiffs' counsel responded to the letter on May 22, 2023, by submitting the 2021 Settlement (*id.* at ¶ 24). Eight days later, Defendant Kirsten Gregg, Chief of Investigations at CDG, forwarded the 2021 Settlement to the Attorney General (*id.*). On December 8, 2023, Defendant Christopher Schroder, Director of CDG, emailed Ms. Gregg, telling her not to send cease and desist letters to Plaintiffs (*id.* at ¶ 25).

### B. Colorado Springs Seizure

On May 11, 2023, Colorado Springs police seized $118,762.11 from Plaintiffs' business premises (*id.* at ¶ 28). Plaintiffs challenged this seizure in El Paso County District Court, and on February 6, 2025, the court ordered the return of the seized money (*id.*). However, the funds were not released to Plaintiffs until April 21, 2025 (*id.* at ¶ 29). As of November 7, 2025, police retained

---

[3] The phrasing in the complaint is unclear as to whether Plaintiffs themselves received this letter and, if so, when. The rest of the complaint seems to indicate it was third-parties that host Plaintiffs' games that received the letter, not Plaintiffs themselves.

some of Plaintiff's equipment, which is valued at more than $150,000 (*id.* at ¶ 55), although it is unclear from the complaint when this equipment was seized.

### C. Pueblo Enforcement

In August and September 2023, Pueblo police issued cease and desist letters to three fraternal organization locations that held Plaintiff Patriot Contest & Games, LLC (Patriot) devices, threatening criminal charges against employees (*id.* at ¶ 36). The letters identified Patriot's games as illegal, causing the fraternal organization locations to cease operations immediately (*id.*). Plaintiffs subsequently applied for device licensing and paid required fees, but Pueblo withheld approvals (*id.* at ¶ 37).

On May 14, 2024, Pueblo's City Council approved gambling-related ordinances modeled on state law (*id.* at ¶ 38). At a council meeting, Pueblo's Chief of Police stated that the fraternal organization operations were illegal, and the ordinances would provide municipal enforcement authority because the District Attorney was not pursuing criminal charges (*id.*). On May 24, 2024, Plaintiffs challenged the state statutes and Pueblo ordinances in Pueblo County court, seeking a determination that Patriot's games comply with the law (*id.* at ¶ 39). On April 5, 2025, Pueblo

police executed a search at one of the fraternal organization locations and charged multiple individuals under the municipal code for their operation of the gambling devices (*id.* at ¶ 40).

### D.  Grand Junction Shopping Center and Relocation

In February 2023, Grand Junction adopted an ordinance implementing a moratorium on the relocation or opening of new simulated-gaming arcades (*id.* at ¶ 44).  The City renewed the ordinance in February 2024 and February 2025 (*id.*).

On November 20, 2023, "the shopping-center owner's counsel"[4] wrote to Grand Junction officials and Defendant Micheal Phibbs, Senior Director of the Specialized Business Group within the Department of Revenue, about unlicensed gambling at Charlie Chedda's (*id.* at ¶ 33).  Mr. Phibbs replied, copying Mr. Schroder in the email (*id.*).  Mr. Phibbs said that the Specialized Business Group would be happy to work with the counsel to include language about illegal gambling on their properties in their leases (*id.*).  Mr. Schroder forwarded the email chain to Ms. Gregg (*id.*).

On February 7, 2025, the Grand Junction City Attorney wrote to Plaintiff Trey Franzoy, owner of Charlie Chedda's, that "relocation in the City is not an option given City ordinances" (*id.* at ¶ 43).

### E.  Veterans Posts

 On January 10, 2025, State Commander Carol Thomas of the Department of Colorado Veterans of Foreign Wars issued a Special Order to all Colorado "posts" stating that certain machines are not legal in Colorado, and posts are not allowed to have them on their premises (*id.*

---

[4] The complaint does not provide any context for where the shopping center is, who the counsel is, or why they were writing to city officials about Charlie Chedda's.  Piecing Plaintiffs' claims together, one might guess Charlie Chedda's is or was located in the shopping center, but that is not stated in the complaint.

at ¶ 32). Plaintiffs state that they "maintained equipment at these VFW posts, and the directive injured Patriot" (*id.*). On January 16, 2025, Patriot responded[5] by "enclosing" the 2021 Settlement and "urged the VFW 'to refrain from interfering further and let due process of law work'" (*id.*).

## II.  LEGAL STANDARD

### A.  12(b)(1)

Because federal courts are courts of limited jurisdiction, a court, sua sponte, or a party may challenge subject matter jurisdiction at any stage of the proceedings. *See Harris v. Illinois-California Exp., Inc.*, 687 F.2d 1361, 1366 (10th Cir. 1982). Under Rule 12(b)(1), a party may seek dismissal for lack of subject matter jurisdiction in two forms: (1) facial attack or (2) factual challenge. For the first, the moving party may "facially attack the complaint's allegations as to the existence of subject matter jurisdiction." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004). When reviewing a facial attack, courts accept a complaint's allegations in the complaint as true. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015) (citation omitted). For a factual attack, a party may go beyond the complaint's allegations by presenting evidence challenging the factual basis "upon which subject matter jurisdiction rests." *Nudell*, 363 F.3d at 1074 (citation omitted). When reviewing a factual challenge, courts cannot "presume the truthfulness of the complaint's factual allegations," and may consider documents outside the complaint without converting the motion to dismiss into a motion for summary judgment. *Pueblo of Jemez*, 790 F.3d at 1148 n.4. In this instance, the party invoking jurisdiction bears the burden of establishing subject matter jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

---

[5] The complaint does not state who Patriot responded to or in what manner it responded.

**B. 12(b)(6)**

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

## III.  ANALYSIS

### A.  City of Grand Junction

Plaintiffs bring two constitutional claims against the City of Grand Junction under 42 U.S.C. § 1983.  The first claim alleges that Grand Junction's ordinance barring relocation or opening of new simulated-gaming arcades chills Plaintiffs' First Amendment right to free speech (D. 25 at ¶ 93).  The second claim alleges that the ordinance deprived Plaintiffs of access to government services and expansion opportunities, violating their Fourteenth Amendment substantive due process rights (*id.* at ¶ 126).  Plaintiffs fail to state a claim on either ground.

### 1. First Amendment claim

Plaintiffs first argue that the ordinance impermissibly restrains their "truthful, non-misleading commercial speech" under *Central Hudson Gas & Electric Corporation v. Public Service Commission,* 447 U.S. 557 (1980) (D. 25 at ¶ 90).  In *Central Hudson* the Supreme Court laid out a four-part test to determine whether a commercial speech restriction violates the First Amendment.  447 U.S. at 566.  However, Plaintiffs do not state how the Grand Junction ordinance's relocation restriction restrains *commercial* speech.  Commercial speech is that which "propose[s] a commercial transaction." *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 473 (1989) (quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, (1976)).  The complaint does not explain how Plaintiffs' desire to relocate their business proposes a commercial transaction.  Nor do Plaintiffs cite any case law indicating that *Central Hudson* is the proper test for an ordinance limiting business locations.  To the contrary, city ordinances limiting locations of certain types of businesses are generally analyzed as time, place, and manner regulations, not restrictions on commercial speech. *See e.g., Young v. American*

8

*Mini Theaters,* 427 U.S. 50 (1975); *City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41 (1986).

*See also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (discussing that

because the ordinance in *Renton* did not ban a certain type of establishment altogether but merely

imposed location restrictions, it was "properly analyzed" as a time, place, and manner regulation).

For this reason, *Central Hudson* is not applicable to Plaintiffs' claim, and Plaintiffs' commercial

speech argument fails.

Plaintiffs next argue that the ordinance is facially invalid under *City of Lakewood v. Plain

Dealer Publishing Company,* 486 U.S. 750 (1988).  In *Lakewood,* the Supreme Court invalidated

a municipal ordinance restricting the placement of newspaper racks on city property, explaining

that, "a licensing statute placing unbridled discretion in the hands of a government official or

agency constitutes a prior restraint and may result in censorship."  486 U.S. at 757.  Here, Plaintiffs

do not identify how the Grand Junction ordinance places any discretion, let alone "unbridled"

discretion, in the hands of a government official or agency.  Plaintiffs state in a conclusory manner

that the ordinance's "categorical refusal to accept applications represents the ultimate form of

unbridled discretion" (D. 25 at ¶ 93).  Leaving aside that it is an apparent oxymoron to describe

the ordinance as both categorical and discretionary, nothing in the ordinance indicates that any

government official has discretion to determine whether a simulated-gaming business may relocate

or open within the City's limits.  Instead, the ordinance clearly prohibits government officials from

making any such determination by prohibiting all skilled-gaming business relocations and

openings.  *See Dr. John's, Inc. v. City of Roy,* 465 F.3d 1150, 1162 (10th Cir. 2006) (rejecting a

*Lakewood* facial challenge to a city ordinance regulating licenses for "sexually oriented

businesses" because the ordinance did not give city officials "discretion over *whether* to grant or

deny" a license application but only whether a business fell into the category of "sexually oriented" (emphasis in original)).  As there is no unbridled discretion issue, Plaintiffs fail to state a claim that the ordinance is facially invalid under *Lakewood*.

In their response brief, Plaintiffs admit that the City's *Lakewood* argument "has some strength regarding the relocation prohibition" (D. 28 at 5).  In an attempt to preserve their claim, they argue for the first time that the ordinance's bar on accepting sign-permit applications from skills-based gaming businesses is a content-based restriction on speech subject to strict scrutiny under *Reed v. Town of Gilbert,* 576 U.S. 155 (2015) (D. 28 at 5–6).  This argument does not pertain to the injury asserted or relief requested in the complaint, creating an issue of redressability, which is required for Article III standing.[6]  To establish Article III standing, a plaintiff must allege that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The injuries Plaintiffs claim are all related to the ordinance's bar on relocation (*see* D. 25 at ¶ 125 (listing Plaintiffs' injuries as loss of relocation and expansion opportunities within City limits; interference with landlord relations and lease negotiations; chilled communication with prospective hosts and business partners; and increased compliance and legal costs)).  The relief Plaintiffs seek in the complaint is specifically tailored to the ordinance's bar on relocation (D. 25 at 47–48 ("Plaintiffs request a permanent injunction barring Grand Junction from enforcing any

---

[6] "[A] court must raise the standing issue sua sponte, if necessary, in order to determine if it has jurisdiction." *United States v. Colorado Supreme Ct.*, 87 F.3d 1161, 1166 (10th Cir. 1996). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

ordinance, moratorium, policy, or practice that categorically prohibits relocation or siting of plaintiff's configuration within city limits")).  If the Court were to enjoin the City from enforcing the ordinance's moratorium on sign permits, this would not provide the relief sought in the complaint or redress the injury asserted because Plaintiffs would still be barred from relocating.[7] Therefore, Plaintiffs' do not have standing to bring their sign-permitting argument, and it fails to save their First Amendment claim.  *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

### 2. Fourteenth Amendment claim

There are two types of substantive due process claims:  (1) government infringement upon a fundamental right and (2) governmental action that arbitrarily deprives a plaintiff of life, liberty, or property in a manner that shocks the judicial conscience.  *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018).  The U.S. Court of Appeals for the Tenth Circuit has clarified that the court must "apply the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*." *Id.*  The Court construes Plaintiffs' challenge to the ordinance as legislative action and Plaintiffs' challenge to the City Attorney's email informing them they would not be able to relocate under the ordinance as executive action and analyzes each in turn.  *See Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.,* 174 F.4th 1235, 1251 (10th Cir. 2026).

---

[7] The signage argument is classic misdirection in aid of a fruitless snark hunt.  It makes no sense to dispute the contents of a sign for a non-existent business location.  That a sign will not be permitted for a location not containing the business speaks for itself.  It is thus not the contents of the sign being regulated by the ordinance.

In the Tenth Circuit, the shocks-the-conscience approach requires a plaintiff to establish (1) a cognizable property interest created by state law, and (2) government action depriving a party of such property in a manner so arbitrary that it "shocks the judicial conscience." *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (citing *Halley,* 902 F.3d 1136). In this case, the complaint clearly frames Plaintiffs' asserted interest at issue as their desire to relocate their business within Grand Junction city limits (D. 25 at ¶¶ 124–127).[8] This is not a cognizable property interest created by Colorado law, and Plaintiffs do not provide any evidence indicating that it is. Therefore, Plaintiffs fail to state a shocks-the-conscience claim.

For the fundamental rights approach, a court must first determine if a fundamental right is at stake. *See Smith,* 174 F.4th at 1251. If there is a fundamental right at stake, the court must then apply strict scrutiny to the challenged legislative action. *Id.* If there is no fundamental right at stake, the court applies rational basis review. *Id.* A fundamental right "is one that is 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Id.* (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720–721 (1997)). Plaintiffs do not argue or state that the right at issue—to relocate their business within Grand Junction's city limits—is a fundamental right, and the Court has not found any case law supporting such. Therefore, the ordinance restricting that right needs only be rationally related to a legitimate government interest. *Smith,*

---

[8] In their response brief, Plaintiffs attempt to reframe the asserted rights as (1) traditional property interests in cash, equipment, and paid-for license stickers, (2) a business operation, and (3) ordinary government application processes (D. 28 at 10). These asserted rights are irrelevant to Plaintiffs' Fourteenth Amendment claim against Grand Junction's ordinance that Plaintiffs specifically challenge for imposing a restriction on their ability to relocate. Furthermore, the complaint does not state that Grand Junction deprived them of any of the listed traditional property interests or operation of their business (they continue to operate in their existing location). Furthermore, it is well established in the Tenth Circuit that property interests within the meaning of the Fourteenth Amendment must be "substantive rights, not rights to procedure." *Elliott v. Martinez*, 675 F.3d 1241, 1245 (10th Cir. 2012). "An expectation of receiving process is not, without more, a liberty interest protected by the Due Process clause." *Id.* (quoting *Olim v. Wakinekona,* 461 U.S. 238 (1983)).

174 F.4th at 1251.  The ordinance, aimed at reducing gambling businesses in the interest of "public health, safety, and welfare" (D. 27-1 at 1),[9] satisfies this standard.  *See Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 341 (1986), *abrogated on other grounds by 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) (upholding a Puerto Rico statute regulating gambling advertising because Puerto Rico's asserted interest in reducing demand for casino gambling to promote health, safety, and welfare of citizens was a "substantial" government interest, and the statute directly advanced Puerto Rico's interest).  As the Supreme Court has stated, gambling "implicates no constitutionally protected right; rather, it falls into a category of 'vice' activity that could be, and frequently has been, banned altogether."  *U.S. v. Edge Broadcasting Co.,* 509 U.S. 418, 427 (1993).  Therefore, Plaintiffs fail to state a claim under the fundamental rights approach as well.

## B.  Defendants Schroder, Phibbs, Hartman, and Gregg

Plaintiffs bring four constitutional claims against Defendants Schroder, Phibbs, Hartman, and Gregg (collectively, the State Defendants).  All four Defendants are named in their individual capacities, and Defendant Schroder is also named in his official capacity.  The State Defendants are immune from suit in both their individual and official capacities.

### 1.  Individual capacity claims

The individual State Defendants are entitled to qualified immunity.  Qualified immunity is immunity from suit and not a mere defense to liability.  *Estate of Reat v. Rodriguez*, 824 F.3d 960,

---

[9] The Court is permitted to take judicial notice of the Grand Junction ordinance, attached as an exhibit to Grand Junction's motion, under Fed. R. Evid. 201(b).  The Court may do so without converting a motion to dismiss into a motion for summary judgment.  *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir.2006) ("facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting a motion to dismiss into a motion for summary judgment.").

13

964 (10th Cir. 2016) (citation omitted). Thus, at this stage of the litigation, the plaintiff must (1) allege a violation of a constitutional right and (2) the right must be clearly established at the time of the defendant's alleged misconduct. *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton,* 438 U.S. 635, 640 (1987)). A plaintiff may show that a law was clearly established "by identifying an on-point Supreme Court or published Tenth Circuit decision" or by showing that "the clearly established weight of authority from other courts" found the law to be as the plaintiff maintains. *Cox v. Glanz,* 800 F.3d 1231, 1247 (10th Cir. 2015) (quotations omitted). While "[t]he qualified immunity doctrine does not require a case exactly on point," it does require that "in the light of pre-existing law the unlawfulness must be apparent." *Weise v. Casper,* 593 F.3d 1163, 1167 (10th Cir. 2010) (internal citations and quotations omitted).

Regardless of whether Plaintiffs have alleged violations of constitutional rights, they have not shown that those rights were clearly established at the time of the State Defendant's conduct. The specific conduct by each State Defendant that Plaintiffs argue violated their rights includes:

- Hartman's May 4, 2023, cease-and-desist letter (D. 25 at ¶ 23);

- Gregg's May 30, 2023, email forwarding Plaintiffs' counsel's response to the May 4 letter to the Attorney General (*id.* at ¶ 24)

- Phibbs's November 20, 2023, email to the shopping center owner's counsel offering to work with them "on language specific to gambling" in their leases (*id.* at ¶ 33);

14

- Schroder's November 20, 2023, email forwarding Phibbs's email chain with the shopping-center owner's counsel to Gregg (*id.*);

- Schroder's December 8, 2023, email directing staff, "please do not send Cease and desist letters to Charlie Chedda or Patriot Contests" (*id.* at ¶ 25);

- Phibbs's May 22, 2024, email to CDG staff "seeking guidance on the terms the Division had invoked in its enforcement directives" (*id.* at ¶ 26);

- Gregg's May 29, 2024, email to CDG staff stating that CDG staff "are not considered experts" (*id.*); and

- Gregg's August 22, 2025, statement to a Mesa County planner that CDG "cannot provide Mesa County with a determination on whether or not Charlie Chedda's games are legal under the Colorado Limited Gaming Act" and suggesting that Mesa County or Plaintiffs file a petition with the Colorado Limited Gaming Control Commission (*id.* at ¶ 47).

Plaintiffs do not provide any case law indicating that any of these actions were clearly established constitutional violations. Instead, Plaintiffs cite five unrelated and unpersuasive cases. Plaintiffs cite *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963), and *NRA v. Vullo,* 602 U.S. 175 (2024), as evidence that it was unconstitutional for Defendants to engage in informal censorship by pressuring third parties to sever relationships with Plaintiffs (D. 42 at 25–26). First, Plaintiffs' characterization of their right as a right to be free from informal censorship is overly broad. *See Mullenix v. Luna,* 577 U.S. 7, 12 (2015) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal citations and quotations

omitted)); *Est. of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016), *as amended on reh'g in part* (Aug. 12, 2016) ("Though the elements of the state-created danger test are clearly established, it also must be clear to which fact scenarios and government actors we apply the test"). Plaintiffs do not cite any case law indicating a clearly established right concerning the particular conduct Defendants engaged in. Additionally, none of the listed actions supports the proposition that any State Defendant in actuality pressured third parties to sever relationships with Plaintiffs. The only possible action this would apply to is Mr. Phibbs's email chain with the shopping center owner's counsel concerning the inclusion of language specific to gambling in their leases. However, there is nothing in the email suggesting that Mr. Phibbs wanted the shopping center owner's counsel to sever ties with Plaintiffs.[10] Mr. Phibbs was clearly offering assistance to the counsel—only if they wanted it—and only in regard to lease language concerning *illegal* gambling, which Plaintiffs contend they were not engaged in.

Next Plaintiffs cite *Mathews v. Eldrige,* 424 U.S. 319 (1976), and *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985), as evidence that it was unconstitutional for Defendants to deprive Plaintiffs of property without a meaningful pre-deprivation hearing (D. 42 at 26). None of the listed actions by the State Defendants indicate that they deprived Plaintiffs of property. The May 4 letter threatened enforcement, but there is no evidence that Defendants took any enforcement action against Plaintiffs. Even if Defendants had taken enforcement action, it is unclear that such action would have been against Plaintiffs or parties hosting Plaintiffs' devices and whether such action would have involved any taking of property or a property right.

---

[10] Again, the Court notes that Plaintiffs' connection the shopping center owner's counsel is not established in the complaint. *See* fn. 3.

Furthermore, the complaint states that the cease and desist letter threatened enforcement action "by the Limited Gaming Control Commission," a distinct entity from the CDG.  Such speculative extrapolation is insufficient to support a takings claim.

Finally, Plaintiffs cite *United States v. Place*, 462 U.S. 696 (1983), as evidence that a prolonged, unreasonable seizure is unconstitutional (D. 42 at 26).  Again, this framing is overly broad.  Additionally, this right is irrelevant because the complaint states that the City of Pueblo, not the State Defendants seized Plaintiffs' funds.  Because Plaintiffs have failed to establish that Defendants' actions violated clearly established constitutional rights, Defendants are entitled to qualified immunity.

### 2. *Official capacity claims against Christopher Schroder*

Plaintiffs' claims against Mr. Schroder in his official capacity are barred by the Eleventh Amendment.  The Eleventh Amendment grants states sovereign immunity from suits brought by citizens, including suits against a state official in his or her official capacity.  *Hendrickson v. AFSCME Council 18,* 992 F.3d 950, 965 (10th Cir. 2021).  Under the *Ex parte Young* exception to the Eleventh Amendment, "a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks only prospective relief."  *Id.*  The doctrine requires that the named state official "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."  *Id.* (internal quotation marks and citation omitted).

Here, Plaintiffs fail to show that Mr. Schroder had a "demonstrated willingness" to enforce any laws against Plaintiffs.  Plaintiffs point to three actions as evidence of Mr. Schorder's willingness to enforce laws (D. 42 at 32): (1) his December 8, 2023, email directing CDG staff,

17

"please do not send Cease and desist letters to Charlie Chedda or Patriot Contests" (D. 25 at ¶ 25), (2) Department of Revenue coordination of training for fraternal organization leadership on gambling enforcement (*id.* at ¶ 27), and (3) his November 20, 2023, email forwarding the thread between Mr. Phibbs and the shopping center owners to Ms. Gregg (*id.* at ¶ 33). First, how Plaintiffs construe the December 8, 2023, email as a demonstration of Mr. Schroder's willingness to enforce any law against Plaintiffs is beyond the Court. On the contrary, it clearly indicates an *un*willingness to take action against Plaintiffs (*see* D. 25 at ¶ 25 ("*please do not send*" (emphasis added))). Second, Plaintiffs do not indicate that CDG, let alone Mr. Schroder individually, had any involvement in the Department of Revenue decision to coordinate training for fraternal organizations. And third, Mr. Schroder's November 20, 2023, email to Ms. Griggs concerned language on gambling in the shopping center owners' leases (it is still unclear how that pertains to Plaintiffs) and included the 2021 Settlement in which CDG agreed not to enforce certain statutes against Plaintiffs.

Furthermore, Plaintiffs do not allege an ongoing violation of federal law. Plaintiffs argue that the ongoing constitutional violations are "standardless enforcement, continued third-party coercion, unremedied seizures, and an unreformed regulatory regime" (D. 42 at 30). As discussed above, there is no evidence in the complaint that the State Defendants enforced any law against Plaintiffs, deprived Plaintiffs of property, seized Plaintiffs' property, or pressured third parties to sever relationships with Plaintiffs. None of the facts presented in the complaint indicate that any State Defendant is presently acting on the cease-and-desist letter or otherwise enforcing any law against Plaintiffs. In fact, the complaint admits that "[t]he enforcement actions have occurred, [and] the constitutional violations are complete" (D. 25 at ¶ 19). The complaint further clarifies

18

that Plaintiffs' claims are based on "[a] credible threat of *renewed* enforcement" (*id.* at ¶ 20) (emphasis added). Therefore, Defendant Schroder in his official capacity is immune from Plaintiffs' suit and *Ex Parte Young* cannot reasonably be construed to apply.

### C. City of Colorado Springs

Plaintiffs bring three constitutional claims against the City of Colorado Springs under 42 U.S.C. § 1983, all stemming from the Colorado Springs Police Department's (CSPD) seizure and retention of its funds and equipment. Plaintiffs fail to state a claim for municipal liability under § 1983 because they do not show that Colorado Springs seized and retained the funds and equipment pursuant to a municipal policy or custom.

Local governing bodies and local officials sued in their official capacities can be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (2018). To state a claim for municipal liability under § 1983, a plaintiff must show: "(1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (citation omitted).

A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and

the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation modified) (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010)). A "custom has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003).

Plaintiffs first argue that Colorado Springs maintained a widespread, informal custom of prolonged property retention and inadequate post-seizure procedures (D. 25 at ¶ 115). In support of this argument, Plaintiffs discuss the CSPD's the CSPD's delay in returning Plaintiffs' funds and the City's opening of a new Property Return Office in July 2023 to address documented "challenges" that community members faced in recovering seized property (*id.* at ¶¶ 115–117). While there is no set number of similar instances of misconduct required to establish "a widespread practice for a municipal liability claim," *Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (internal quotation marks omitted), a plaintiff may establish a claim by proffering evidence "that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). Plaintiffs' argument fails because it does not show that any other individuals faced issues of prolonged property retention and inadequate post-seizure procedures. At best, the complaint indicates that others faced vague "challenges" to recovering seized property, but it does not state what sort of challenges or if those challenges involved prolonged retention/delay.

Plaintiffs also argue that the CSPD evidence unit's conduct, which is overseen by the Chief of Police, reflected "either a final-policymaker decision" or "a custom of such longstanding duration that policymakers must have known and acquiesced to it" (D. 25 at ¶ 115).  This argument fails because the complaint does not indicate that the Chief of Police had any involvement in the evidence unit's handling of Plaintiffs' property, that the Chief made any decision impacting the evidence unit's handling of Plaintiffs' property, or why the evidence unit's conduct in this one circumstance establishes "a custom of such longstanding duration."  Plaintiffs rely on *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986), to argue that "CSPD's evidence unit exercised authority the Chief delegated," in which case "the subordinates' actions *are* the municipality's policy" (D. 44 at 12) (emphasis in original).  *Pembaur* specifically discussed a final policymaker's delegation of the authority to *make municipal policy*.  475 U.S. at 483.  Plaintiffs do not state anywhere in the complaint that the Chief delegated the authority to make municipal policy to the evidence unit. Alternatively, Plaintiffs argue that, under *Moss v. Kopp*, 559 F.3d 1155 (10th Cir. 2009), *Monell* liability attaches when an official with final policymaking authority approves of a subordinate's decision and the basis for it (D. 44 at 12).  There is similarly no indication anywhere in the complaint that the Chief approved or even knew of the evidence unit's actions in this case, including their failure to return the funds by the state court's March 13 deadline.

Because Plaintiffs have failed to show that CSPD's seizure and retention of its funds was pursuant to a municipal policy or custom, it has failed to state any claim for *Monell* liability under § 1983.

### D. City of Pueblo

Plaintiffs bring multiple (unclear) constitutional claims against the City of Pueblo under 42 U.S.C. § 1983. From what the Court can discern (keeping in mind that "[j]udges are not like pigs, hunting for truffles buried in briefs," *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)), Plaintiffs claim that Pueblo's cease and desist letters to fraternal organizations and denial/withholding of licensing for fraternal organizations violated Plaintiffs' Fourteenth Amendment procedural and substantive due process rights (D. 25 at ¶¶ 72, 83); and the denial/withholding of licensing violated their First Amendment rights (*id.* at ¶ 94). Plaintiffs do not have standing to assert these claims.

Standing under Article III is a threshold issue that must be addressed before the putative plaintiff can litigate their claims in federal court. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76 (1982).

Ast stated above, to establish Article III standing, a plaintiff must allege that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth*, 528 U.S. at 180–81.

Plaintiffs' asserted injuries include lost revenues and placements, withheld licensing and fees, and direct harm from the search on a fraternal organization in April 2025 and resulting charges (D. 25 at ¶¶ 112). Considering that the complaint states it was the fraternal organizations, not any Plaintiffs themselves, who were denied licensing, searched, and charged by the City of Pueblo, those actions do not establish or plausibly allege any injury suffered by *Plaintiffs*. The complaint also claims that Patriot directly lost revenue when fraternal organizations ceased

operations of Patriot's games after receiving cease-and-desist letters from Pueblo (*id.* at ¶ 36). This sort of downstream economic harm resulting from government action against a third-party business is a cognizable injury sufficient to establish standing. *See Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 384, (2024) ("[T]he Court has identified a variety of familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff. For example, when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers.").

However, it is unlikely that this injury—loss in revenue from fraternal organizations ceasing operations of Patriot's games—will be redressed by a favorable decision by this Court, based on the relief Plaintiffs seek. To establish redressability, a plaintiff does not need to show that an injury is completely redressable, only that "a favorable decision would 'alleviate the injury to some extent.'" *Sanchez v. Torrez*, 173 F.4th 1202, 1216–17 (10th Cir. 2026) (quoting *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012)).

First, Plaintiffs request an injunction barring Pueblo from "enforcing its gambling-related ordinances and licensing measures against Plaintiffs" (D. 25 at 46). This would not prevent Pueblo from enforcing its laws and licensing measures against fraternal organizations. Second, Plaintiffs request an order requiring Pueblo to provide "prompt, neutral post-seizure hearings for any future seizure or restraint of property" (*id.*). The Court fails to see how this is applicable to Plaintiffs' alleged injury as the complaint does not indicate that Pueblo seized any of Plaintiffs' property. Third, Plaintiffs request that "Pueblo be enjoined from informal censorship by pressuring fraternal

23

organizations, veteran commands, landlords, or similar intermediaries to remove or refuse plaintiffs' contests" (*id.*). Because the decision whether to host Plaintiffs' games ultimately lies with the fraternal organizations, it is merely speculative, as opposed to likely, that such an injunction would result in the re-instatement of Plaintiffs' source of revenue. There is no indication in the complaint that an order forcing Pueblo to stop "pressuring" fraternal organizations to remove Plaintiffs' games would result in the organizations that removed Plaintiffs' games agreeing to host them again. *See Citizens for Const. Integrity v. United States*, 57 F.4th 750, 761 (10th Cir. 2023) ("Where, as here, the causal relation between the injury and the challenged action depends upon the decision of an independent third party . . . a plaintiff must plausibly allege at the least that the third party will *likely* react in predictable ways." (citation modified) (emphasis in original)). Because Plaintiffs' alleged injury is not likely to be redressed by the relief sought, they have failed to establish Article III standing, and the Court lacks jurisdiction to hear their claims. [11]

## IV.  CONCLUSION

Accordingly, all four motions to dismiss (D. 27, D. 33, D. 34, D. 36) are GRANTED and all of Plaintiffs' claims in this suit are dismissed. Plaintiffs have already filed one amended complaint, and the Court determines an opportunity for further amendment would be futile.[12] Therefore, it is FURTHER ORDERED that the Clerk of the Court shall close this case.

---

[11] In their response brief, Plaintiffs also make an argument that they have third-party standing due to their "ongoing commercial relationships" with fraternal organizations (D. 43 at 7). To establish third-party standing in the Tenth Circuit, a plaintiff must establish (1) that it has a "close relationship" with the third-party, and (2) there is a "hindrance" to the third-party's ability to protect its own interest. *Aid for Women v. Foulston,* 441 F.3d 1101, 1112 (10th Cir. 2006). Plaintiffs do not argue or indicate in any way that there is a hindrance to the fraternal organizations' ability to protect their own interests. Therefore, their third-party standing argument fails.

[12] Whether to allow or deny amended pleading lies within the discretion of the district court. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *Vazirabadi v. Denver Pub. Schs.,* 820 F. App'x 805, 809 (10th Cir. 2020). A district court may refuse to allow amendment if it would be futile. *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007). A

24

DATED June 8, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

---

proposed amendment is futile if the pleading, as amended, would be subject to dismissal. *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013).