**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03588-GPG-KAS

TREY FRANZOY, an individual; PATRIOT CONTEST & GAMES, LLC, a Wyoming limited liability company; and CHARLIE CHEDDA'S, LLC, a Wyoming limited liability company,

    Plaintiffs,

v.

CITY OF PUEBLO, COLORADO; and CITY OF COLORADO SPRINGS, COLORADO,

    Defendants.

---

**SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF, AND ATTORNEY FEES (42 U.S.C. §§ 1983, 1988)**

---

**INTRODUCTION**

1. This is a civil rights action under 42 U.S.C. § 1983. Plaintiffs Trey Franzoy, Patriot Contest & Games, LLC, and Charlie Chedda's, LLC operate skill-based, pattern-recognition contest machines in a configuration that an independent gaming laboratory examined and reported to be a game of skill, not chance, and that a Colorado district attorney agreed not to prosecute. No Colorado court has ruled that configuration unlawful, and Plaintiffs maintain the machines are skill contests, not gambling devices. Each Defendant named below took its own separate action against Plaintiffs' property, operations, or speech without first publishing or applying any neutral standard to distinguish a skill contest from a prohibited gambling device.

1

2. Plaintiffs sue two Defendants for two separate but related courses of conduct by state actors. The City of Colorado Springs seized $118,762.11 of Plaintiffs' operating capital, held it for more than 23 months, did not return it until 39 days after the court-ordered return deadline, and still holds equipment Plaintiff Franzoy estimates is worth more than $150,000. The City of Pueblo accepted Plaintiffs' license fees, withheld the licenses Plaintiffs paid for, seized Plaintiff Franzoy's money and equipment, and enacted and carried out an ordinance to prosecute Plaintiffs' operations.

3. This Second Amended Complaint pleads each count against a single Defendant and asks only for relief that addresses that Defendant's own conduct. No count attributes one Defendant's act to another. Plaintiffs seek damages from the Defendants whose conduct is complete, injunctive relief from the municipalities that still hold Plaintiffs' property or enforce against them, and a declaration that the conduct described below violated the First, Fourth, and Fourteenth Amendments.

**JURISDICTION AND VENUE**

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)–(4) (civil rights).

5. The Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202.

6. Venue lies in this District under 28 U.S.C. § 1391(b)(1)–(2). All Defendants reside in Colorado, and a substantial part of the events giving rise to each claim

occurred in Colorado.

## PARTIES

7. Plaintiff Trey Franzoy is a natural person who resided in Colorado from 2001 to 2023 and now resides in Puerto Rico. He owns and operates Patriot Contest & Games, LLC and Charlie Chedda's, LLC.

8. Plaintiff Patriot Contest & Games, LLC is a Wyoming limited liability company registered to do business in Colorado. Patriot places and services skill-based, pattern-recognition contest machines at fundraising-partner host venues on a revenue-share model.

9. Plaintiff Charlie Chedda's, LLC is a Wyoming limited liability company registered to do business in Colorado.

10. Defendant City of Colorado Springs, Colorado is a Colorado municipal corporation. It is sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief arising from its property-handling policies and decisions.

11. Defendant City of Pueblo, Colorado is a Colorado municipal corporation. It is sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief arising from its ordinances, policies, and final-policymaker decisions.

## COMMON BACKGROUND

12. On November 22, 2020, the independent gaming laboratory Nick Farley & Associates conducted a forensic examination of the Triangle Games Skill-Based Amusement System version 1.5.2 that Plaintiffs operate. The laboratory reported that the system draws from finite, self-replenishing pools of predetermined

3

outcomes, that the player must perform a time-limited, pattern-recognition selection task to obtain value, and that the system contains no random-number generator or other mechanism by which chance alone can produce a win. A player who fails the 10-second selection task receives no prize. The Farley report is attached as Exhibit 1.

13. In February 2021, Charlie Chedda's, LLC and the elected District Attorney for Colorado's Twenty-first Judicial District executed a Settlement Agreement and Release in Mesa County Case No. 2019CV25. The agreement incorporates the November 22, 2020, Farley report as its Exhibit A and defines Plaintiffs' configuration by reference to the devices "as they existed on November 22, 2020." In the agreement, the District Attorney promised not to file or prosecute simulated-gambling charges under C.R.S. § 18-10.5-103 against that configuration, while reserving authority to pursue other offenses and clarifying that modifications or different devices fall outside the agreement's scope. Plaintiffs have continued to operate the devices in reliance on this baseline, maintaining the hardware, software version, and gameplay parameters set forth in the Farley report. The agreement is between Charlie Chedda's, LLC and the District Attorney for Colorado's Twenty-first Judicial District, and it binds only that District Attorney, not any other prosecutor, agency, or court. Plaintiff Patriot Contest & Games, LLC places and services the same Farley-defined configuration at its host venues. The Settlement Agreement is attached as Exhibit 2.

14. Plaintiffs do not allege that any Colorado official or court ever ruled their machines lawful, and no count depends on such a ruling. Plaintiffs allege the concrete, verifiable facts that follow: the Farley report exists and found the configuration to be a game of skill; the 2021 Settlement Agreement exists and reflects an elected prosecutor's agreement not to charge that configuration as simulated gambling; each Defendant named below possessed or was aware of one or both documents before acting; Plaintiffs relied on them in continuing to operate; and each Defendant acted against Plaintiffs without first identifying or applying any published standard for distinguishing a lawful skill contest from a prohibited gambling device. Plaintiffs' claims do not rest on the machines being lawful. They rest on each Defendant's own conduct: acting against Plaintiffs' property, operations, or speech while holding a forensic report and a prosecutor's non-prosecution decision that at a minimum placed the legality of the configuration genuinely in question, and while the State's own gaming agency conceded in writing that it could not tell a lawful contest from a prohibited device. Throughout this Complaint, references to Plaintiffs' machines mean the Farley-defined configuration described in paragraph 12.

15. The Division of Gaming's own records show that it could not, and did not, distinguish Plaintiffs' machines from lawful skill contests. On May 22, 2024, a senior Department of Revenue official asked Division leadership to explain the obstacles to prosecuting these machines without a forensic examination of each device. Days later, on May 29, 2024, the Division's Chief of Investigations stated

in an internal Division email that Division staff are not considered experts and could not testify that a device is a slot machine, and that the Division should not offer its staff as experts on that question. On August 22, 2025, responding to a Mesa County inquiry concerning Plaintiffs' machines, the Division stated that it cannot provide a determination on whether Plaintiffs' games are legal under the Colorado Limited Gaming Act, and the Colorado Limited Gaming Control Commission, the body to which the Division refers that question, had already declined a materially identical petition on the ground that it was not the correct body to decide whether such devices are simulated gambling devices. These are the Division's own contemporaneous statements. They matter here because they frame the municipal conduct alleged below: when even the state agency with primary responsibility for gambling enforcement conceded in writing that it could not tell a lawful skill contest from a prohibited gambling device, each Defendant's decision to act against Plaintiffs' property and operations without identifying or applying any neutral standard of its own is not plausibly explained as ordinary, good-faith enforcement of a clear prohibition.

**FACTS COMMON TO COUNTS 1 AND 2, THE CITY OF COLORADO SPRINGS**

16. On May 11, 2023, Colorado Springs police seized $118,762.11 in United States currency, together with silver bars, from Plaintiffs' business premises in Colorado Springs.

17. The People filed a civil-forfeiture action in El Paso County District Court, Case No. 2023CV31384, on July 19, 2023, with service of process on September 26,

6

2023.

18. On February 6, 2025, the El Paso County District Court ordered the People to return the seized currency and silver bars to Mr. Franzoy by March 13, 2025.

19. The People continued to hold the property and did not return it by March 13, 2025. On February 10, 2025, four days after the court's order, the People filed the release of evidence with the Colorado Springs Police Department, and filed a further release on March 12, 2025. An April 18, 2025, Joint Status Report filed in El Paso County District Court documented that "the property has not yet been released by Colorado Springs Police Department" as of April 18, 2025, and that "CSPD has repeatedly pushed back the date" on which the currency would be available for Mr. Franzoy to retrieve, "initially with last Friday, April 11th, to then Wednesday, April 16th and now to Friday, April 18th." The same filing, signed by both the District Attorney and Mr. Franzoy's counsel, attributed the delay specifically to the Colorado Springs Police Department.

20. Colorado Springs did not release the currency and silver bars until April 21, 2025, 39 days after the March 13, 2025, court-ordered deadline. Throughout those 39 days, Colorado Springs identified no lawful basis for continued retention of property a court had ordered returned.

21. The currency and silver bars were thus returned more than 23 months after the May 11, 2023, seizure. On April 23, 2025, the People filed a Stipulated Motion to Dismiss the forfeiture action, and the El Paso County District Court dismissed it.

22. As of the date of this filing, Colorado Springs continues to hold Plaintiffs'

equipment cabinets and computers, which Plaintiff Franzoy, as their owner, estimates are worth more than $150,000.

23. During the period after the February 6, 2025, return order, Colorado Springs had no criminal charge pending against Plaintiffs and no forfeiture-based justification for continued retention. The state court had ordered the property returned, and the People filed the corresponding evidence releases with the Department in February and March 2025.

24. By ordinance, the Chief of Police of the City of Colorado Springs is responsible for the care and condition of property in the Department's custody. Colorado Springs City Code § 8.1.104 provides that the Chief of Police "shall be responsible for the discipline, good order and proper conduct of the Department, for the enforcement of all laws, ordinances and regulations and for the care and condition of the buildings, equipment, apparatus and all other property of the Department," and that "[w]hen this Code requires or authorizes the Chief of Police to act, the act may be taken by authorized employees, assistants or designees of the Chief."

25. Under § 8.1.104, the Chief of Police holds final authority over how the Police Department cares for, holds, and returns property in its custody, including the evidence-unit practices that governed the retention of Plaintiffs' currency and equipment, and the Department's evidence personnel exercised that authority as the Chief's designees under the ordinance. Plaintiffs allege that no City ordinance, regulation, or mandatory review procedure constrains the Chief's

8

authority over the Department's property-return practices or subjects the Chief's decisions in that area to meaningful review. The exercise of discretion by a subordinate is not itself municipal policy, and the identity of the official with final policymaking authority is a question of state and local law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126–27 (1988) (plurality opinion). Here, that official is the Chief of Police, to whom the City Code assigns responsibility for the care and condition of, and the holding and return of, Department property, and whose decisions in that area no other City policymaker meaningfully reviews.

26. The decisions to retain Plaintiffs' property after the February 6, 2025, return order, to postpone its release on April 11, 16, and 18, 2025, and to continue holding Plaintiffs' equipment were made under the property-handling authority the ordinance assigns to the Chief of Police and exercised through the Department's evidence personnel. Plaintiffs allege that the Chief of Police, or a designee acting on the Chief's behalf, made the decision to withhold Plaintiffs' property and not to return it by the court-ordered deadline. On information and belief, the Chief of Police knew of or acquiesced in the Department's continued retention of Plaintiffs' property after the court-ordered deadline: the state court's return order and the People's releases were directed to the Department the Chief commands, the evidence unit reset the release date three times over 39 days, and no ordinance or procedure permitted anyone other than the Chief or his designees to control the release.

27. In or about July 2023, the Colorado Springs Police Department opened a

Property Return Office. In connection with that office, Department personnel acknowledged that members of the community had faced challenges timely recovering seized property.

28. The opening of the Property Return Office, and the City's contemporaneous acknowledgment that community members had faced challenges timely recovering property, gave the City of Colorado Springs notice that its property-return practices created an ongoing risk of prolonged deprivation of seized property, and those practices were a moving force behind the deprivation in this case.

29. After the District Attorney filed the releases, the only remaining control over when Plaintiffs received their property lay with the Department personnel who hold and release seized property. Those personnel, not the District Attorney, set the return date and then moved it. That property-handling function is the same one Colorado Springs City Code § 8.1.104 assigns to the Chief of Police and the Chief's designees.

## COUNT 1

### *Fourth Amendment, Unreasonable and Prolonged Seizure and Retention of Property (42 U.S.C. § 1983, Monell Liability)*

### Against Defendant City of Colorado Springs

30. Plaintiffs incorporate paragraphs 12 through 29.

31. The Fourth Amendment protects against unreasonable seizures of property, and its protection governs the reasonableness of a seizure throughout its duration, not only at the initial moment. A seizure reasonable at its inception becomes

unreasonable when the government prolongs its interference with possessory interests beyond what is justified by a legitimate law-enforcement need pursued with diligence. *United States v. Place*, 462 U.S. 696, 709–10 (1983) (continued detention of property may become unreasonable when the government's diligence and justification lapse). The Tenth Circuit has recognized that a failure to timely return seized property that is without evidentiary value and is not subject to forfeiture may state a constitutional claim. *Davis v. Gracey*, 111 F.3d 1472, 1477 (10th Cir. 1997). Here, once the state court ordered the currency returned and the People filed the corresponding releases, the property was, by the People's own releases, no longer evidence and no longer subject to any forfeiture, yet Colorado Springs continued to hold it.

32. Colorado Springs seized $118,762.11 of Plaintiffs' currency and silver bars on May 11, 2023, and retained the property for more than 23 months. After the El Paso County District Court ordered the property returned by March 13, 2025, Colorado Springs had no legitimate law-enforcement justification for continued possession. Plaintiffs challenge the unreasonableness of Colorado Springs' continued retention of the property, not the initial 2023 seizure. Because the Fourth Amendment governs a seizure throughout its duration, each day Colorado Springs held the currency and equipment without any legitimate justification, and in particular the 39 days it held the currency after the court-ordered return deadline of March 13, 2025, and its continued retention of the equipment through the date of this filing, was itself an unreasonable seizure that accrued when it

occurred. No criminal charge was pending, no forfeiture-based justification remained, and no investigative need remained. The government's interest in continued possession was at its lowest, and Plaintiffs' interest in the prompt return of their operating capital was at its highest. Colorado Springs nonetheless retained the currency for 39 days past the court-ordered deadline and continues to hold equipment Plaintiff Franzoy estimates is worth more than $150,000. The duration and manner of that retention were unreasonable.

33. A municipality is liable under 42 U.S.C. § 1983 when the execution of its own policy or the decision of its final policymaker is the moving force behind a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978). A single decision by an official who possesses final policymaking authority over the relevant subject matter is an act of the municipality. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986). The identification of the official with final policymaking authority is a question of state and local law, and the mere exercise of discretion by a subordinate does not establish municipal policy. *Praprotnik*, 485 U.S. at 123, 126–27. An official holds final policymaking authority where the official is not meaningfully constrained by policies made by others, the official's decisions are not subject to meaningful review, and the decision falls within the official's grant of authority; any such review must be meaningful rather than merely hypothetical. *Randle v. City of Aurora*, 69 F.3d 441, 448–49 (10th Cir. 1995).

34. The Chief of Police is that final policymaker. Construing this City's own municipal

12

code, the Tenth Circuit held that the Colorado Springs Chief of Police holds final policymaking authority in the departmental context there at issue, because the Chief has direct management and supervision of the Department and is responsible for its discipline, good order, and proper conduct and the enforcement of all laws, and because any administrative review of the Chief's decisions by the City Manager or City Council is illusory rather than mandatory. *Flanagan v. Munger*, 890 F.2d 1557, 1568–69 (10th Cir. 1989); accord *Randle*, 69 F.3d at 448–49. Section 8.1.104 assigns the Chief that same responsibility and, in the same grant, responsibility for the care and condition of, and the holding and return of, property in the Department's custody. No ordinance, regulation, or mandatory review procedure constrains or reviews the Chief's decisions about how the Department holds and returns seized property. The Chief's decisions in that area are therefore final policymaking decisions of the City, and the evidence personnel who set and reset the return date acted as the Chief's designees under § 8.1.104.

35. Plaintiffs plead municipal liability in the alternative. First, a single decision by the official with final policymaking authority over property-return practices is itself an act of the City, and no pattern of similar incidents is required. *Pembaur*, 475 U.S. at 481–83. Second, and in the alternative, the deprivation flowed from the City's own established property-return practices rather than from any isolated lapse: the City opened a Property Return Office in July 2023 in acknowledgment that community members had faced difficulty timely recovering seized property,

reflecting the City's awareness that its property-return practices governed how and when the Department returned seized property. Either way, the moving force was the City's own final policymaking decision or its established property-handling practice, not a rogue act by an individual employee.

36. Plaintiffs suffered concrete damages, including loss of use of $118,762.11 for more than 23 months, continued deprivation of more than $150,000 in equipment, business interruption, and the costs of securing the property's return.

37. Plaintiffs seek compensatory damages, declaratory relief, injunctive relief requiring constitutionally adequate property-return procedures and the prompt return of the equipment still held, and reasonable attorney fees and costs under 42 U.S.C. § 1988, against the City of Colorado Springs.

## COUNT 2

### *Fourteenth Amendment, Procedural Due Process (Retention of Property Without Prompt Post-Deprivation Process) (42 U.S.C. § 1983, Monell Liability)*

### Against Defendant City of Colorado Springs

38. Plaintiffs incorporate paragraphs 12 through 29.

39. Plaintiffs possess a protected property interest in the $118,762.11 in currency and the equipment, valued by their owner at more than $150,000, that Colorado Springs seized and held. The Fourteenth Amendment's Due Process Clause requires that a person deprived of property receive notice and an opportunity to be heard at a meaningful time and in a meaningful manner. When the government seizes property and acts before any hearing, it must provide a prompt and neutral post-deprivation process to test whether continued retention

14

is lawful.

40. Colorado Springs provided no prompt, neutral post-deprivation process to test its continued retention of Plaintiffs' property. While the forfeiture action was pending, the state court supplied the only available process; once that court ordered the property returned on February 6, 2025, no process of any kind protected Plaintiffs' interest in prompt compliance. The City held Plaintiffs' currency for 23 months, retained it for 39 days after a court ordered its return, repeatedly postponed the release date on April 11, 16, and 18, 2025, and continues to hold Plaintiffs' equipment. No neutral procedure existed by which Plaintiffs could obtain prompt return or a prompt determination of the lawfulness of continued retention. The Property Return Office described in paragraph 27 supplied no such process to Plaintiffs: the currency's release was postponed three times after the court-ordered deadline notwithstanding that office's existence. Plaintiffs obtained return of the currency only after court intervention and repeated delays. Plaintiffs challenge Colorado Springs' continued retention of their property without prompt, neutral process, which persisted through April 21, 2025, as to the currency and continues as to the equipment still held, not the initial 2023 seizure.

41. Colorado Springs' retention of Plaintiffs' property was not a random or unauthorized act. It was carried out through the City's own established property-handling and property-return practices, which the ordinance assigns to the Chief of Police and which the Chief's evidence personnel administered as a matter of routine policy, not accident. The officials who held the property possessed the

15

delegated authority to control its release, the deprivation was foreseeable and occurred at a predictable point once a court had ordered the property returned, and the City faced no need for quick action because it had already secured the property for nearly two years. In that circumstance, predeprivation process, or at a minimum a prompt and neutral post-seizure process, was entirely feasible, and the availability of a state post-deprivation remedy does not satisfy due process or bar this claim. *Zinermon v. Burch*, 494 U.S. 113, 138–39 (1990) (a deprivation is not random and unauthorized, and predeprivation process is required, where state officials hold delegated authority to effect it and the deprivation is foreseeable at a predictable point); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–37 (1982) (*Parratt* does not apply, and a post-deprivation tort remedy does not satisfy due process, where the deprivation is caused by conduct pursuant to established state procedure); *Lavicky v. Burnett*, 758 F.2d 468, 472–73 (10th Cir. 1985) (a due process challenge to the continued retention of seized property, as distinct from its initial seizure, is not barred by *Parratt* because a hearing to determine the propriety of retention is not impractical, and a planned, authorized retention is not a random or unauthorized act); *Gillihan v. Shillinger*, 872 F.2d 935, 939–40 (10th Cir. 1989) (where a deprivation is pursuant to an affirmatively established or de facto policy, procedure, or custom, the availability of an adequate state post-deprivation remedy is irrelevant and does not bar a § 1983 claim), *overruled on other grounds by Clark v. Wilson*, 625 F.3d 686, 691 (10th Cir. 2010).

42. The Chief of Police is the City's final policymaker for the Department's property-handling and post-seizure practices, for the reasons alleged above. *Randle*, 69 F.3d at 448–49; *Flanagan*, 890 F.2d at 1568–69. The retention of Plaintiffs' property was carried out through those established property-return practices rather than as a random or unauthorized act. The City maintained no policy providing a prompt, neutral post-deprivation process for the return of seized property, and the absence of such a process was a moving force behind the prolonged deprivation here. The over-retention of Plaintiffs' property was the operation of the City's own established evidence-handling and property-return practice, exercised under the authority § 8.1.104 assigns to the Chief. Where the State delegates to officials the authority to effect a deprivation and can predict the point at which the deprivation will occur, it must provide predeprivation or prompt post-deprivation process, and an after-the-fact state tort remedy does not satisfy due process. *Zinermon*, 494 U.S. at 138–39. Here, that predictable point arrived when the evidence unit continued to hold Plaintiffs' currency after the state court ordered its return and the People filed the corresponding evidence releases, yet the City provided no neutral procedure to secure prompt return.

43. Plaintiffs suffered concrete damages, including loss of use of their currency and equipment, business interruption, and the costs of securing return.

44. Plaintiffs seek compensatory damages, declaratory relief, injunctive relief requiring prompt and neutral post-seizure procedures and the prompt return of the equipment still held, and reasonable attorney fees and costs under 42 U.S.C.

17

§ 1988, against the City of Colorado Springs.

**FACTS FOR COUNT 3, THE CITY OF PUEBLO**

45. Defendant City of Pueblo enacted and enforced an ordinance and a licensing policy targeting Plaintiffs' machines.

46. On information and belief, in 2021, before the City of Pueblo adopted Ordinance No. 10703, the Pueblo County liquor-licensing authority, with the concurrence of the Colorado Attorney General, agreed to the same resolution of the legality of Plaintiffs' configuration that the District Attorney for Colorado's Twenty-first Judicial District had reached, and did so using the same statutory terms the City later wrote into its ordinance. The City enacted and enforced Ordinance No. 10703 notwithstanding that earlier resolution.

47. On August 30, 2023, Pueblo police issued cease-and-desist letters to host venues, including Fraternal Order of Eagles 145 and Steel City Eagles 3367, identifying Plaintiffs' machines as illegal and threatening criminal charges. On September 20, 2023, Pueblo issued a further cease-and-desist letter to American Legion Post 2.

48. On November 3, 2023, a Pueblo Sales Tax Division official, Valerie Palumbo, denied a liquor-license application with the notation "No approval until removal of skilled games," and the City withheld already-paid device-license stickers belonging to Patriot. Patriot had tendered payment for those stickers, the City had accepted the payment, and the City refused to deliver the stickers Patriot had purchased.

18

49. On May 14, 2024, the Pueblo City Council adopted Ordinance No. 10703, codified at Pueblo Municipal Code §§ 11-1-901 through 11-1-904, defining gambling devices and providing criminal penalties. The City Council's Background Paper stated that the ordinance's purpose was "to give municipal enforcement authority to the Pueblo Police Department and jurisdiction to the Pueblo Municipal Court." The Mayor signed the ordinance on May 17, 2024.

50. On May 24, 2024, Plaintiffs filed their own action in the District Court for Pueblo County, Colorado, Case No. 2024CV30253, seeking a state-court determination that Patriot's machines comply with the law. Plaintiffs initiated that action; Pueblo did not initiate it and did not compel Plaintiffs to participate in it. That state action remains pending. The relief Plaintiffs seek in this Complaint does not depend on the outcome of that action.

51. On April 5, 2025, Pueblo police conducted a search at Steel City Eagles and charged individuals other than Plaintiffs under the municipal code for electronic gambling, carrying out the enforcement authority the City Council enacted Ordinance No. 10703 to create. Before this civil action began, Pueblo had not charged any Plaintiff under the ordinance.

52. Pueblo's withholding of Patriot's already-paid device-license stickers and its enforcement of its ordinance and licensing policy destroyed Patriot's revenue-share contracts with its Pueblo host venues. Patriot operates on a revenue-share model under which it places and services its machines at host venues and shares the resulting revenue. Pueblo's cease-and-desist letters, its categorical

19

"No approval until removal of skilled games" condition, and its April 5, 2025, enforcement action directly deprived Patriot of the licenses it had paid for and of the revenue from its own contracts.

53. When Pueblo police searched Steel City Eagles on April 5, 2025, they seized Plaintiff Franzoy's machines and the money those machines held. Pueblo treated the machines and their contents as the host club's property, but Pueblo knew the machines and the revenue in them belonged to Plaintiff Franzoy. Mr. Franzoy, as the owner of that property, estimates it is worth approximately $60,000. Before this civil action commenced, Pueblo had filed no charge against Mr. Franzoy in connection with that property, gave him no notice of any process by which he might recover it, and had not returned it. This seized property is separate from the $118,762.11 in currency and silver bars that Colorado Springs seized and later returned, and separate from the equipment, valued by its owner at more than $150,000, that Colorado Springs continues to hold.

54. Pueblo enacted and enforced its ordinance with notice that a prosecutor had declined to pursue charges and without any neutral standard of its own. Before the City adopted the ordinance, the Pueblo Chief of Police told the City Council that the City needed the ordinance so that it could prosecute these operations, because the Pueblo District Attorney was not pursuing charges. Pueblo had also issued a cease-and-desist to a host organization after being given the forensic report and a settlement reflecting non-prosecution. The reasonable inference is that Pueblo adopted and enforced its ordinance to reach conduct a prosecutor

20

had declined to charge and did so without any neutral way to tell a lawful contest from a prohibited device.

## COUNT 3

### *Fourth Amendment Unreasonable Seizure, First Amendment Prior Restraint, and Fourteenth Amendment Due Process (42 U.S.C. § 1983, Monell Liability)*

### Against Defendant City of Pueblo

55. Plaintiffs incorporate paragraphs 12 through 15 and 45 through 54.

56. Plaintiff Patriot suffered a direct, concrete injury caused by Pueblo's own conduct. Patriot paid Pueblo for device-license stickers, Pueblo accepted the payment, and Pueblo withheld the stickers under the condition "No approval until removal of skilled games." Pueblo's cease-and-desist letters, licensing condition, ordinance, and April 5, 2025, enforcement action destroyed Patriot's own revenue-share contracts with its Pueblo host venues. These are Patriot's own injuries, the withheld property Patriot paid for and the contracts Pueblo's enforcement destroyed. They are not derivative injuries of any other party. Plaintiff Franzoy suffered a separate direct injury caused by Pueblo's own conduct. In connection with Pueblo's enforcement against Plaintiffs' machines, the City of Pueblo, acting through the Pueblo Police Department, seized money and equipment belonging to Mr. Franzoy that he, as its owner, estimates is worth approximately $60,000, and Pueblo retained that property with no charge filed against him, no notice, and no process by which he can recover it. That seized property is separate from the property at issue in Counts 1 and 2, which Colorado Springs seized. This too is Plaintiff Franzoy's own injury, not a

21

derivative injury of any other party. Plaintiffs' standing to pursue this Count against Pueblo does not depend on that seizure. Independent of it, Patriot's withheld paid-for device-license stickers and Patriot's lost revenue from its own Pueblo contracts are direct injuries caused by Pueblo's own licensing condition and ordinance, and each independently establishes Plaintiffs' standing against Pueblo.

57. Patriot's injuries are cognizable and redressable. When the government regulates a business, the regulation may cause downstream economic injuries to others in the chain of commerce, including that business's suppliers, customers, and contracting partners, and those downstream injuries can establish injury in fact. Patriot's loss of the license fees it paid Pueblo and of the revenue from its own Pueblo host contracts is precisely that kind of downstream economic harm. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 384 (2024). Patriot's injuries are redressable by relief directed at Pueblo's own enforcement authority. *Sanchez v. Torrez*, 173 F.4th 1202, 1216–17 (10th Cir. 2026). An order enjoining Pueblo from withholding Patriot's paid-for licenses and from enforcing its ordinance and licensing condition against Plaintiffs' operation of the Farley-defined configuration absent neutral, published criteria would redress Patriot's injury through Pueblo's own conduct. Returning the license fees Pueblo accepted, delivering the stickers Patriot paid for, and halting Pueblo's own enforcement redress Patriot's injuries without reference to any third party's choice. To the extent any part of Patriot's lost contract revenue turns on how

22

Pueblo's host venues respond, the requested relief redresses it because those host venues will predictably react in commonsense ways: Pueblo's cease-and-desist letters, its categorical licensing condition, and its April 5, 2025, enforcement action are what caused the host venues to remove Plaintiffs' machines, and lifting that municipal coercion will predictably restore the hosting on which Patriot's revenue depends. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114–22 (2025). A plaintiff need only show a predictable chain of events likely to follow from the relief, drawing on commonsense economic realities, and need not prove that the injury will be redressed completely. *Diamond Alternative Energy*, 606 U.S. at 117–22; *see Alliance for Hippocratic Med.*, 602 U.S. at 385 (a plaintiff must show a "predictable chain of events"). Plaintiff Franzoy's seizure injury is likewise redressable by an order requiring Pueblo to return the money and equipment it seized, relief that operates entirely through Pueblo's own conduct and does not depend on any third party. That other entities may share enforcement authority does not defeat redressability where Pueblo has its own special authority to withhold Patriot's licenses and to enforce its ordinance. *Sanchez*, 173 F.4th at 1217.

58. A municipality is liable under 42 U.S.C. § 1983 when its official policy or the decision of its final policymaker is the moving force behind a constitutional violation. *Monell*, 436 U.S. at 690–94. A legislative body's enactment of an ordinance that deprives a plaintiff of a federally protected right establishes municipal policy and causation. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,

23

520 U.S. 397, 404–05 (1997). The Pueblo City Council, the City's final policymaker for ordinances, enacted Ordinance No. 10703 for the stated purpose of authorizing enforcement against operations like Plaintiffs', and Pueblo officials applied the categorical "No approval until removal of skilled games" licensing condition as City policy.

59. Pueblo's policy operated as a prior restraint and a denial of due process. The categorical licensing condition and the ordinance restrained Plaintiffs' commercial activity and associated expression without neutral, published criteria and without any prompt, neutral process, and Pueblo deprived Patriot of its paid-for licenses and its contractual revenue without a hearing. Pueblo also seized money and equipment belonging to Plaintiff Franzoy and retained it with no charge, no notice, and no process by which Mr. Franzoy can recover it, which was an unreasonable seizure of property under the Fourth Amendment and a deprivation of property without due process under the Fourteenth Amendment, redressable by Pueblo's return of the property. Pueblo's policy was the moving force behind those injuries.

60. Plaintiffs suffered concrete damages, including the value of the withheld device-license stickers Patriot paid for, lost revenue-share income from Patriot's own Pueblo contracts, lost host placements, compliance and legal costs, and the value of the money and equipment the Pueblo Police Department seized from Plaintiff Franzoy.

61. Plaintiffs seek compensatory damages, declaratory relief, prospective injunctive

24

relief barring Pueblo from continuing to withhold Patriot's paid-for licenses and from subjecting Plaintiffs' operation of the Farley-defined configuration to future enforcement under Ordinance No. 10703 and its licensing condition absent neutral, published criteria and prompt, neutral procedures, an order requiring Pueblo to return the money and equipment it seized from Plaintiff Franzoy or, at a minimum, to provide a prompt and neutral process in which Mr. Franzoy can test the lawfulness of its continued retention, and reasonable attorney fees and costs under 42 U.S.C. § 1988, against the City of Pueblo. Plaintiffs do not seek to enjoin any pending state proceeding or any pending prosecution of any person not a party to this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

A.  On Count 1 (Fourth Amendment, City of Colorado Springs): enter a declaration that Colorado Springs' prolonged retention of Plaintiffs' property violated the Fourth Amendment; award Plaintiffs compensatory damages; enter an injunction requiring Colorado Springs to adopt constitutionally adequate property-return procedures and to promptly return the equipment it continues to hold; and award attorney fees and costs under 42 U.S.C. § 1988.

B.  On Count 2 (Fourteenth Amendment Procedural Due Process, City of Colorado Springs): enter a declaration that Colorado Springs deprived

25

Plaintiffs of property without prompt, neutral post-deprivation process in violation of the Fourteenth Amendment; award Plaintiffs compensatory damages; enter an injunction requiring prompt, neutral post-seizure procedures and the prompt return of the equipment still held; and award attorney fees and costs under 42 U.S.C. § 1988.

C. On Count 3 (Fourth Amendment, First Amendment Prior Restraint, and Fourteenth Amendment Due Process, City of Pueblo): enter a declaration that Pueblo's ordinance and licensing policy, as applied to the Farley-defined configuration, violated the First and Fourteenth Amendments, and that Pueblo's seizure and continued retention of Plaintiff Franzoy's property violated the Fourth and Fourteenth Amendments; award Plaintiffs compensatory damages; enter a prospective injunction requiring Pueblo to deliver Patriot's paid-for licenses, to return the money and equipment it seized from Plaintiff Franzoy or, at a minimum, to provide a prompt and neutral process in which Mr. Franzoy can test the lawfulness of its continued retention, and to refrain from subjecting Plaintiffs' operation of the Farley-defined configuration to future enforcement under Ordinance No. 10703 and its licensing condition absent neutral, published criteria and prompt, neutral procedures, not directed at any pending state proceeding or any pending prosecution of any non-party; and award attorney fees and costs under 42 U.S.C. § 1988.

D. On all Counts: award post-judgment interest on any money judgment under 28 U.S.C. § 1961, and prejudgment interest at the rate and on the terms permitted by applicable law; and grant such other and further legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable. Claims for declaratory and injunctive relief are to be decided by the Court. Fed. R. Civ. P. 38–39.

_s/ Edward C. Hopkins Jr._
Edward C. Hopkins Jr., Bar No. 43298
Raymond K. Bryant, Bar No. 42586
Civil Rights Litigation Group, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(720) 515-6165
ed@rightslitigation.com
raymond@rightslitigation.com
Attorneys for Plaintiffs