# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-03588-~~GPG-~~KAS

TREY FRANZOY, an individual; PATRIOT CONTEST & GAMES, LLC, a Wyoming limited liability company; and CHARLIE CHEDDA'S, LLC, a Wyoming limited liability company,

     Plaintiffs,

v.

~~CHRISTOPHER SCHRODER, in his official capacity as Director of the Colorado Division of Gaming, Colorado Department of Revenue, and in his individual capacity; MICHAEL PHIBBS, in his individual capacity; DANIEL J. HARTMAN, in his individual capacity; KIRSTEN GREGG, in her individual capacity; CITY OF GRAND JUNCTION, COLORADO;~~ CITY OF PUEBLO, COLORADO; and CITY OF COLORADO SPRINGS, COLORADO,

     Defendants.

===========================================================================

### ~~FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEY FEES (42 U.S.C. §§ 1983, 1988)~~

===========================================================================

### SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF, AND ATTORNEY FEES (42 U.S.C. §§ 1983, 1988)

1

## INTRODUCTION

1.    ~~Plaintiffs bring this~~ <u>This is a</u> civil <u>-</u> rights action under 42 U.S.C. § 1983 ~~for declaratory~~<u>.</u> <u>Plaintiffs Trey Franzoy, Patriot Contest & Games, LLC,</u> and ~~injunctive relief, damages, and attorney fees.~~

1. ~~Colorado's Division of Gaming launched a coordinated pre-adjudicatory shutdown program that targeted plaintiffs'~~<u>Charlie Chedda's, LLC operate</u> skill-based, pattern-recognition <u>contest machines in a configuration that an independent gaming laboratory examined and reported to be a game of skill, not chance, and that a Colorado district attorney agreed not to prosecute. No Colorado court has ruled that configuration unlawful, and Plaintiffs maintain the machines are skill</u> contests <u>-</u><u>, not gambling devices. Each Defendant named below took its own separate action against Plaintiffs' property, operations, or speech</u> without first publishing or ~~using objective standards for distinguishing lawful contests from prohibited gambling devices. Although the Division later conceded it lacked in-house expertise and the clear administrable criteria it needed to determine whether it had lawful authority to take the actions it took, it coordinated with three municipalities to impose cease-and-desist letters, licensing blocks, and seizures on plaintiffs' business operations. One seizure resulted in a twenty-three-month retention of operating capital despite a court order to return the property sooner. While this occurred, the defendants knew plaintiffs had executed a settlement agreement with a Colorado district attorney and had reviewed a forensic and testing analysis that a leading, independent~~

2

gaming laboratory and regulation expert prepared, which showed that plaintiffs' configuration was skill-based, not a form of illegal gambling, and lawful. Despite the legal agreement and expert forensic evidence, the defendants pressed forward without neutral standards or prompt post-deprivation procedures, breaching constitutional protections applying any neutral standard to distinguish a skill contest from a prohibited gambling device.

2. The Fourth Amendment forbids unreasonable seizures of property; a duration without adequate justification for continued retention renders a seizure unconstitutional. Plaintiffs sue two Defendants for two separate but related courses of conduct by state actors. The City of Colorado Springs seized $118,762.11 of Plaintiffs' operating capital, held it for more than 23 months, did not return it until 39 days after the court-ordered return deadline, and still holds equipment Plaintiff Franzoy estimates is worth more than $150,000. The City of Pueblo accepted Plaintiffs' license fees, withheld the licenses Plaintiffs paid for, seized Plaintiff Franzoy's money and equipment, and enacted and carried out an ordinance to prosecute Plaintiffs' operations.

3. This Second Amended Complaint pleads each count against a single Defendant and asks only for relief that addresses that Defendant's own conduct. No count attributes one Defendant's act to another. Plaintiffs seek damages from the Defendants whose conduct is complete, injunctive relief from the municipalities that still hold Plaintiffs' property or enforce against them, and a declaration that the conduct described below violated the First, Fourth, and Fourteenth

3

Amendments.

2.    ~~*United States v. Place*, 462 U.S. 696, 709–10 (1983) (holding ninety-minute luggage detention unreasonable). The First Amendment protects against prior restraints and informal censorship; any licensing scheme vesting discretion without neutral criteria operates as a prior restraint. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757–59 (1988) (licensing schemes with unbridled discretion chill protected speech and are presumptively invalid). The Fourteenth Amendment Due Process Clause demands notice and an opportunity to be heard before the government deprives a person of property, and longstanding controlling precedent demands when summary action occurs, a prompt and neutral post-deprivation hearing must follow. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) (balancing private interest, risk of error, and government need). These protections apply with added force when enforcement chills lawful speech and operates without published standards.~~

## JURISDICTION AND VENUE

~~2.~~4.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)–(4) (civil rights ~~action under 42 U.S.C. § 1983~~).

~~3.~~5.    The Court may grant declaratory and injunctive relief under ~~the Declaratory Judgment Act,~~ 28 U.S.C. §§ 2201–2202.

~~3.    Personal jurisdiction is proper because each state-officer defendant resides in Colorado and directed the challenged practices within this District, and each municipal defendant is a Colorado city, with all enforcement actions occurring in Colorado.~~

~~4.~~6.    Venue lies in this District under 28 U.S.C. § 1391(b)(1)–(2~~) because all~~

4

defendants). All Defendants reside in Colorado, and a substantial part of the events giving rise to the claimseach claim occurred herein Colorado.

**PARTIES**

5.7.    Plaintiff Trey Franzoy is a natural person who resided in Colorado from 2001 to 2023 and now resides in Puerto Rico. He owns and operates Charlie Chedda's, LLC and Patriot Contest & Games, LLC, through which he operates arcade-style businesses in Colorado featuring skill-based, pattern-recognition contests and Charlie Chedda's, LLC.

6.8.    Plaintiff Patriot Contest & Games, LLC is a Wyoming limited liability company registered to do business in Colorado that. Patriot places and services skill-based, pattern-recognition devices forcontest machines at fundraising-partner hostshost venues on a revenue-share model.

7.9.    Plaintiff Charlie Chedda's, LLC is a Wyoming limited liability company registered to do business in Colorado.

8.10.   Defendant Christopher Schroder is the DirectorCity of the Colorado Division of Gaming within theSprings, Colorado Department of Revenue. Heis a Colorado municipal corporation. It is sued in his official capacityunder 42 U.S.C. § 1983 for prospectivedamages and declaratory and injunctive relief and in his individual capacity for damagesarising from its property-handling policies and decisions.

4.    Defendant Michael Phibbs is the Senior Director of the Specialized Business Group within the Department of Revenue and is sued in his individual capacity for damages arising from administrative and investigative conduct.

5.    Defendant Daniel J. Hartman is the former Director of the Division of Gaming and is sued in his individual capacity for damages.

6.    Defendant Kirsten Gregg is the Chief of Investigations at the Division of Gaming and is sued in her individual capacity for damages.

9.11.   Defendant City of ~~Grand Junction~~Pueblo, Colorado is a Colorado municipal corporation. It is sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief ~~based on municipal~~arising from its ordinances, policies, and final-policymaker decisions.

7.    Defendant City of Pueblo, Colorado is a Colorado municipal corporation sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief.

8.    Defendant City of Colorado Springs, Colorado is a Colorado municipal corporation sued under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief based on municipal property-handling practices.

### STANDING, RIPENESS, AND CREDIBLE THREAT

9.    Plaintiffs satisfy Article III standing. They have suffered concrete, particularized injuries traceable to defendants and redressable by the relief sought. The factual basis for these injuries is set forth in detail in the Statement of Facts.

10.    The controversy is ripe for adjudication. The Division launched a shutdown-letter program and plaintiffs challenged it. State and municipal officials have taken continuing enforcement actions while the legality of plaintiffs' configuration remains unresolved. One municipal defendant has issued cease-and-desist letters, licensing denials, prosecutorial ordinances, and executed a raid, establishing concrete present hardship and fitness for judicial

6

decision. The enforcement actions have occurred, the constitutional violations are complete, and no further factual development is necessary for this Court to resolve the federal claims.

11.    A credible threat of renewed enforcement independently supports pre-enforcement standing. The Division retains policy-level control over the enforcement regime and can revoke the pause orders it issued in December 2023. State actors continue coordinating with local governments and third-party intermediaries regarding plaintiffs' operations, and permitting authorities have conditioned approvals on non-adjudicatory procedures that provide no meaningful forum for resolving the legality question. These circumstances establish a non-speculative threat of continued enforcement and operational chill.

### STATEMENT OF FACTS

### THE NICK FARLEY & ASSOCIATES ANALYSIS AND 2021 SETTLEMENT BASELINE

### COMMON BACKGROUND

10.12. On November 22, 2020, the independent gaming laboratory Nick Farley & Associates conducted a forensic examination of the Triangle Games Skill-Based Amusement System version 1.5.2 that plaintiffs operated at their Grand Junction location.Plaintiffs operate. The laboratory reported findings that became central to this dispute:that the system draws from finite, self-replenishing pools of predetermined outcomes;, that the player must perform a time-limited, pattern-recognition cognitive selection task to obtain value;, and that the system contains no hidden random-number generator or other mechanism by which chance alone can produce a win. The report further specified that aA player failingwho fails the ten10-second selection task receives no prize and that the presence of a

7

~~consolation option does not alter that winning depends on successful human performance, not chance~~. The Farley report is attached as Exhibit 1.

~~11.~~13.  In February 2021, Charlie Chedda's, LLC and the elected District Attorney for Colorado's ~~21st~~Twenty-first Judicial District executed a Settlement Agreement and Release in Mesa County Case No. 2019CV25. The agreement incorporates the November 22, 2020, Farley report as its Exhibit A~~, establishing an objective, dated baseline for plaintiffs' Grand Junction operation~~ and defines Plaintiffs' configuration by reference to the devices "as they existed on November 22, 2020." ~~The~~In the agreement, the District Attorney promised not to file or prosecute simulated-gambling charges under C.R.S. § 18-10.5-103 against ~~the Farley-defined~~that configuration ~~at the Grand Junction address~~, while reserving authority to pursue other offenses and clarifying that modifications or different devices fall outside the agreement's scope. ~~Presuming no Colorado district attorney had the authority to agree to authorize illegal gaming in their district, plaintiffs reasonably understood the agreement to mean that Colorado's government had determined plaintiffs' games were not illegal.~~ Plaintiffs have continued to operate the devices in reliance on this baseline, maintaining the hardware, software ~~versioning~~version, and gameplay parameters set forth in the Farley report. The agreement is between Charlie Chedda's, LLC and ~~fixed by~~ the ~~2021 settlement~~District Attorney for Colorado's Twenty-first Judicial District, and it binds only that District Attorney, not any other prosecutor, agency, or court. Plaintiff Patriot Contest & Games, LLC places and services the same Farley-

defined configuration at its host venues. The Settlement Agreement is attached as Exhibit 2.

**DIVISION OF GAMING'S ENFORCEMENT PROGRAM**

12. On May 4, 2023, the Division launched a form cease-and-desist directive issued by then-Director Daniel J. Hartman. The letter ordered recipients to cease "all unlicensed gaming and/or sports betting at once" and warned of enforcement action by the Limited Gaming Control Commission, criminal prosecution, and civil action. The Division simultaneously steered operators toward obtaining a gaming license by directing them to contact the Division's Chief of Investigations "for further information about obtaining a gaming license or sports betting license."

13. Plaintiffs' counsel responded on May 22, 2023, by submitting the Farley analysis and the 2021 settlement to the Division. Eight days later, on May 30, 2023, Chief of Investigations Kirsten Gregg forwarded counsel's submission to the Attorney General with the notation "fyi. We can discuss further tomorrow." This transmission evidenced state-level coordination, signaling that the Division viewed the matter as requiring inter-agency attention.

14. By November 20, 2023, Division leadership had the fully executed settlement in hand. On December 8, 2023, Director Christopher Schroder emailed Breanne Nolan and Chief of Investigations Kirsten Gregg: "Breanne, please do not send Cease and desist letters to Charlie Chedda or Patriot Contests." This directive—issued eighteen days after Schroder forwarded the settlement to Gregg with "FYI"—demonstrates that Schroder exercised personal, discretionary control over the Division's enforcement program. By selectively halting enforcement against Charlie Chedda and Patriot while allowing the broader enforcement posture against other

9

operators and hosts to continue, Schroder made a policy-level decision reflecting his own judgment after reviewing the settlement.

15. Yet the enforcement posture soon revealed uncertainty underlying the initial shutdown campaign. On May 22, 2024, Senior Director Michael Phibbs circulated an email titled "Clarification of Definitions of Gambling Devices," attaching statutory materials and seeking guidance on the terms the Division had invoked in its enforcement directives. One week later, on May 29, 2024, Chief Gregg stated in an internal email that Division staff "are not considered experts and [could not] testify that a device is a slot machine." These admissions underscored the defendants' known risk of legal error in a program that had already threatened shutdowns, licensing actions, and criminal prosecution.

16. Coordination with third parties continued. In October 2024, Department of Revenue personnel coordinated training for fraternal organization leadership on gambling enforcement issues. The breadth of these communications—spanning from the May 2023 shutdown letter to continued outreach in late 2024—demonstrates a Division-driven enforcement campaign launched without clear legal standards, maintained through escalation to the Attorney General, briefly paused after leadership's review of the settlement, and resumed through training and coordination even as the Division acknowledged its own lack of expertise.

**COLORADO SPRINGS SEIZURE AND EXTENDED RETENTION**

14. Plaintiffs do not allege that any Colorado official or court ever ruled their machines lawful, and no count depends on such a ruling. Plaintiffs allege the concrete, verifiable facts that follow: the Farley report exists and found the configuration to be a game of skill; the 2021 Settlement Agreement exists and

reflects an elected prosecutor's agreement not to charge that configuration as simulated gambling; each Defendant named below possessed or was aware of one or both documents before acting; Plaintiffs relied on them in continuing to operate; and each Defendant acted against Plaintiffs without first identifying or applying any published standard for distinguishing a lawful skill contest from a prohibited gambling device. Plaintiffs' claims do not rest on the machines being lawful. They rest on each Defendant's own conduct: acting against Plaintiffs' property, operations, or speech while holding a forensic report and a prosecutor's non-prosecution decision that at a minimum placed the legality of the configuration genuinely in question, and while the State's own gaming agency conceded in writing that it could not tell a lawful contest from a prohibited device. Throughout this Complaint, references to Plaintiffs' machines mean the Farley-defined configuration described in paragraph 12.

15. The Division of Gaming's own records show that it could not, and did not, distinguish Plaintiffs' machines from lawful skill contests. On May 22, 2024, a senior Department of Revenue official asked Division leadership to explain the obstacles to prosecuting these machines without a forensic examination of each device. Days later, on May 29, 2024, the Division's Chief of Investigations stated in an internal Division email that Division staff are not considered experts and could not testify that a device is a slot machine, and that the Division should not offer its staff as experts on that question. On August 22, 2025, responding to a Mesa County inquiry concerning Plaintiffs' machines, the Division stated that it

11

cannot provide a determination on whether Plaintiffs' games are legal under the Colorado Limited Gaming Act, and the Colorado Limited Gaming Control Commission, the body to which the Division refers that question, had already declined a materially identical petition on the ground that it was not the correct body to decide whether such devices are simulated gambling devices. These are the Division's own contemporaneous statements. They matter here because they frame the municipal conduct alleged below: when even the state agency with primary responsibility for gambling enforcement conceded in writing that it could not tell a lawful skill contest from a prohibited gambling device, each Defendant's decision to act against Plaintiffs' property and operations without identifying or applying any neutral standard of its own is not plausibly explained as ordinary, good-faith enforcement of a clear prohibition.

**FACTS COMMON TO COUNTS 1 AND 2, THE CITY OF COLORADO SPRINGS**

16. On May 11, 2023, Colorado Springs police seized $118,762.11 in United States currency, together with silver bars, from ~~plaintiffs'~~Plaintiffs' business premises ~~.~~ in Colorado Springs.

17. The People ~~subsequently~~ filed a civil-forfeiture action in El Paso County District Court, Case No. 2023CV31384, on July 19, 2023, with service of process ~~occurring~~ on September 26, 2023. ~~Throughout 2023 and into 2024, plaintiffs contested the restraint, and the court eventually ruled on the matter. On February~~

~~12.~~18. On February 6, 2025, the ~~court~~El Paso County District Court ordered the ~~Colorado Springs police~~People to return the seized currency and silver bars to

12

Mr. Franzoy by March 13, 2025.

19. ~~Despite this judicial directive, the evidence unit repeatedly delayed release. A~~The People continued to hold the property and did not return it by March 13, 2025. On February 10, 2025, four days after the court's order, the People filed the release of evidence with the Colorado Springs Police Department, and filed a further release on March 12, 2025. An April 18, 2025, Joint Status Report filed ~~with~~in El Paso County District Court documented ~~the pattern:~~ that "the property has not yet been released by Colorado Springs Police Department" as of April 18, 2025, and that "CSPD has repeatedly pushed back the date ~~of when~~" on which the ~~check~~currency would be available for Mr. Franzoy to ~~pick it up,~~ retrieve, "initially with last Friday, April 11th, to then Wednesday, April 16th and now to Friday, April 18th." The ~~Report further stated that despite the People~~same filing, signed by both the District Attorney and Mr. Franzoy's counsel, attributed the ~~release of evidence with CSPD on February 10, 2025—four days after~~delay specifically to the ~~court's return order—the "property has not yet been released by~~ Colorado Springs Police Department~~" as of~~.

20. Colorado Springs did not release the currency and silver bars until April ~~18~~21, 2025, ~~thirty-nine~~39 days after the March 13, 2025, court-ordered deadline. ~~On April 21, 2025, approximately ten weeks after the court's order and over twenty-three~~ Throughout those 39 days, Colorado Springs identified no lawful basis for continued retention of property a court had ordered returned.

~~13.~~21. The currency and silver bars were thus returned more than 23 months after

the ~~initial~~ May 11, 2023, seizure~~, Colorado Springs police released a bank check for the cash and returned the silver bars to Mr. Franzoy.~~. On April 23, 2025, the People filed a Stipulated Motion to Dismiss the forfeiture action ~~to reflect that return~~, and the El Paso County District Court dismissed it.

~~14.~~22. As of the date of this filing, Colorado Springs ~~police retained~~ continues to hold Plaintiffs' equipment cabinets and computers ~~valued at~~, which Plaintiff Franzoy, as their owner, estimates are worth more than $150,000~~, further demonstrating prolonged possession and the ongoing capital deprivation.~~.

23. During the period after the February 6, 2025, return order, Colorado Springs had no criminal charge pending against Plaintiffs and no forfeiture-based justification for continued retention. The state court had ordered the property returned, and the People filed the corresponding evidence releases with the Department in February and March 2025.

24. By ordinance, the Chief of Police of the City of Colorado Springs is responsible for the care and condition of property in the Department's custody. Colorado Springs City Code § 8.1.104 provides that the Chief of Police "shall be responsible for the discipline, good order and proper conduct of the Department, for the enforcement of all laws, ordinances and regulations and for the care and condition of the buildings, equipment, apparatus and all other property of the Department," and that "[w]hen this Code requires or authorizes the Chief of Police to act, the act may be taken by authorized employees, assistants or designees of the Chief."

14

25. Under § 8.1.104, the Chief of Police holds final authority over how the Police Department cares for, holds, and returns property in its custody, including the evidence-unit practices that governed the retention of Plaintiffs' currency and equipment, and the Department's evidence personnel exercised that authority as the Chief's designees under the ordinance. Plaintiffs allege that no City ordinance, regulation, or mandatory review procedure constrains the Chief's authority over the Department's property-return practices or subjects the Chief's decisions in that area to meaningful review. The exercise of discretion by a subordinate is not itself municipal policy, and the identity of the official with final policymaking authority is a question of state and local law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126–27 (1988) (plurality opinion). Here, that official is the Chief of Police, to whom the City Code assigns responsibility for the care and condition of, and the holding and return of, Department property, and whose decisions in that area no other City policymaker meaningfully reviews.

26. The decisions to retain Plaintiffs' property after the February 6, 2025, return order, to postpone its release on April 11, 16, and 18, 2025, and to continue holding Plaintiffs' equipment were made under the property-handling authority the ordinance assigns to the Chief of Police and exercised through the Department's evidence personnel. Plaintiffs allege that the Chief of Police, or a designee acting on the Chief's behalf, made the decision to withhold Plaintiffs' property and not to return it by the court-ordered deadline. On information and belief, the Chief of Police knew of or acquiesced in the Department's continued

15

retention of Plaintiffs' property after the court-ordered deadline: the state court's return order and the People's releases were directed to the Department the Chief commands, the evidence unit reset the release date three times over 39 days, and no ordinance or procedure permitted anyone other than the Chief or his designees to control the release.

27. In or about July 2023, the Colorado Springs Police Department opened a Property Return Office. In connection with that office, Department personnel acknowledged that members of the community had faced challenges timely recovering seized property.

28. The opening of the Property Return Office, and the City's contemporaneous acknowledgment that community members had faced challenges timely recovering property, gave the City of Colorado Springs notice that its property-return practices created an ongoing risk of prolonged deprivation of seized property, and those practices were a moving force behind the deprivation in this case.

29. After the District Attorney filed the releases, the only remaining control over when Plaintiffs received their property lay with the Department personnel who hold and release seized property. Those personnel, not the District Attorney, set the return date and then moved it. That property-handling function is the same one Colorado Springs City Code § 8.1.104 assigns to the Chief of Police and the Chief's designees.

16

## COUNT 1

### *Fourth Amendment, Unreasonable and Prolonged Seizure and Retention of Property (42 U.S.C. § 1983, Monell Liability)*

### Against Defendant City of Colorado Springs

30. Plaintiffs incorporate paragraphs 12 through 29.

31. The Fourth Amendment protects against unreasonable seizures of property, and its protection governs the reasonableness of a seizure throughout its duration, not only at the initial moment. A seizure reasonable at its inception becomes unreasonable when the government prolongs its interference with possessory interests beyond what is justified by a legitimate law-enforcement need pursued with diligence. *United States v. Place*, 462 U.S. 696, 709–10 (1983) (continued detention of property may become unreasonable when the government's diligence and justification lapse). The Tenth Circuit has recognized that a failure to timely return seized property that is without evidentiary value and is not subject to forfeiture may state a constitutional claim. *Davis v. Gracey*, 111 F.3d 1472, 1477 (10th Cir. 1997). Here, once the state court ordered the currency returned and the People filed the corresponding releases, the property was, by the People's own releases, no longer evidence and no longer subject to any forfeiture, yet Colorado Springs continued to hold it.

32. Colorado Springs seized $118,762.11 of Plaintiffs' currency and silver bars on May 11, 2023, and retained the property for more than 23 months. After the El Paso County District Court ordered the property returned by March 13, 2025, Colorado Springs had no legitimate law-enforcement justification for continued

17

possession. Plaintiffs challenge the unreasonableness of Colorado Springs' continued retention of the property, not the initial 2023 seizure. Because the Fourth Amendment governs a seizure throughout its duration, each day Colorado Springs held the currency and equipment without any legitimate justification, and in particular the 39 days it held the currency after the court-ordered return deadline of March 13, 2025, and its continued retention of the equipment through the date of this filing, was itself an unreasonable seizure that accrued when it occurred. No criminal charge was pending, no forfeiture-based justification remained, and no investigative need remained. The government's interest in continued possession was at its lowest, and Plaintiffs' interest in the prompt return of their operating capital was at its highest. Colorado Springs nonetheless retained the currency for 39 days past the court-ordered deadline and continues to hold equipment Plaintiff Franzoy estimates is worth more than $150,000. The duration and manner of that retention were unreasonable.

33. A municipality is liable under 42 U.S.C. § 1983 when the execution of its own policy or the decision of its final policymaker is the moving force behind a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978). A single decision by an official who possesses final policymaking authority over the relevant subject matter is an act of the municipality. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986). The identification of the official with final policymaking authority is a question of state and local law, and the mere exercise of discretion by a subordinate does not establish municipal

18

policy. *Praprotnik*, 485 U.S. at 123, 126–27. An official holds final policymaking authority where the official is not meaningfully constrained by policies made by others, the official's decisions are not subject to meaningful review, and the decision falls within the official's grant of authority; any such review must be meaningful rather than merely hypothetical. *Randle v. City of Aurora*, 69 F.3d 441, 448–49 (10th Cir. 1995).

34. The Chief of Police is that final policymaker. Construing this City's own municipal code, the Tenth Circuit held that the Colorado Springs Chief of Police holds final policymaking authority in the departmental context there at issue, because the Chief has direct management and supervision of the Department and is responsible for its discipline, good order, and proper conduct and the enforcement of all laws, and because any administrative review of the Chief's decisions by the City Manager or City Council is illusory rather than mandatory. *Flanagan v. Munger*, 890 F.2d 1557, 1568–69 (10th Cir. 1989); accord *Randle*, 69 F.3d at 448–49. Section 8.1.104 assigns the Chief that same responsibility and, in the same grant, responsibility for the care and condition of, and the holding and return of, property in the Department's custody. No ordinance, regulation, or mandatory review procedure constrains or reviews the Chief's decisions about how the Department holds and returns seized property. The Chief's decisions in that area are therefore final policymaking decisions of the City, and the evidence personnel who set and reset the return date acted as the Chief's designees under § 8.1.104.

**PLAINTIFFS PLEAD MUNICIPAL LIABILITY IN THE ALTERNATIVE. FIRST, A SINGLE DECISION BY THE OFFICIAL WITH FINAL POLICYMAKING AUTHORITY OVER PROPERTY-RETURN PRACTICES IS ITSELF AN ACT OF THE CITY, AND NO PATTERN OF SIMILAR INCIDENTS IS REQUIRED. *PEMBAUR*, 475 U.S. AT** ~~STATE AND MUNICIPAL PRESSURE THROUGH THIRD PARTIES~~

~~17.    On October 5, 2023, the Colorado Department of State issued an Observation Report following inspections at multiple fraternal posts. On November 20, 2023, a Department of State investigator forwarded the report to Department of Revenue personnel with a note that read: "Just passing on this observation report regarding illegal gaming devices in a few fraternal organizations." The report indicated that licensees claimed to have received a letter from the Colorado Secretary of State approving the games as legal and requested any such documentation. Internal Division emails reflect follow-up the next day, and the Division's Agent in Charge responded, "I didn't think there was a letter saying they were legal. Maybe I missed something."~~

~~18.    Communications with veterans' organizations compounded the state-driven pressure. On January 10, 2025, State Commander Carol Thomas of the Department of Colorado Veterans of Foreign Wars issued Special Order CO-25-04 to all Colorado posts, stating: "After speaking with the Department of Revenue / Gaming division and them doing an investigation into this, it was found that these machines are not legal in the State of Colorado for numerous reasons. Posts are not allowed to have them on their premises as they violate Colorado State Gaming Laws dealing with slot machines etc. If you have them, they need to be shut down and removed immediately." This directive explicitly identified the Division of Gaming as the source of the enforcement assertions, establishing the causal chain between state officials' conduct and third-party pressure on plaintiffs' host organizations. Plaintiffs maintained equipment at these~~

VFW posts, and the directive injured Patriot. On January 16, 2025, Patriot responded by enclosing the Farley forensic report and the government-approved settlement and urged the VFW to "refrain from interfering further and let due process of law work," while noting that if the games were illegal, the Division's agent should issue a cease-and-desist letter to Patriot rather than threaten the host organizations.

19.    On November 20, 2023, the shopping-center owner's counsel wrote to Grand Junction officials and copied Senior Director Michael Phibbs about alleged unlicensed gambling at Charlie Chedda's. At 11:24 AM, Phibbs replied: "I have included our new Director of Gaming, Christopher Schroder in this email. I am certain your leases already include language about illegal activities on your properties. We would be happy to work with you on language specific to gambling if that would be helpful." Ten minutes later, at 11:34 AM, Director Schroder forwarded the entire chain to Chief of Investigations Gregg with the single word "FYI"—attaching the settlement as "Franzoy Agreement Fully Executed (1).pdf." These communications demonstrate that Division leadership offered affirmative assistance to a private landlord in crafting lease restrictions targeting plaintiffs while simultaneously possessing documentary evidence that plaintiffs' operations were lawful.

20.    Spillover effects followed. In February 2024, Wells Fargo closed Charlie Chedda's accounts after agency pressure and adverse publicity. In early 2025, VFW state command issued a directive to affiliated posts ordering removal of Patriot's devices after the Division represented to the VFW that the devices were illegal. These events injured plaintiffs' reputation, threatened host relationships, and narrowed access to financial services and venue partners.

**PUEBLO'S COORDINATED ENFORCEMENT CAMPAIGN**

21.    In 2021, Pueblo's Liquor Enforcement Division resolved its action against American Legion Post 2 by stipulation, agreeing not to pursue further action so long as the laws or the devices did not change. This stipulation tracked the Farley-anchored baseline and put Pueblo officials on notice that Patriot's configuration at Post 2 was lawful.

35. 481–83. Second, and in the alternative, the deprivation flowed from the City's own established property-return practices rather than from any isolated lapse: the City opened a Property Return Office in July 2023 in acknowledgment that community members had faced difficulty timely recovering seized property, reflecting the City's awareness that its property-return practices governed how and when the Department returned seized property. Either way, the moving force was the City's own final policymaking decision or its established property-handling practice, not a rogue act by an individual employee.

36. Plaintiffs suffered concrete damages, including loss of use of $118,762.11 for more than 23 months, continued deprivation of more than $150,000 in equipment, business interruption, and the costs of securing the property's return.

37. Plaintiffs seek compensatory damages, declaratory relief, injunctive relief requiring constitutionally adequate property-return procedures and the prompt return of the equipment still held, and reasonable attorney fees and costs under 42 U.S.C. § 1988, against the City of Colorado Springs.

## COUNT 2

*Fourteenth Amendment, Procedural Due Process (Retention of Property Without Prompt Post-Deprivation Process) (42 U.S.C. § 1983, Monell Liability)*

22

**Against Defendant City of Colorado Springs**

38. Plaintiffs incorporate paragraphs 12 through 29.

39. Plaintiffs possess a protected property interest in the $118,762.11 in currency and the equipment, valued by their owner at more than $150,000, that Colorado Springs seized and held. The Fourteenth Amendment's Due Process Clause requires that a person deprived of property receive notice and an opportunity to be heard at a meaningful time and in a meaningful manner. When the government seizes property and acts before any hearing, it must provide a prompt and neutral post-deprivation process to test whether continued retention is lawful.

40. Colorado Springs provided no prompt, neutral post-deprivation process to test its continued retention of Plaintiffs' property. While the forfeiture action was pending, the state court supplied the only available process; once that court ordered the property returned on February 6, 2025, no process of any kind protected Plaintiffs' interest in prompt compliance. The City held Plaintiffs' currency for 23 months, retained it for 39 days after a court ordered its return, repeatedly postponed the release date on April 11, 16, and 18, 2025, and continues to hold Plaintiffs' equipment. No neutral procedure existed by which Plaintiffs could obtain prompt return or a prompt determination of the lawfulness of continued retention. The Property Return Office described in paragraph 27 supplied no such process to Plaintiffs: the currency's release was postponed three times after the court-ordered deadline notwithstanding that office's existence. Plaintiffs

23

obtained return of the currency only after court intervention and repeated delays. Plaintiffs challenge Colorado Springs' continued retention of their property without prompt, neutral process, which persisted through April 21, 2025, as to the currency and continues as to the equipment still held, not the initial 2023 seizure.

41. Colorado Springs' retention of Plaintiffs' property was not a random or unauthorized act. It was carried out through the City's own established property-handling and property-return practices, which the ordinance assigns to the Chief of Police and which the Chief's evidence personnel administered as a matter of routine policy, not accident. The officials who held the property possessed the delegated authority to control its release, the deprivation was foreseeable and occurred at a predictable point once a court had ordered the property returned, and the City faced no need for quick action because it had already secured the property for nearly two years. In that circumstance, predeprivation process, or at a minimum a prompt and neutral post-seizure process, was entirely feasible, and the availability of a state post-deprivation remedy does not satisfy due process or bar this claim. *Zinermon v. Burch*, 494 U.S. 113, 138–39 (1990) (a deprivation is not random and unauthorized, and predeprivation process is required, where state officials hold delegated authority to effect it and the deprivation is foreseeable at a predictable point); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–37 (1982) (*Parratt* does not apply, and a post-deprivation tort remedy does not satisfy due process, where the deprivation is caused by conduct pursuant to established state procedure); *Lavicky v. Burnett*, 758 F.2d 468, 472–

73 (10th Cir. 1985) (a due process challenge to the continued retention of seized property, as distinct from its initial seizure, is not barred by *Parratt* because a hearing to determine the propriety of retention is not impractical, and a planned, authorized retention is not a random or unauthorized act); *Gillihan v. Shillinger*, 872 F.2d 935, 939–40 (10th Cir. 1989) (where a deprivation is pursuant to an affirmatively established or de facto policy, procedure, or custom, the availability of an adequate state post-deprivation remedy is irrelevant and does not bar a § 1983 claim), *overruled on other grounds by Clark v. Wilson*, 625 F.3d 686, 691 (10th Cir. 2010).

42. The Chief of Police is the City's final policymaker for the Department's property-handling and post-seizure practices, for the reasons alleged above. *Randle*, 69 F.3d at 448–49; *Flanagan*, 890 F.2d at 1568–69. The retention of Plaintiffs' property was carried out through those established property-return practices rather than as a random or unauthorized act. The City maintained no policy providing a prompt, neutral post-deprivation process for the return of seized property, and the absence of such a process was a moving force behind the prolonged deprivation here. The over-retention of Plaintiffs' property was the operation of the City's own established evidence-handling and property-return practice, exercised under the authority § 8.1.104 assigns to the Chief. Where the State delegates to officials the authority to effect a deprivation and can predict the point at which the deprivation will occur, it must provide predeprivation or prompt post-deprivation process, and an after-the-fact state tort remedy does not

25

satisfy due process. *Zinermon*, 494 U.S. at 138–39. Here, that predictable point arrived when the evidence unit continued to hold Plaintiffs' currency after the state court ordered its return and the People filed the corresponding evidence releases, yet the City provided no neutral procedure to secure prompt return.

43. Plaintiffs suffered concrete damages, including loss of use of their currency and equipment, business interruption, and the costs of securing return.

44. Plaintiffs seek compensatory damages, declaratory relief, injunctive relief requiring prompt and neutral post-seizure procedures and the prompt return of the equipment still held, and reasonable attorney fees and costs under 42 U.S.C. § 1988, against the City of Colorado Springs.

### FACTS FOR COUNT 3, THE CITY OF PUEBLO

45. Defendant City of Pueblo enacted and enforced an ordinance and a licensing policy targeting Plaintiffs' machines.

46. On information and belief, in 2021, before the City of Pueblo adopted Ordinance No. 10703, the Pueblo County liquor-licensing authority, with the concurrence of the Colorado Attorney General, agreed to the same resolution of the legality of Plaintiffs' configuration that the District Attorney for Colorado's Twenty-first Judicial District had reached, and did so using the same statutory terms the City later wrote into its ordinance. The City enacted and enforced Ordinance No. 10703 notwithstanding that earlier resolution.

~~15.~~47.  On August 30, 2023, Pueblo police issued cease-and-desist letters ~~threatening criminal charges against employees at~~to host venues, including

26

Fraternal Order of Eagles 145 and Steel City Eagles 3367 ~~because Patriot's devices were present.~~, identifying Plaintiffs' machines as illegal and threatening criminal charges. On September 20, 2023, Pueblo issued a ~~new~~further cease-and-desist letter ~~targeted~~to American Legion Post 2 ~~despite plaintiffs' prior submission of the Farley report and the 2021 Post 2 resolution as exculpatory materials. The letters identified plaintiffs' games as illegal, causing fraternal organizations to cease operations immediately, with resulting revenue loss to both the host organizations and Patriot~~.

~~16.~~48.  ~~While plaintiffs paid required fees and applied for device licensing, Pueblo withheld approvals.~~ On November 3, 2023, a Pueblo Sales Tax Division official, Valerie Palumbo, denied ~~Steel City's~~a liquor-license application with the notation "No approval until removal of skilled games," and the City withheld already-paid device-license stickers ~~from Patriot. These actions impeded plaintiffs' lawful business operations despite fee payment and prior licensing approvals~~belonging to Patriot. Patriot had tendered payment for those stickers, the City had accepted the payment, and the City refused to deliver the stickers Patriot had purchased.

~~22.    On May 14, 2024, Pueblo's City Council approved gambling-related ordinances modeled on state law, which the Mayor signed on May 17, 2024. At the May 13 council meeting, the Chief of Police publicly stated that fraternal-organization operations were illegal and that Pueblo stated the ordinance would give municipal enforcement authority because the District Attorney was not pursuing criminal charges. The City Attorney similarly described the ordinance as enabling municipal prosecution.~~

27

23.    On May 24, 2024, plaintiffs filed a declaratory action in Pueblo County challenging the state statutes and Pueblo provisions and seeking a determination that Patriot's games comply with the law. That state-court action does not resolve the federal constitutional issues raised in this filing.

24.    Despite plaintiffs' prior challenge to these provisions, Pueblo escalated enforcement. On April 5, 2025, Pueblo police executed a search at Steel City Eagles, and multiple individuals were charged under the municipal code regarding electronic gambling. These events occurred while plaintiffs continued seeking judicial clarification of the legality of their devices.

**GRAND JUNCTION'S RELOCATION PROHIBITION**

25.    By November 2023, Division leadership and Grand Junction officials were in communication about plaintiffs' operations while the fully executed 2021 settlement was circulating within Colorado's government. On November 20, 2023, the shopping-center owner's counsel wrote to Grand Junction police commanders regarding "alleged unlicensed gambling" at Charlie Chedda's and copied Senior Director Michael Phibbs. Phibbs replied that he had included Division Director Schroder and offered to help develop "language specific to gambling" for lease provisions. That same morning, Director Schroder forwarded the thread to Chief of Investigations Gregg with "FYI," attaching the settlement. These exchanges demonstrate that state leadership engaged with the City regarding plaintiffs while possessing the settlement document and coordinating on third-party pressure.

26.    Around the same period, Division leadership circulated a "2023 Suspected Gaming Locations" image as part of an internal enforcement thread, evidencing the compilation

28

and sharing of suspected-location materials with local partners. This practice confirms coordination channels between state and local enforcement.

27.    On February 27, 2025, the Grand Junction City Attorney wrote toOn May 14, 2024, the Pueblo City Council adopted Ordinance No. 10703, codified at Pueblo Municipal Code §§ Mr. Franzoy: "relocation in the City is not an option given City ordinances" and requested a copy of the District Attorney settlement agreement. This authoritative statement simultaneously acknowledged the settlement's existence while categorically foreclosing relocation within City limits, representing a final municipal policy applied directly to plaintiffs' situation.

28.    Contemporaneous records reflect that Grand Junction adopted an ordinance in February 2023 barring relocation or opening of new simulated-gaming arcades, renewed it in February 2024 while shutting down other operators, and renewed it again in 2025 in a manner that effectively singled out plaintiffs despite the settlement baseline. This ordinance-based moratorium, paired with coordinated state-city communications, foreclosed a lawful path for plaintiffs to operate within City limits.

## MESA COUNTY'S PERMITTING LOOP AND NON-ADJUDICATORY REQUIREMENTS

29.    On July 30, 2025, Mesa County's Planning Manager informed Mr. Franzoy that the County would not accept or approve any application to permit a "Skilled Gaming type business." The Manager explained that this decision was based on communications with the Department of Revenue and stated that such businesses are only legal in Black Hawk, Central City, and Cripple Creek. By making this assertion, the Manager determined that plaintiffs' contest games were illegal and not entitled to the same government services that lawful

businesses are entitled to. The Manager then instructed plaintiffs to obtain a state "letter of review and determination" confirming that the proposed business was not illegal. This was the Manager telling plaintiffs to prove me wrong if you want to do business here. Without this letter, the Manager made clear that the County would not consider processing plaintiffs' planning and building permits the way it would for other businesses seeking to use these government services.

30. The next day, July 31, 2025, Mesa County reiterated the requirement, stating that because plaintiffs intended to apply for an arcade or skilled gaming or similar business, the County was requesting a letter of determination from the appropriate regulatory agency and would not approve any application.

31. Mesa County then sought that determination from the Division of Gaming. On August 18, 2025, a County planner asked the Division's Chief of Investigations whether the Division could determine the legality of plaintiffs' games. On August 22, 2025, the Chief replied that the Division "cannot provide Mesa County with a determination on whether or not Charlie Cheddas' games are legal under the Colorado Limited Gaming Act." The Chief suggested that Mesa County or plaintiffs "file a petition for declaratory order" with the Colorado Limited Gaming Control Commission under Rule 30-601 to -603. The Chief further stated that the Division could not guarantee the Commission would decide the petition.

32. Mesa County then adopted the Commission petition process as a condition for permitting. On August 27, 2025, the Community Development Director advised that the County could not permit the use unless a "petition for declaratory order" were filed with the Commission and asserted that "only the [Commission] can determine whether this operation is in fact a prize

redemption arcade and not under their jurisdiction," citing 1 Colo. Code Regs. 207-1, Rules 30-601 to -603.

33. In a separate August 26, 2025, exchange, the Division's Chief of Investigations stated that email was not the proper forum for a legal determination and again directed Mesa County and plaintiffs to the Commission petition process. When plaintiffs pressed for ordinary permit processing, the County answered on September 2, 2025, that it had identified a risk the use might be illegal, that it lacked expertise to distinguish permissible from prohibited devices, and that this "underlies the need" for a Commission opinion. The County also instructed plaintiffs to request a pre-application meeting through its portal.

34. The Commission path proved illusory. On December 23, 2024, another operator, No Limit Games, LLC, petitioned the Commission for a declaratory order on whether its kiosks were "simulated gambling devices" under C.R.S. § 18-10.5-102(6)(a). The Commission set the matter for discussion on January 16, 2025. That day, the Commission voted unanimously to decline and dismiss the petition, with the Vice-Chair stating that the Commission lacked jurisdiction or authority to address the issue and that the Commission "was not the correct body to address" such determinations. The Commission directed counsel to memorialize the decision in a written order stating that the requested declaratory order would not terminate the controversy or resolve the uncertainty regarding the statute's application.

35. Mesa County routed plaintiffs from the County to the Division to the Commission, only to find that the Commission had already disclaimed authority to resolve the precise question the County required. The Division's inability to decide legality and the

31

Commission's dismissal of the petition left no adjudicatory forum available while delaying ordinary land-use review for plaintiffs' proposed relocation.

**ONGOING HARMS**

36.    The foregoing events produced foreseeable, concrete, ongoing injury. Colorado Springs retained plaintiffs' $118,762.11 in operating capital for over twenty-three months despite a court order to return the funds sooner and it continues to hold equipment valued at more than $150,000. Pueblo's cease-and-desist letters, categorical licensing denials, and April 2025 raid caused immediate host defections and revenue loss. Grand Junction's ordinance-based relocation prohibition, combined with state-city coordination regarding enforcement, foreclosed any lawful avenue to access the government services plaintiffs needed to access to operate at any different location within City limits and damaged plaintiffs' landlord relationships. Mesa County's permitting loop created an infinite regress, conditioning permits on a non-existent legal determination. Cross-agency communications through the Department of State, coordinated training, and VFW pressure injured plaintiffs' reputation, threatened host contracts, and narrowed access to financial and venue partnerships. These harms continue to accumulate in legal fees, compliance costs, lost business opportunities, and chilled operations that undermine the value of plaintiffs' lawful configuration.

**FEDERAL CLAIMS FOR RELIEF UNDER 42 U.S.C. § 1983**

**COUNT I
FOURTH AMENDMENT
(UNREASONABLE SEIZURE AND PROLONGED RETENTION)**

37.    Plaintiffs incorporate the preceding paragraphs.

32

38. The Fourth Amendment guards against unreasonable seizures that infringe upon a person's possessory interests in property. A seizure is effected when a government official substantially interferes with those possessory interests. The touchstone for evaluating a seizure's constitutionality is reasonableness, assessed by balancing the nature and quality of the intrusion against the importance of the governmental interests at stake and the diligence shown in pursuing them. This protection extends to seizures of property outside the home and is not confined to privacy-based objections. A seizure's duration must be reasonable and cannot be prolonged without adequate justification tied to legitimate law-enforcement needs pursued with diligence.

39. Colorado Springs police seized $118,762.11 from plaintiffs' business on May 11, 2023, and retained the funds for over twenty-three months. A court ordered return of the property by March 13, 2025. Despite this directive, the evidence unit repeatedly delayed release, postponing the projected date multiple times before finally releasing the property on April 21, 2025. On the date of this filing, police retained equipment valued at more than $150,000. The duration and manner of retention are unreasonable. After the court's February 6, 2025, return order, the government's interest in continued possession was at its nadir while the possessory interest in prompt restoration of capital and equipment was at its apex. Prolonged interference with property beyond a clear judicial deadline, absent legitimate law-enforcement need pursued with diligence, violates the Fourth Amendment.

40. Defendants Hartman, Gregg, Schroder, and Phibbs were responsible for setting in motion the enforcement posture that foreseeably led to the unreasonable seizure and retention. Hartman issued the May 4, 2023, cease-and-desist letter. Gregg escalated it to the Attorney General. Schroder exercised policy-level control through the December 8, 2023, directive and

33

internal circulation of the settlement. Phibbs directed continued enforcement while the Division acknowledged definitional uncertainty and lack of expertise. These officials caused the enforcement sequence that prompted municipal seizures and prolonged the restraint through continued state-level coordination. Section 1983 imposes liability on officials who through their own actions cause a constitutional deprivation, including by setting in motion a series of events they know or reasonably should know will cause a violation by another actor. The facts establish the required affirmative link between these officials' conduct and the unreasonable seizure.

41.    On February 6, 2025, the El Paso County District Court in Case No. 2023CV31384 ordered Defendant Colorado Springs to return the seized funds to Plaintiff Franzoy by March 13, 2025. Despite this judicial determination that continued retention was no longer justified, Colorado Springs failed to return the funds until April 21, 2025—more than five weeks past the court-ordered deadline.

42.    During the post-order retention period, Colorado Springs had no legitimate law enforcement interest in continuing to hold plaintiffs' property. No criminal charges were pending. No forfeiture proceeding was initiated. No investigation remained active. The government's sole justification for the initial seizure—potential evidence in a criminal investigation—had been extinguished by judicial order.

43.    The continued retention meaningfully interfered with Plaintiff Franzoy's possessory interests in his property. Plaintiff was forced to secure alternative financing, suffered ongoing business disruption, and incurred additional costs directly attributable to the prolonged deprivation.

44.    The law governing seizure duration was clearly established before 2023. In *Place*, 462 U.S. at 709–10, the Supreme Court held that even a ninety-minute luggage detention was unreasonable because the agents failed to diligently pursue their investigation. The principle that a seizure reasonable at inception becomes unreasonable through prolonged retention without diligence has controlled for four decades. No reasonable official in 2023 could believe that retaining $118,762.11 for twenty-three months, and continuing to retain it for thirty-nine days after a court ordered return by March 13, 2025, comported with the Fourth Amendment. Under the Tenth Circuit's sliding-scale approach, *see Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (building on *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)), the more egregious the conduct, the less factually analogous prior case law must be; retaining seized property for weeks beyond a judicial deadline absent any legitimate law-enforcement need is so obviously unreasonable that defendants cannot reasonably claim a lack of fair warning.

45.    Multiple federal courts of appeals have held that the Fourth Amendment governs the reasonableness of ongoing property retention, not merely the initial moment of seizure. *See Asinor v. District of Columbia*, 111 F.4th 1249, 1252 (D.C. Cir. 2024); *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017).

46.    The Supreme Court has held that a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests. *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). A seizure can become unreasonable because its length unduly intruded upon constitutionally protected interests. *Id.* at 124 n.25.

35

47. The Supreme Court has further held that Fourth Amendment protections continue throughout the duration of a seizure, even after the commencement of legal process. *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017).

48. Here, Colorado Springs continued retention of plaintiffs' funds became unreasonable no later than February 6, 2025, when a court ordered return of the property. At that point, the government's justification for the seizure evaporated entirely. Under *Brewster*, the government must cease the seizure or secure a new justification. 859 F.3d at 1197. Colorado Springs did neither. Its post-order retention therefore violated the Fourth Amendment.

49. Plaintiffs suffered concrete damages including loss of use of $118,762.11 for over twenty-three months, business interruption, lost opportunities, and costs associated with seeking return, with equipment retention continuing. Plaintiffs seek compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities, together with punitive damages where permitted, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT II

### Procedural Due Process
**(Shutdowns and Licensing Blocks Without Pre-Deprivation Process; Delayed Post-Deprivation Process; Non-Adjudicatory Permit Loop)**

50. Plaintiffs incorporate the preceding paragraphs.

51. Plaintiffs possess cognizable property interests protected by the Fourteenth Amendment's Due Process Clause: (a) Traditional property: $118,762.11 in U.S. currency seized from business accounts; equipment valued in excess of $150,000; and device-license stickers for which plaintiffs tendered payment that Pueblo accepted but refused to deliver. (b) Mutually explicit understanding: The 2021 Settlement Agreement between the District Attorney for

36

Colorado's 21st Judicial District and Charlie Chedda's, LLC, incorporated the Farley report as Exhibit A, established an objective baseline for lawful operation, and constituted a binding promise not to prosecute the Farley-defined configuration. Under *Perry v. Sindermann*, 408 U.S. 593, 601 (1972), such mutually explicit understandings create property interests. (c) Governmental acknowledgment: By November 2023, Division leadership possessed the executed settlement agreement, forwarded it internally with instructions not to send cease-and-desist letters to plaintiffs, and thereby acknowledged its operative effect.

52.    These property interests do not depend on any claim of entitlement to a gaming license or regulatory approval. Plaintiffs assert a right not to have their existing property—cash, equipment, paid-for stickers—seized and their operations shuttered without any pre-deprivation process or prompt post-deprivation review.

53.    The question presented is not whether plaintiffs must ultimately obtain regulatory approval, but whether defendants could deprive plaintiffs of property and demand immediate cessation without any neutral adjudication. The Division acknowledged it lacked expertise. The Commission disclaimed jurisdiction. The municipalities imposed categorical denials. Plaintiffs were left with no forum.

54.    The Due Process Clause of the Fourteenth Amendment requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner before the government deprives a person of property. Pre-deprivation process is the rule. Exceptions are extraordinary and require exigent circumstances coupled with prompt post-deprivation review. When summary action is taken, the government must follow it with a prompt and neutral post-deprivation hearing.

55.    The Division's May 4, 2023, cease-and-desist letter demanded immediate cessation under threat of criminal, civil, and Commission enforcement without any neutral pre-deprivation process. Plaintiffs' counsel promptly supplied the Farley analysis and settlement. The Division escalated to the Attorney General and continued programmatic communications. These actions imposed a compelled business shutdown without contemporaneous notice and hearing tailored to the risk of error. Plaintiffs possessed a district attorney settlement and independent forensic analysis. The risk of erroneous deprivation of plaintiffs' rights was acute.

56.    Pueblo compounded the deprivation through cease-and-desist letters labeling plaintiffs' games illegal, licensing denials with the categorical notation "No approval until removal of skilled games," and withholding of already-paid device-license stickers. Fearful fraternal hosts ceased operations upon receiving these letters. The City then denied or withheld licensing and adopted ordinances aimed at prosecution and shutdown, all without providing timely, neutral procedures to contest the determinations. On April 5, 2025, Pueblo executed a raid resulting in criminal charges. This imposed deprivations without meaningful pre-deprivation process or prompt post-deprivation review.

57.    Colorado Springs' twenty-three-month retention of $118,762.11 and continued equipment hold, including delays even after a court-ordered return date, demonstrate the absence of prompt, neutral post-deprivation procedures adequate to test continued detention. When the government acts first and hears later, it must afford a prompt and neutral hearing keyed to the deprivation. The record here shows prolonged interference and post-order lag instead.

58.    Mesa County imposed an administrative loop that denied any meaningful process. The County refused to process permits absent a state determination of legality, the Division

38

declined to make that determination, the County then conditioned permits on a petition to a Commission that had already disclaimed jurisdiction, and the Commission voted unanimously that it was "not the correct body to address" the issue. This circular sequence left plaintiffs without a pre-deprivation hearing, prompt post-deprivation review, or any adjudicator at all.

59.    Plaintiffs' interests in operating capital, equipment, paid-for license stickers, and ongoing business operations are substantial. The risk of legal error was known. Division leadership sought "Clarification of Definitions of Gambling Devices" and the Chief of Investigations acknowledged that staff "are not considered experts and [could not] testify that a device is a slot machine." Pueblo's categorical "No approval until removal" and the Commission's non-path demonstrate the absence of neutral, administrable criteria and the high value of pre- or prompt post-deprivation procedures. The government's interests did not justify immediate shutdowns and prolonged retention without tailored safeguards.

60.    Defendants Hartman, Gregg, Schroder, and Phibbs caused these due-process deprivations. Hartman initiated the shutdown program. Gregg escalated the matter to the Attorney General and subsequently directed operators to a non-adjudicatory process, all while acknowledging that staff lacked the expertise necessary to act without risking deprivation of plaintiffs' possessory interests. Schroder exercised policy-level control, and Phibbs continued to direct enforcement efforts despite ongoing uncertainty regarding definitions. Under § 1983, officials are liable when they set in motion a series of actions by others that they know, or reasonably should know, will result in a constitutional deprivation of possessory interests.

61.    The procedural due process principles governing this claim were settled long before the conduct alleged. In *Mathews*, 424 U.S. at 334, the Supreme Court adopted a three-

factor balancing test for determining what process is due and held that some form of hearing must ordinarily precede final deprivation of a protected interest. The Tenth Circuit's decision in *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210-11 (10th Cir. 2000), confirmed that permit applicants possess a protected property interest only when governing codes impose 'sufficient substantive limitations' that constrain official discretion.  By 2023, every reasonable official knew that categorical license denials or moratoria blocking applications require hearings, and circular referral to a forum disclaiming jurisdiction does not satisfy due process.

62.    *Hyde Park Co.* and *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 766-68 (2005), do not bar plaintiffs' due process claim. (a) *Hyde Park* addresses prospective entitlement to regulatory approval. Plaintiffs' claim rests primarily on traditional property interests—cash, equipment, paid-for stickers—that exist independent of any regulatory scheme. (b) *Castle Rock* involved the indirect benefit of police enforcement against a third party. Here, defendants directly seized plaintiffs' property. Moreover, plaintiffs' property has ascertainable monetary value—precisely what *Castle Rock* said was lacking. 545 U.S. at 766-68. (c) The 2021 Settlement constrains discretion by defining an objective baseline—exactly what *Hyde Park* requires for an entitlement. The Farley report specifies hardware, software versioning, and gameplay parameters.

63.    Plaintiffs suffered damages including loss of use of funds, continued equipment retention, lost venue revenues, compliance and legal costs, and business interruption. They seek compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities, punitive damages where permitted, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

40

COUNT III
Due Process (Vagueness)
(As Applied to the Farley-Defined Configuration; Limited Facial Relief)

64.    Plaintiffs incorporate the preceding paragraphs.

65.    The Due Process Clause forbids laws that fail to give fair notice of what is prohibited and that encourage arbitrary and discriminatory enforcement. Laws vesting unfettered discretion in officers without minimal guidelines are unconstitutional. When government restraints touch speech or ordinary commercial communication, clarity requirements are heightened because uncertainty chills lawful activity.

66.    As applied to the Farley-defined baseline, defendants' scheme and the enforcement measures lack administrable standards. In May 2024, Division leadership circulated "Clarification of Definitions of Gambling Devices," seeking guidance on the core terms it had been invoking. One week later, the Division's Chief acknowledged that staff "are not considered experts and [could not] testify that a device is a slot machine." These contemporaneous admissions establish an absence of objective criteria and a high risk of arbitrary application and the accompanying high risks of rights deprivation.

67.    Pueblo's licensing stance confirms this vagueness problem. After cease-and-desist letters labeled plaintiffs' games illegal, the City denied or withheld approvals with the categorical notation "No approval until removal of skilled games" and withheld already-paid device-license stickers. The City articulated no neutral standards distinguishing lawful skill contests from prohibited devices, inviting discretion unmoored to published criteria.

68.    Mesa County's permitting process added a non-adjudicatory loop underscoring the vagueness problem. When the County asked the Division to render a legality determination,

41

the Division declined and directed plaintiffs to petition a Commission. The County then adopted the Commission petition as a permitting condition while admitting it lacked expertise to distinguish permissible devices from prohibited ones. On January 16, 2025, the Commission unanimously declined a similar petition, stating it "was not the correct body to address" the issue and that a declaratory order would not resolve uncertainty. An enforcement regime that directs operators to a forum which expressly disclaims authority exemplifies a process lacking objective standards and creates unconstitutional uncertainty.

69. The Division's foundational cease-and-desist letter itself reflected the lack of administrable standards. The May 4, 2023, directive ordered recipients to cease "all unlicensed gaming and/or sports betting at once," threatening Commission, criminal, and civil enforcement and steering to licensure, before any neutral yardstick for distinguishing lawful skill contests from prohibited devices had been promulgated. In late 2023, while the fully executed settlement was circulating internally, Division leadership issued an internal "do not send" instruction for plaintiffs, underscoring that outcomes turned on government discretion, not published criteria.

70. The statutory and municipal terms as implemented — "gambling device," "simulated gambling device," and related enforcement triggers — fail to give fair notice as applied to the Farley-defined baseline and invited arbitrary, ad hoc enforcement by Division, Pueblo, and Grand Junction officials.

71. Defendants Hartman, Gregg, Schroder, and Phibbs are liable because they initiated, directed, and maintained the standardless enforcement posture producing these vagueness injuries. Hartman issued the shutdown directive. Gregg escalated to the Attorney General and later insisted on the Commission petition process while acknowledging staff lacked

expertise. Schroder exercised policy control over the letter program. Phibbs continued directing enforcement while leadership sought definitional clarification. Their actions form the affirmative link to the deprivation.

72.    Plaintiffs seek a declaration that, as applied to the Farley-defined baseline and the documented record, defendants use of these provisions and practices is unconstitutionally vague, with limited facial relief to prevent continued chilling through standardless restraints; compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities; punitive damages where permitted; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT IV

### First Amendment
### (Programmatic Prior Restraints and Informal Censorship of Truthful, Non-Misleading Commercial Speech)

73.    Plaintiffs incorporate the preceding paragraphs.

74.    The First Amendment forbids prior restraints and informal censorship regimes that suppress speech without procedural safeguards. Any system of prior restraint requires procedural safeguards, including prompt judicial review with the burden on the government to justify continued restraint. The First Amendment also protects truthful, non-misleading commercial speech from restrictions that fail the *Central Hudson* test: the restriction must directly and materially advance a substantial governmental interest and must be narrowly tailored to serve that interest. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Content-based and speaker-based burdens on commercial speech warrant heightened

scrutiny. Licensing schemes vesting unbridled discretion in officials operate as prior restraints and chill protected speech. Prior restraints are presumptively invalid.

75.    Defendants cannot invoke *Central Hudson*, 447 U.S. at 566, to claim plaintiffs' speech concerns unlawful activity and is therefore unprotected. This defense fails for three reasons: (a) The legality of plaintiffs' operations is the very question in dispute. The government cannot first declare an activity illegal through enforcement posture, then invoke that declaration to strip the speaker of First Amendment protection. (b) The Division acknowledged it lacks expertise to determine legality. Chief of Investigations Gregg stated that staff are not considered experts and could not testify that a device is a slot machine. The Commission disclaimed jurisdiction. (c) The 2021 Settlement Agreement establishes that a Colorado district attorney—after expert analysis—determined the Farley-defined configuration does not violate C.R.S. 18-10.5-103. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 196 (2024), expressly rejected this defense: the contention that the NRA and the insurers violated New York law does not excuse the defendant from allegedly employing coercive threats to stifle advocacy.

76.    The Division instituted a pre-adjudicatory shutdown regime on May 4, 2023, demanding immediate cessation, threatening Commission, criminal, and civil enforcement, and steering recipients to licensure, all without neutral standards or prompt government-initiated judicial review. Plaintiffs' counsel promptly supplied the Farley analysis and settlement. Eight days later, the Division escalated the matter to the Attorney General for coordinated enforcement. These actions restrained plaintiffs' truthful, non-misleading speech soliciting lawful contests and business partners before any neutral adjudication and without the required safeguards.

44

77. ~~Grand Junction's moratorium operates as an unconstitutional prior restraint facially invalid under~~ *Lakewood*~~, 486 U.S. at 757 59. Grand Junction Ordinance No. 5199, Section 4, provides: "No application(s) pertaining to sales and use tax, amendment(s) to the official zoning development map, site development, liquor license, sign permit, building permit, any development permit, or renewal or transfer of any of the aforementioned shall be accepted for review by the City for the moratorium period as defined herein." This categorical refusal to accept applications represents the ultimate form of unbridled discretion: standardless suppression with no possibility of individualized review. Under~~ *Lakewood*~~, a facial challenge lies without first submitting to the licensing process when a law vests unbridled discretion in a government official. 486 U.S. at 755 56. The City Attorney's written statement that relocation in the City is not an option given City ordinances confirms the restraint is categorical. The moratorium fails every procedural safeguard required by~~ *Freedman v. Maryland*~~, 380 U.S. 51, 58 59 (1965): no time limits for decision, no preservation of status quo pending review, no avenue for prompt judicial review, and no burden on government to justify continued restraint. The Division and related state officials engaged in informal censorship by coercing third parties to cut ties with plaintiffs. The Supreme Court unanimously reaffirmed the informal-censorship prohibition in~~ *Vullo*~~, 602 U.S. at 189, holding that officials violate the First Amendment when they use regulatory authority to coerce third parties into severing relationships with disfavored speakers. The Division's communications to VFW leadership, fraternal organizations, and landlords fit this framework. The prior restraint extended through licensing and third-party channels. In October 2023, the Department of State delivered an Observation Report about "illegal gaming devices" at fraternal posts to Department of Revenue officials, triggering internal follow-ups. In October~~

45

2024, Department policy staff circulated training communications concerning "Gambling in the canteen," projecting coordinated messaging to fraternal organizations. In January 2025, VFW state leadership relayed state enforcement assertions and pressed for removal of plaintiffs' devices. Officials also pressed landlords. On November 20, 2023, Senior Director Phibbs offered to help a shopping-center owner develop "language specific to gambling" for leases while Division leadership possessed the fully executed settlement. These communications operated like informal censorship by pressuring intermediaries, hosts and landlords, to cut off plaintiffs' speech and business relationships.

78.     Pueblo's categorical "No approval until removal of skilled games" and withholding of already-paid device-license stickers amplified the restraint on plaintiffs' marketing and contracting with hosts. The City's stance chilled speech by signaling that ordinary promotional and business communications about plaintiffs' games would trigger denial of municipal approvals, without content-neutral, published standards or prompt review, which is an unbridled-discretion problem.

79.     The restraints fail *Central Hudson*. Plaintiffs' speech truthfully promotes lawful, non-misleading skill contests verified by the Farley analysis and anchored by the 2021 settlement baseline. The government's interest in preventing illegal gambling is substantial, but the Division's own record admits unresolved definitions and lack of staff expertise, and the municipalities relied on standardless directives and third-party pressure rather than tailored, objective criteria. A shutdown letter commanding immediate cessation, licensing denials conditioned on removal of plaintiffs' devices, and informal threats to hosts and landlords do not directly and materially advance the asserted interest and are more extensive than necessary

46

because they lack neutral, administrable standards, fail to allow prompt neutral review, and sweep in truthful speech about lawful contests.

80. Defendants Hartman, Gregg, Schroder, and Phibbs caused these First Amendment violations through their personal direction of the enforcement regime. Hartman initiated the shutdown directive. Gregg escalated to the Attorney General and later directed Mesa County and plaintiffs toward a petition to a Commission that would not decide the issue. Schroder exercised policy control over the program while circulating the executed settlement internally. Phibbs reinforced the program through landlord-facing communications and coordinated training. Their actions set in motion and maintained a regime of prior restraints and informal censorship that predictably suppressed plaintiffs' speech.

81. The governing First Amendment principles were clearly established before the conduct alleged. *Lakewood*, 486 U.S. at 757–59, held that licensing schemes vesting unbridled discretion operate as unconstitutional prior restraints, and facial challenges may proceed without applying for a permit. *Freedman*, 380 U.S. at 58–59, established that prior restraint systems must include time limits, preservation of status quo, and prompt judicial review. Grand Junction's moratorium, mandating that no applications shall be accepted, satisfies none of these requirements. The informal-censorship prohibition is equally established under *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963), reaffirmed unanimously in *Vullo*, 602 U.S. at 189. No reasonable official could believe that refusing all permit applications or pressuring hosts and landlords to terminate relationships with plaintiffs comported with the First Amendment.

82. The First Amendment rights at issue were clearly established before defendants' conduct. *Bantam Books*, 372 U.S. at 67, established over sixty years ago that government

47

officials may not achieve censorship through informal sanctions and pressure on intermediaries. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235–37 (7th Cir. 2015), applied this principle to government pressure on financial intermediaries. *Vullo* unanimously reaffirmed these principles.

83. Plaintiffs suffered damages including lost placements and revenue, reputational harm, and increased compliance and legal costs from chilled communications with hosts, customers, and landlords. They seek compensatory damages against Hartman, Gregg, Schroder, and Phibbs in their individual capacities, punitive damages where permitted, and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT V

### Municipal Liability — Pueblo
### (Prior Restraints and Due Process Violations Through Coordinated Enforcement)

84. Plaintiffs incorporate the preceding paragraphs.

85. A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy or custom, a final-policymaker decision, or deliberate indifference to a known risk, and that policy is the direct cause of the injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978). A single decision by a final policymaker regarding an official matter may constitute municipal policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–83 (1986). Where a municipality fails to train officials in constitutional obligations and the failure is deliberately indifferent to a highly predictable consequence, liability attaches. The policy must be the moving force behind the injury.

86. Pueblo's course of conduct from August 2023 through April 2025 constitutes an official policy of enforcement directed at plaintiffs' operations. The City's cease-and-desist

letters, licensing denials, ordinance adoption, and subsequent raid form a continuous enforcement campaign with purpose of suppressing and eliminating plaintiffs' devices.

87. Pueblo's conduct was not isolated or attributable solely to individual employees. The City Council enacted Ordinance No. 10703 as formal legislative policy. Under *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404–05 (1997), when a municipality's legislative body has intentionally deprived a plaintiff of a federally protected right, fault and causation are established simultaneously. Pueblo's ordinance was the moving force behind the constitutional violations.

17.49. On May 14, 2024, Pueblo's City Council adopted Ordinance No. 10703, creating Article IX of Chapter 1 of Title XI of the Pueblo Municipal Code. The ordinance added Sections 11-1-901 through 11-1-904, defining gambling devices and providing criminal penalties. The City Council's Background Paper stated: "Despite state law prohibiting the offering of such simulated gambling devices, and through independent investigation, the Pueblo Police Department has determined such devices are in use within the City of Pueblo." The Background Paper further stated that the ordinance's purpose was "to give municipal enforcement authority to the Pueblo Police Department and jurisdiction to the Pueblo Municipal Court." This ordinance constituted a formal legislative policy enacted by the City's final policymakerThe Mayor signed the ordinance on May 17, 2024.

50. Separate from On May 24, 2024, Plaintiffs filed their own action in the ordinance,District Court for Pueblo establishedCounty, Colorado, Case No.

49

2024CV30253, seeking a state-court determination that Patriot's machines comply with the law. Plaintiffs initiated that action; Pueblo did not initiate it and applied a did not compel Plaintiffs to participate in it. That state action remains pending. The relief Plaintiffs seek in this Complaint does not depend on the outcome of that action.

51. On April 5, 2025, Pueblo police conducted a search at Steel City Eagles and charged individuals other than Plaintiffs under the municipal code for electronic gambling, carrying out the enforcement authority the City Council enacted Ordinance No. 10703 to create. Before this civil action began, Pueblo had not charged any Plaintiff under the ordinance.

52. Pueblo's withholding of Patriot's already-paid device-license stickers and its enforcement of its ordinance and licensing policy destroyed Patriot's revenue-share contracts with its Pueblo host venues. Patriot operates on a revenue-share model under which it places and services its machines at host venues and shares the resulting revenue. Pueblo's cease-and-desist letters, its categorical licensing-denial custom. On November 3, 2023, Sales Tax Division official Valerie Palumbo denied Steel City's liquor-license application with the notation "No approval until removal of skilled games" condition, and its April 5, 2025, enforcement action directly deprived Patriot of the licenses it had paid for and of the revenue from its own contracts.

53. When Pueblo police searched Steel City Eagles on April 5, 2025, they seized Plaintiff Franzoy's machines and the money those machines held. Pueblo treated

the machines and their contents as the host club's property, but Pueblo knew the machines and the revenue in them belonged to Plaintiff Franzoy. Mr. ." PalumboFranzoy, as the owner of that property, estimates it is worth approximately $60,000. Before this civil action commenced, Pueblo had filed no charge against Mr. Franzoy in connection with that property, gave him no notice of any process by which he might recover it, and had not returned it. This seized property is separate from the $118,762.11 in currency and silver bars that Colorado Springs seized and later returned, and separate from the equipment, valued by its owner at more than $150,000, that Colorado Springs continues to hold.

54. Pueblo enacted and enforced its ordinance with notice that a prosecutor had declined to pursue charges and without any neutral standard of its own. Before the City adopted the ordinance, the Pueblo Chief of Police told the City Council that the City needed the ordinance so that it could prosecute these operations, because the Pueblo District Attorney was not pursuing charges. Pueblo had also issued a cease-and-desist to a host organization after being given the forensic report and a settlement reflecting non-prosecution. The reasonable inference is that Pueblo adopted and enforced its ordinance to reach conduct a prosecutor had declined to charge and did so without any neutral way to tell a lawful contest from a prohibited device.

## COUNT 3

### *Fourth Amendment Unreasonable Seizure, First Amendment Prior Restraint, and*

51

### *Fourteenth Amendment Due Process (42 U.S.C. § 1983, Monell Liability)*

### Against Defendant City of Pueblo

55. Plaintiffs incorporate paragraphs 12 through 15 and 45 through 54.

56. Plaintiff Patriot suffered a direct, concrete injury caused by Pueblo's own conduct. Patriot paid Pueblo for device-license stickers, Pueblo accepted the payment, and Pueblo withheld the stickers under the condition "No approval until removal of skilled games." Pueblo's cease-and-desist letters, licensing condition, ordinance, and April 5, 2025, enforcement action destroyed Patriot's own revenue-share contracts with its Pueblo host venues. These are Patriot's own injuries, the withheld property Patriot paid for and the contracts Pueblo's enforcement destroyed. They are not derivative injuries of any other party. Plaintiff Franzoy suffered a separate direct injury caused by Pueblo's own conduct. In connection with Pueblo's enforcement against Plaintiffs' machines, the City of Pueblo, acting through the Pueblo Police Department, seized money and equipment belonging to Mr. Franzoy that he, as its owner, estimates is worth approximately $60,000, and Pueblo retained that property with no charge filed against him, no notice, and no process by which he can recover it. That seized property is separate from the property at issue in Counts 1 and 2, which Colorado Springs seized. This too is Plaintiff Franzoy's own injury, not a derivative injury of any other party. Plaintiffs' standing to pursue this Count against Pueblo does not depend on that seizure. Independent of it, Patriot's withheld paid-for device-license stickers and Patriot's lost revenue from its own

52

Pueblo contracts are direct injuries caused by Pueblo's own licensing condition and ordinance, and each independently establishes Plaintiffs' standing against Pueblo.

18.57. Patriot's injuries are cognizable and redressable. When the government regulates a business, the regulation may cause downstream economic injuries to others in the chain of commerce, including that business's suppliers, customers, and contracting partners, and those downstream injuries can establish injury in fact. Patriot's loss of the license fees it paid Pueblo and of the revenue from its own Pueblo host contracts is precisely that kind of downstream economic harm. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. device license stickers that plaintiffs had paid for. This 367, 384 (2024). Patriot's injuries are redressable by relief directed at Pueblo's own enforcement authority. *Sanchez v. Torrez*, 173 F.4th 1202, 1216–17 (10th Cir. 2026). An order enjoining Pueblo from withholding Patriot's paid-for licenses and from enforcing its ordinance and licensing condition against Plaintiffs' operation of the Farley-defined configuration absent neutral, published criteria would redress Patriot's injury through Pueblo's own conduct. Returning the license fees Pueblo accepted, delivering the stickers Patriot paid for, and halting Pueblo's own enforcement redress Patriot's injuries without reference to any third party's choice. To the extent any part of Patriot's lost contract revenue turns on how Pueblo's host venues respond, the requested relief redresses it because those host venues will predictably react in commonsense ways: Pueblo's cease-and-desist letters, its categorical licensing

53

condition, and its April 5, 2025, enforcement action are what caused the host venues to remove Plaintiffs' machines, and lifting that municipal coercion will predictably restore the hosting on which Patriot's revenue depends. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114–22 (2025). A plaintiff need only show a predictable chain of events likely to follow from the relief, drawing on commonsense economic realities, and need not prove that the injury will be redressed completely. *Diamond Alternative Energy*, 606 U.S. at 117–22; *see Alliance for Hippocratic Med.*, 602 U.S. at ~~policy provided no neutral criteria, no written standards, and no avenue for review~~385 (a plaintiff must show a "predictable chain of events"). Plaintiff Franzoy's seizure injury is likewise redressable by an order requiring Pueblo to return the money and equipment it seized, relief that operates entirely through Pueblo's own conduct and does not depend on any third party. That other entities may share enforcement authority does not defeat redressability where Pueblo has its own special authority to withhold Patriot's licenses and to enforce its ordinance. *Sanchez*, 173 F.4th at 1217.

~~88.~~ A municipality is liable under 42 U.S.C. § 1983 when its official policy or the decision of its final policymaker is the moving force behind a constitutional violation. *Monell*, 436 U.S. at 690–94. A legislative body's enactment of an ordinance that deprives a plaintiff of a federally protected right establishes municipal policy and causation. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404–05 (1997~~Under Colorado law, Pueblo's~~). The Pueblo City Council ~~is,~~ the City's final policymaker for ~~legislative acts including municipal~~ ordinances~~.~~

54

*See*, enacted Ordinance No. 10703 for the ~~*Pembaur*, 475 U.S. at~~ 483. ~~The City Council's Background Paper~~ stated ~~the ordinance's~~ purpose ~~was "to give municipal~~of authorizing enforcement ~~authority to the Pueblo Police Department and jurisdiction to the Pueblo Municipal Court." The ordinance and Background Paper, adopted by the Council through its legislative vote, confirm that the City sought to prosecute~~against operations like ~~plaintiffs' through municipal court.~~

~~19.~~58.   ~~On August 30 and September 20, 2023, Pueblo police issued cease-and-desist letters to fraternal hosts identifying plaintiffs' games as illegal and threatening criminal charges. In November 2023, a City official denied Steel City's liquor-license application with the notation~~ Plaintiffs', and Pueblo officials applied the categorical "No approval until removal of skilled games" ~~and withheld already-paid device-license stickers from Patriot. These administrative actions established the City's enforcement posture and immediately chilled host operations~~licensing condition as City policy.

~~89.    On May 14, 2024, Pueblo's City Council adopted gambling-related ordinances. The Background Paper accompanying the ordinance stated its purpose was to give municipal enforcement authority to the Pueblo Police Department and jurisdiction to the Pueblo Municipal Court. This Council decision represented a final-policymaker act explicitly targeting the operations plaintiffs conducted.~~

~~90.    On April 5, 2025, Pueblo police executed the ordinance-based policy through a search at Steel City Eagles and arrested individuals under the municipal code for electronic~~

gambling. This raid executed the enforcement policy that City Council adopted for the stated purpose of prosecuting plaintiffs' operations.

91.    Pueblo's ordinance-based policy and categorical licensing custom were the direct and proximate cause of plaintiffs' injuries. The cease-and-desist letters caused fraternal organizations to cease operations immediately. The "No approval until removal" notation blocked Steel City's liquor license and withheld device-license stickers. The April 5, 2025, raid resulted in criminal charges under the ordinance the City enacted specifically to prosecute plaintiffs. These harms flowed directly from the enforcement policy the City Council adopted. The policy was the "moving force" behind each constitutional violation alleged. *Bryan Cnty.*, 520 U.S. at 404.

92.    Pueblo's ordinance-based enforcement campaign, documented through cease-and-desist letters, categorical licensing denials, formal ordinance adoption with stated intent to prosecute plaintiffs' operations, and the April 5 raid, constitutes a final-policymaker decision and official custom that operated as prior restraints on commercial speech, imposed licensing denials without neutral criteria or timely review, and effected searches without constitutional safeguards. This policy caused each alleged constitutional violation.

59. Pueblo's policy operated as a prior restraint and a denial of due process. The categorical licensing condition and the ordinance restrained Plaintiffs' commercial activity and associated expression without neutral, published criteria and without any prompt, neutral process, and Pueblo deprived Patriot of its paid-for licenses and its contractual revenue without a hearing. Pueblo also seized money and equipment belonging to Plaintiff Franzoy and retained it with no charge, no

56

notice, and no process by which Mr. Franzoy can recover it, which was an unreasonable seizure of property under the Fourth Amendment and a deprivation of property without due process under the Fourteenth Amendment, redressable by Pueblo's return of the property. Pueblo's policy was the moving force behind those injuries.

60. Plaintiffs suffered concrete damages, including the value of the withheld device-license stickers Patriot paid for, lost revenue-share income from Patriot's own Pueblo contracts, lost host revenues and placements from the cease, compliance and legal costs, and desist letters, withheld licensing the value of the money and fees in November 2023, and direct harmequipment the Pueblo Police Department seized from the search and charges in April 2025. Plaintiff Franzoy.

20. 61. Plaintiffs seek compensatory damages, declaratory and relief, prospective injunctive relief barring Pueblo from enforcing these ordinancescontinuing to withhold Patriot's paid-for licenses and policies againstfrom subjecting Plaintiffs' operation of the Farley-defined baselineconfiguration to future enforcement under Ordinance No. 10703 and its licensing condition absent neutral, published standardscriteria and prompt, neutral procedures; compensatory damages;, an order requiring Pueblo to return the money and equipment it seized from Plaintiff Franzoy or, at a minimum, to provide a prompt and neutral process in which Mr. Franzoy can test the lawfulness of its continued retention, and reasonable attorney fees and costs under 42 U.S.C. § 1988, against the City of Pueblo. Plaintiffs do not seek to enjoin any pending state proceeding or any pending

prosecution of any person not a party to this action.

## ~~COUNT VI~~

~~**Municipal Liability – Colorado Springs**~~
~~**(Property-Handling Practices Causing Fourth and Fourteenth Amendment Violations)**~~

~~93.    Plaintiffs incorporate the preceding paragraphs.~~

~~94.    A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy or custom, a final-policymaker decision, or deliberate indifference to an obvious need, and that policy directly causes the injury. Municipal liability for failure to train attaches when the need for training was obvious and the failure was deliberately indifferent to a highly predictable consequence. *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989). The policy must be the moving force behind the constitutional violation.~~

~~95.    Colorado Springs maintained a custom of prolonged property retention and inadequate post-seizure procedures without written protocols ensuring timely return or compliance with judicial deadlines. The City's evidence unit: (1) retained $118,762.11 in currency and silver bars for over twenty-three months following the May 11, 2023 seizure; (2) failed to comply with the court's February 6, 2025, order directing return by March 13, 2025; (3) serially postponed the release date from April 11 to April 16 to April 18 before finally releasing property on April 21, 2025—more than a month after the court-ordered deadline; and (4) complied only after serial postponements and court intervention, evidencing that internal procedures were inadequate to ensure lawful conduct. This pattern of post-order delay and serial postponement, combined with the absence of any codified schedule or prompt-return procedure, constitutes a custom "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Under Colorado Springs' municipal structure, the~~

58

Chief of Police is the final policymaker for property-retention and evidence-handling procedures. Colorado Springs Municipal Code § 8.1.104 provides that the Chief of Police "shall be responsible for the discipline, good order and proper conduct of the Department . . . and for the care and condition of the buildings, equipment, apparatus and all other property of the Department." The evidence unit's conduct, including its retaining property beyond judicial deadlines without lawful justification, reflects either a final-policymaker decision to maintain inadequate procedures or a custom of such longstanding duration that policymakers must have known of and acquiesced in it. On this filing's date, the police retained equipment valued at more than $150,000.

96. Alternatively, Colorado Springs maintained a custom of prolonged property retention. The City acknowledged in July 2023 that community members faced challenges recovering seized property, yet failed to implement corrective measures. This pattern of deliberate indifference to constitutional rights, under *Canton*, 489 U.S. at 388–92, establishes municipal liability.

97. Colorado Springs acted with deliberate indifference to the obvious need to train and supervise evidence-unit personnel on: (1) prompt post-seizure return procedures; (2) compliance with court-ordered deadlines; and (3) the binding nature of judicial directives. Given the predictable recurrence of seizures in municipal law-enforcement operations, the need for adequate post-deprivation procedures was obvious. *Canton*, 489 U.S. at 390 (failure to train where need is "so obvious"). In July 2023, CSPD opened a new Property Return Office specifically to address documented problems, with Evidence Unit personnel acknowledging that community members previously "faced challenges" recovering property—demonstrating actual

knowledge of constitutionally inadequate procedures. The City's failure to train created a foreseeable consequence: prolonged retention, missed deadlines, and constitutional violations. The need for court-issued delay-prevention orders evidences the inadequacy of the City's procedures as an operative matter of municipal practice.

The City's property-handling policy and failure to train directly caused plaintiffs' injuries: loss of use of capital for twenty-three months, business interruption, legal costs incurred to secure return, and continuing equipment retention. Plaintiffs seek declaratory and injunctive relief requiring the City to implement constitutionally adequate post-seizure procedures, including timely notice, prompt neutral hearings with the burden on the City to justify retention, written protocols ensuring compliance with court-ordered release dates, and a single accountable point of contact for property claimants; compensatory damages; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## COUNT VII

### Municipal Liability—Grand Junction
### (Ordinance-Based Relocation Prohibition and Coordinated Targeting)

98.    Plaintiffs incorporate the preceding paragraphs.

99.    A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy or custom, a final-policymaker decision, or deliberate indifference, and that policy directly causes the injury. A single authoritative statement by a final policymaker regarding an official matter establishes municipal policy. Municipal liability requires the policy to be the moving force behind the constitutional injury.

60

100.    On February 21, 2024, Grand Junction's City Council adopted Ordinance No. 5199, extending a moratorium on "the establishment of any new or relocation of any existing Gaming Arcade(s)." The ordinance provides that "No application(s) pertaining to sales and use tax, amendment(s) to the official zoning map, site development, liquor license, sign permit, building permit, any development permit, or renewal or transfer of any of the aforementioned shall be accepted for review by the City for the moratorium period." This ordinance continued a moratorium originally imposed effective March 5, 2023. The City Council is the final policymaker for municipal ordinances. *Monell*, 436 U.S. at 694. Grand Junction's Zoning and Development Code independently restricts plaintiffs' operations by classifying Gaming Arcades under regulations applicable to "Adult Entertainment" establishments. This classification imposes 1,000-foot buffer requirements from schools, parks, churches, and residential zones—effectively foreclosing most potential relocation sites independent of the moratorium. This ordinance was the City's official policy directed at curtailing operations like plaintiffs'. On February 27, 2025, the Grand Junction City Attorney issued a final statement of municipal policy to Mr. Franzoy: "relocation in the City is not an option given City ordinances." This categorical foreclosure, issued by a final policymaker or policy enforcer regarding an official matter, applied the ordinance-based policy specifically to plaintiffs and demonstrated that the City intended to prevent plaintiffs' relocation regardless of objective land-use suitability or compliance with the Farley-defined baseline.

101.    While the adoption of Ordinance No. 5199 may constitute legislative action under *Onyx Properties LLC v. Board of County Commissioners*, 838 F.3d 1039, 1045–47 (10th Cir. 2016), the City Attorney's categorical application of that ordinance to plaintiffs constitutes

61

administrative—not legislative—action. City Attorney John P. Shaver's February 27, 2025 statement that relocation in the City is not an option given City ordinances and moving won't be a topic for discussion was an individualized determination targeting plaintiffs specifically. Under *Onyx Properties*, when action has a limited focus (only a few people or properties are affected) and is based on grounds that are individually assessed, it may be more adjudicative than legislative. 838 F.3d at 1046. The City's application of the moratorium to foreclose plaintiffs' specific relocation request—while possessing and requesting review of plaintiffs' DA settlement—constitutes executive action to which due process protections attach.

102.    The record documents coordination between state and municipal officials targeting plaintiffs. On November 20, 2023, a shopping-center owner's counsel wrote to Grand Junction police commanders regarding plaintiffs' operations and copied Senior Director Michael Phibbs. Phibbs offered to help develop "language specific to gambling" for lease provisions, and Director Schroder forwarded the thread to the Chief of Investigations with the 2021 settlement attached. Division leadership circulated lists of "suspected gaming locations" to municipal law-enforcement partners while possessing knowledge of the 2021 settlement. In November 2023, state and City officials exchanged communications regarding plaintiffs' operations and enforcement strategies. This coordination, coupled with the ordinance-based relocation prohibition, demonstrates a policy aimed at suppressing plaintiffs' operations through municipal land-use restrictions.

103.    Grand Junction's ordinance and the City Attorney's authoritative statement operated as prior restraints. The categorical "no relocation" policy chilled plaintiffs' truthful commercial speech about lawful skill contests by foreclosing ordinary business relocation and

62

expansion within the City. *Lakewood*, 486 U.S. at 757–59. The ordinance-based policy also denied due process by providing no neutral criteria, no administrable standards, and no prompt review mechanism for determining whether plaintiffs' Farley-defined configuration complied with City law. *Mathews*, 424 U.S. at 334–35. The City foreclosed relocation without neutral standards or meaningful process, leaving plaintiffs with no lawful path within City limits. *Barry v. Barchi*, 443 U.S. 55, 64–66 (1979).

104.   Grand Junction's ordinance-based policy, the City Council's repeated extensions of the moratorium, and the City Attorney's categorical application of that policy to plaintiffs were the direct and proximate cause of plaintiffs' injuries: loss of relocation and expansion opportunities within City limits since March 2023; interference with landlord relations and lease negotiations; chilled communications with prospective hosts and business partners; and increased compliance and legal costs. The moratorium's prohibition on accepting any applications—combined with the City Attorney's confirmation that "relocation in the City is not an option"—establishes that the policy was the moving force behind each injury. *Bryan Cnty.*, 520 U.S. at 404.

105.   Grand Junction's ordinance-based policy and the City Attorney's final policymaker statement directly caused plaintiffs' injuries: by treating plaintiffs' business operations as if the City was certain the plaintiffs' operations violated the law even though the City proved it was not certain, the City unconstitutionally deprived plaintiffs of access to government services and expansion opportunities within City limits. As a result, plaintiffs incurred increased compliance costs and legal expenses to seek constitutional relief, leading to

63

the loss of earned financial capital in which they had a protected property interest. The financial harms were a direct consequence of the City's unconstitutional actions and deprivations.

106.   Plaintiffs seek declaratory and injunctive relief barring enforcement of the relocation prohibition against the Farley-defined configuration absent neutral, published siting standards and prompt, neutral procedures; prohibiting coordinated targeting with state actors without neutral criteria and evenhanded application; compensatory damages; and reasonable attorney fees and costs under 42 U.S.C. § 1988.

## SOVEREIGN IMMUNITY AND CAPACITIES

107.   The Eleventh Amendment bars damages actions against a State and its agencies in federal court, including suits for damages against state officials in their official capacities and suits seeking retroactive monetary relief from the state treasury.

108.   Prospective relief may be obtained against a state officer in his official capacity to halt an ongoing violation of federal law, provided the complaint alleges an ongoing violation and seeks prospective rather than retroactive relief. *Ex parte Young*, 209 U.S. 123, 159–60 (1908). Plaintiffs seek only prospective declaratory and injunctive relief against the Director of the Colorado Division of Gaming in his official capacity. No damages are sought against the State or any state official in an official capacity.

109.   Federal courts may not order state officials to comply with state law in an official-capacity posture. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). To the extent any claim could be construed to compel compliance with state statutes, rules, or ordinances as such, plaintiffs disclaim and do not pursue that relief against state officials in their official capacities.

110.   State officers sued in their individual capacities are "persons" under 42 U.S.C. § 1983 liable for damages for their own unconstitutional conduct. *Hafer v. Melo*, 502 U.S. 21, 25-31 (1991). The claims against Daniel J. Hartman, Kirsten Gregg, Christopher Schroder, and Michael Phibbs proceed in their individual capacities based on their personal participation and causal role in the violations alleged. Any immunity defenses are affirmative matters for those defendants to prove.

111.   Defendants cannot establish qualified immunity because the rights at issue were clearly established before the conduct alleged. Fourth Amendment seizure-duration principles have been settled since *Place*. Procedural due process requirements were established in *Mathews*. Prior restraint and informal censorship prohibitions were established in *Lakewood* and *Bantam Books* and unanimously reaffirmed in *Vullo*.

112.   Under the Tenth Circuit's sliding-scale approach, *Casey*, 509 F.3d at 1284, the more egregious the conduct, the less factually analogous prior precedent must be. Defying a court order for longer than a month, directing citizens to a forum that has already disclaimed jurisdiction, and coordinating pressure campaigns against third parties to chill lawful speech are so obviously unconstitutional that no reasonable official could claim lack of fair warning.

113.   The 2021 Settlement Agreement defeats any claim of good-faith reliance on statutory ambiguity. By November 2023, defendants possessed documentary evidence—a fully executed settlement between a Colorado district attorney and plaintiffs—establishing that the Farley-defined configuration was not illegal gambling. Defendants cannot claim reasonable reliance on uncertain statutory text when they possessed government-approved exculpatory

evidence and contemporaneously admitted they lacked expertise to distinguish lawful from unlawful devices.

114. Municipal defendants are "persons" under § 1983, not protected by the Eleventh Amendment, and are subject to declaratory, injunctive, and compensatory relief upon proof of municipal policy or final-policymaker acts as the moving force behind the injury. Punitive damages are unavailable against municipalities and are sought only against individual-capacity defendants. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259–71 (1981).

115. Attorney fees and costs are recoverable by prevailing parties under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

### DECLARATIONS

a) Plaintiffs request a declaration that, as applied to the Farley-defined configuration and on the facts alleged, defendants' enforcement actions—including cease-and-desist letters, licensing blocks, relocation prohibitions, searches, seizures, and property retentions—violate the First, Fourth, and Fourteenth Amendments to the United States Constitution.

b) Plaintiffs further request a declaration that Colorado's and its municipalities' statutory and ordinance provisions, as applied to plaintiffs and as implemented through the enforcement practices described in Counts I through VII, are unconstitutionally vague and operate as prior restraints on commercial speech.

### ~~INJUNCTIVE RELIEF AGAINST THE DIRECTOR OF THE COLORADO DIVISION OF GAMING (OFFICIAL CAPACITY)~~

~~a)      Plaintiffs request a prospective injunction under *Ex parte Young*, enjoining the Director from issuing cease-and-desist letters, shutdown directives, or equivalent communications directed at plaintiffs' operations without published, objective criteria and a prompt, neutral review process placing the burden on the government to justify any restraint. The order should include withdrawal of the May 4, 2023, shutdown communication as to plaintiffs and written notice to affected intermediaries that the Division will not demand stoppages or threaten enforcement absent these safeguards.~~

~~b)      Plaintiffs further request that the Director be enjoined from directing plaintiffs or local governments to condition operations or permitting on a petition to the Colorado Limited Gaming Control Commission, or from otherwise conditioning speech or operations on Commission action, where the Commission has already disclaimed jurisdiction and declined to adjudicate such legality questions.~~

~~c)      Plaintiffs also request that the Director be enjoined from informal censorship by pressuring third parties such as fraternal organizations, veteran commands, landlords, or trade associations to remove or refuse plaintiffs' devices through threat of enforcement or licensing consequences, unless the Division first promulgates neutral, published criteria and affords prompt, neutral review meeting constitutional standards. This includes an order barring use of training campaigns or one-off communications to induce removals that would chill plaintiffs' truthful, non-misleading commercial speech.~~

67

d)      Finally, plaintiffs request an order requiring the Director to publish objective enforcement criteria and a neutral review mechanism before initiating future pre-adjudicatory restraints against plaintiffs' configuration and to apply those criteria consistently in any communications with state or municipal partners affecting plaintiffs' operations.

**INJUNCTIVE RELIEF AGAINST THE CITY OF PUEBLO**

a)      Plaintiffs request a permanent injunction barring Pueblo from enforcing its gambling-related ordinances and licensing measures against plaintiffs absent neutral, published criteria and prompt review procedures placing the burden on the City to justify any restraint. The order should bar conditioning approvals on categorical notations such as "No approval until removal of skilled games" and from withholding already-paid device-license stickers without written, standard-based reasons and an avenue for timely review.

b)      Plaintiffs further request an order requiring the City to provide prompt, neutral post-seizure hearings for any future seizure or restraint of property, with the burden on the City and return by a date certain unless the City proves continued retention is lawful, together with clear written notice of procedures and points of contact to reclaim property.

c)      Plaintiffs also request that Pueblo be enjoined from informal censorship by pressuring fraternal organizations, veteran commands, landlords, or similar intermediaries to remove or refuse plaintiffs' contests through threats of enforcement or licensing consequences, unless the City applies neutral, published criteria and affords prompt, neutral review meeting constitutional standards.

d)      Finally, plaintiffs request that Pueblo be required to publish objective standards and timelines governing licensing and enforcement decisions; to issue written reasons keyed to

68

~~those standards for any denial or restraint; and to provide a prompt administrative appeal to a neutral decisionmaker, followed by prompt judicial review.~~

~~Injunctive Relief Against the~~WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

## A.  ON COUNT 1 (FOURTH AMENDMENT, CITY OF COLORADO SPRINGS

~~Plaintiffs request a permanent injunction barring Colorado Springs from maintaining property-handling and post-seizure practices that cause delayed notice or~~): enter a declaration that Colorado Springs' prolonged retention of ~~seized property and requiring~~ Plaintiffs' property violated the Fourth Amendment; award Plaintiffs compensatory damages; enter an injunction requiring Colorado Springs to adopt constitutionally adequate property-return procedures ~~ensuring timely~~and to promptly return ~~or a prompt, neutral determination of lawful retention. The record reflects a twenty-three-month restraint, repeated post-order delays, and the need for court-issued delay-prevention orders before final release~~the equipment it continues to hold; and award attorney fees and costs under 42 U.S.C. § 1988.

~~a)     The ~~B. On Count 2 (Fourteenth Amendment Procedural Due Process, City of Colorado Springs): enter a declaration that Colorado Springs deprived Plaintiffs of property without prompt, neutral post-deprivation process in violation of the Fourteenth Amendment; award Plaintiffs compensatory damages; enter an injunction ~~should require a~~requiring prompt,

neutral post-seizure ~~hearing whenever the City seeks to retain property beyond a short, defined interval, with the burden on the City to justify retention by a date certain. The City must provide clear written notice of~~ procedures and ~~a single accountable point of contact for property claimants.~~

~~The injunction should direct immediate~~the prompt return of the equipment ~~currently retained or, if the City asserts a lawful basis for retention, a prompt hearing under these standards~~still held; and award attorney fees and costs under 42 U.S.C. § 1988.

C.  On Count 3 (Fourth Amendment, First Amendment Prior Restraint, and Fourteenth Amendment Due Process, City of Pueblo): enter a declaration that Pueblo's ordinance and licensing policy, as applied to the Farley-defined configuration, violated the First and Fourteenth Amendments, and that Pueblo's seizure and continued retention of Plaintiff Franzoy's property violated the Fourth and Fourteenth Amendments; award Plaintiffs compensatory damages; enter a prospective injunction requiring Pueblo to deliver Patriot's paid-for licenses, to return the money and equipment it seized from Plaintiff Franzoy or, at a minimum, to provide a prompt and neutral process in which Mr. Franzoy can test the lawfulness of its continued retention, and to refrain from subjecting Plaintiffs' operation of the Farley-defined configuration to future enforcement under Ordinance No. 10703 and its licensing condition absent neutral, published criteria and prompt, neutral procedures, not directed at any pending state proceeding

70

or any pending prosecution of any non-party; and award attorney fees and costs under 42 U.S.C. § 1988.

b)    Finally, the injunction should require the City to adopt and publish written standard operating procedures ensuring compliance with court-ordered release dates, establishing internal deadlines for processing returns, designating a single accountable point of contact for claimants, and requiring written reasons keyed to lawful criteria for any continued retention.

**INJUNCTIVE RELIEF AGAINST THE CITY OF GRAND JUNCTION**

a)    Plaintiffs request a permanent injunction barring Grand Junction from enforcing any ordinance, moratorium, policy, or practice that categorically prohibits relocation or siting of plaintiffs' configuration within City limits absent neutral, published, objective siting standards and a prompt, neutral process placing the burden on the City to justify any restraint. The order should bar application of Ordinance No. 5199 and any successor or renewal that forecloses relocation without such standards and process.

b)    Plaintiffs further request an order requiring the City to process any relocation or siting request for plaintiffs under objective, administrable criteria with written reasons keyed to those criteria, firm decision deadlines, and prompt administrative appeal to a neutral decisionmaker followed by prompt judicial review. The order should preclude the City from conditioning relocation or permitting on non-adjudicatory steps and from relying on coordination channels or "suspected locations" lists as a substitute for published standards.

c)    Plaintiffs also request an order prohibiting the City from applying its ordinance-based restrictions in a manner that categorically denies relocation, as reflected in the City Attorney's February 27, 2025, written statement that "relocation in the City is not an option,"

71

unless and until the City adopts and applies neutral standards and affords prompt, neutral procedures.

d)    Finally, plaintiffs request such further prospective relief as is necessary to ensure evenhanded application of any valid, neutral standards to plaintiffs and similarly situated venues, and to prevent coordinated targeting that would chill lawful operations absent published criteria and timely process.

## DAMAGES

a)    Plaintiffs request compensatory damages against the Cities of Pueblo, Colorado Springs, and Grand Junction, and against defendants Hartman, Gregg, Schroder, and Phibbs in their individual capacities, to compensate for: loss of use of $118,762.11 during the over-twenty-three-month seizure and documented post-order delays; continuing equipment retention valued at more than $150,000; lost venue revenues and business opportunities resulting from municipal cease-and-desist letters, categorical licensing denials, enforcement ordinances, and raids; loss of relocation and expansion opportunities within Grand Junction; reputational and contractual harm from cross-agency coordination and third-party pressure; and incremental legal and compliance costs incurred to address these violations.

b)    Plaintiffs seek punitive damages against Hartman, Gregg, Schroder, and Phibbs where the evidence demonstrates conduct motivated by evil intent or involving reckless or callous indifference to federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages are not sought against municipal defendants.

## FEES, COSTS, AND INTEREST

Plaintiffs request:

a) ~~reasonable attorney fees and expenses under 42 U.S.C. § 1988;~~

b) ~~taxable costs under 28 U.S.C. § 1920; and~~

c) ~~pre-judgment and~~D.    On all Counts: award post-judgment interest ~~at the maximum rates permitted by law~~on any money judgment under 28 U.S.C. § 1961~~.~~

## ~~FURTHER RELIEF AND RETENTION OF JURISDICTION~~

~~Plaintiffs request~~, and prejudgment interest at the rate and on the terms permitted by applicable law; and grant such other and further legal and equitable relief as the Court deems just and proper ~~to effectuate the declarations and injunctions and to remedy the harms established. The Court should retain jurisdiction to enforce and modify its orders and to resolve disputes concerning compliance with the relief granted~~.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable~~, including all claims for legal relief and damages under 42 U.S.C. § 1983~~. Claims for declaratory and injunctive relief are to be decided by the Court. Fed. R. Civ. P. 38–39.

~~Respectfully submitted on 25 December 2025,~~

~~By:    s/ Edward C. Hopkins Jr.~~

~~Edward C. Hopkins Jr., Bar. No. 43298~~

~~Raymond K. Bryant, Bar No. 42586~~
~~Civil Rights Litigation Group, LLP~~

~~1543 Champa Street, Suite 400~~

~~Denver, CO 80202~~

73

Phone: (720) 515-6165
ed@rightslitigation.com

raymond@rightslitigation.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on 25 December 2025, I electronically filed the foregoing First Amended Complaint with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

Edward C. Hopkins Jr.

*s/ Edward C. Hopkins Jr.*

*s/ Edward C. Hopkins Jr.*
Edward C. Hopkins Jr., Bar No. 43298
Raymond K. Bryant, Bar No. 42586
Civil Rights Litigation Group, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(720) 515-6165
ed@rightslitigation.com
raymond@rightslitigation.com
Attorneys for Plaintiffs